UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE BANC OF CALIFORNIA SECURITIES LITIGATION | Court File No. 0:18-mc-00076-WMW-KMM |
| | **STEVEN A. SUGARMAN'S MEMORANDUM IN SUPPORT OF HIS MOTION TO COMPEL PRODUCTION** |

## I.    INTRODUCTION

Minnesota residents Castalian Partners and James Gibson[1] ("Respondents") have refused to produce documents in response to July 17, 2018 subpoenas (the "Subpoenas") from Defendant Steven Sugarman ("Movant" or "Mr. Sugarman") on an issue that the United States District Court for the Central District of California has identified as a relevant issue for summary judgment in the underlying case.  Mr. Sugarman respectfully requests that this Court issue an order requiring production.

Mr. Sugarman is currently a defendant in *In re Banc of California Securities Litigation*, No. SACV 17-00118 AG (DFMx) (C.D. Cal.) (the "Underlying Action"), a securities fraud class action alleging violations of §10(b) and §20(a) of the Securities Exchange Act of 1934.  The complaint was filed after a drop in the price of Banc of California ("Banc") stock following an October 18, 2016 blog post by an anonymous

_____

[1] According to SEC records, James Gibson is the Manager of the General Partner of Castalian Partners Value Fund, LP.  Ex. 1.

author pen-named "Aurelius" that argued Banc stock was "uninvestable" (the "Blog"). Trading data suggests the stock price drop was not caused by anything done by Mr. Sugarman, but instead by traders who manipulated the stock price based on information they knew to be false. Mr. Sugarman has strong evidence to suggest that Respondents were involved in efforts to drive the stock price downward based on false information, and make money when the stock rebounded after the public realized the Blog was false. Mr. Sugarman now seeks information regarding their trading, communications, and knowledge. Mr. Sugarman is entitled to information from Respondents that may support his defenses regarding materiality, class adjudication, and loss causation.

Through the course of discovery in the underlying matter, Mr. Sugarman has obtained FINRA trading data indicating that in the four days between October 14, 2016 and October 17, 2016—just shortly before the release of the Blog—a group of approximately 10 entities, including Respondents, amassed thousands of put options and entered into more than 175,000 short sale contracts on Banc stock. Collectively, the short sellers and option holders in Banc stock stood to gain more than $5 million if Banc's stock price decreased. These traders bought the position just days before the Blog was released, suggesting they knew the Blog would be released and perhaps were involved with it. The Blog disclosed that all of the information underlying the opinion came from information that was already publicly available.

Two internal investigations by reputable law firms have found that the facts do not support the main allegations in the Blog. Nonetheless, on October 18, 2016 the market reacted to the allegations in the Blog—sending Banc stock down $4.61 (from $15.87 at

2

the close of October 17, 2016 to $11.26 at the close of October 18, 2016), or 29 percent per share.  After the Blog was published, Respondents and other members of the seemingly coordinated group of short sellers and put option traders (the "Short-and-Distort Traders") immediately covered their short sales and exercised or sold the vast majority of their put options, thus capitalizing immediately on the stock price drop. Then, in a little over two hours after the Blog was published, certain of the Short-and-Distort Traders flipped their investment position completely by  REDACTED

        equity shares in Banc stock (twice as many as necessary to cover their short position).  This trading pattern suggests that the traders knew the Blog was false, and anticipated a temporary decline after the Blog's release followed by a subsequent price rebound when the market realized the Blog was false.

        The trading pattern exhibited here—opening a large short position shortly before the issuance of a negative report containing an unfounded and unsupported thesis so as to benefit from any stock price decrease resulting from the negative report, and then immediately investing in a long equity position to benefit from a subsequent stock price rebound—is discussed in academic literature and strongly suggests two key points for the underlying litigation:  (1) that a coordinated group of traders knew about the Blog prior to its release and (2) that the traders expected the Blog to have only a temporary effect on Banc's stock price because the Blog constituted a pseudo-signal as opposed to the release of new information of substance.  Mr. Sugarman is entitled to discover evidence that demonstrates and supports these points.

        Respondents objected to the Subpoenas on four grounds, but in subsequent meet

and confer discussions, have relied on only one argument against production—that the requested documents are not relevant to the Underlying Action.  The Respondents argument is belied by the court's holdings on these issues in the Underlying Action.  In response to a series of motions, the court has indicated that whether market participants were aware of the information in the Blog before its publication on October 18, 2016 is a key issue for summary judgment.  Information from Respondents on what they knew, when they knew it, and who else was aware of the information is therefore highly likely to lead to admissible evidence bearing on the issues in the case.  And despite explanations regarding the relevance of these documents in meet-and-confer calls with two separate counsel for Castalian Partners and James Gibson, Respondents have refused to produce a single page.  Mr. Sugarman therefore respectfully asks this Court to issue an order compelling Castalian Partners and James Gibson to produce documents in response to the Subpoenas.

## II.      THE UNDERLYING ACTION

Mr. Sugarman was the CEO of Banc from 2012 to 2017.  The plaintiffs in the Underlying Action allege that Mr. Sugarman's biography in Banc's April 2016 proxy statement is misleading because it does not disclose alleged "ties" with a convicted fraudster named Jason Galanis.  *See* Dkt. No. 41.[2]  They further allege that the truth regarding these ties was revealed to the market by the Blog on October 18, 2016, and that this revelation of truth caused Banc's stock price to decline—eliminating the inflation in

---

[2] All citations to the Docket refer to the Docket in *In re Banc of Cal. Sec. Litig.*, No. SACV 17-00118 AG (DFMx) (C.D. Cal. Jan. 23, 2017), unless otherwise indicated.

price attributable to the allegedly misleading statements in Mr. Sugarman's April 2016 biography.[3]

In motions to dismiss filed June 30, 2017 (Dkt. Nos. 42, 43), a motion to certify matters for interlocutory appeal filed October 5, 2017 (Dkt. No. 74), and an opposition to class certification filed February 12, 2018 (Dkt. Nos. 141, 142), defendants Mr. Sugarman and Banc argued that the October 18, 2016 Blog could not serve as a revelation of truth that caused material loss to Banc shareholders because all of the information in the Blog was already public and known to the market.  The court found that this argument was not an appropriate grounds to defeat the plaintiffs' claims at the pleading and class certification stages, holding that the plaintiffs adequately pleaded loss causation with respect to the October 18, 2016 Blog, and that plaintiffs were entitled to a fraud-on-the-market presumption of reliance because the market for Banc stock is efficient.  Dkt. Nos. 68, 236.

In rejecting the defendants' arguments, the court drew a distinction between information that was readily available to the market and information that was only discernible by poring over extensive legal and agency documents.  Dkt. No. 68 at 8, 15.  The court also found that the plaintiffs had sufficiently alleged that the information in the Blog was material new information by referencing a stock price drop.  *Id*.  The defendants would therefore need evidence to prove that market participants actually knew about the information prior to the Blog and that other influences impacted the stock price

---

[3] The Court found that plaintiffs failed to adequately allege a violation of securities laws with respect to the other challenged statements in the complaint.  Dkt. No. 68.

movement. *Id*. at 15.  Similarly, in the order granting class certification, the court held that the issue of market participant knowledge prior to the Blog "go[es] to issues of materiality and loss causation that are inappropriate to decide on a [class] certification motion." Dkt. No. 236 at 11-12.  The Court's rulings have thereby established that market knowledge regarding the information and allegations in the Blog are materiality and loss causation issues that should be presented at the summary judgment stage.

## III.    FACTUAL BACKGROUND

### A.    Put Option Trading and Short Sales in the Days Prior to the Blog's Publication Suggest that a Seemingly Coordinated Group of Entities, Including Respondents, Knew About the Blog Before October 18, 2016.

There was a significant and unusual build-up in put options and short sales[4] in Banc stock in October 2016.  Data from Bloomberg shows that in early October, put options traders were entering one or two hundred put options in Banc stock per day.  *See* Declaration of Torben Voetmann ("Voetmann Dec.") at 4-5.  This pattern drastically changed in the week immediately prior to the publication of the Blog on October 18, 2016.  During that week, the volume of put options trades increased to nearly 2,000 per day.  *Id.* at 5.  On October 17, 2016, the day before the Blog, the put-call trading volume

---

[4] Put options and short sales are different mechanisms by which individuals can trade upon the belief that a stock price is likely to drop.  A put option is a trade conducted on the options market that gives the owner the right, but not the obligation, to sell a specified amount of an underlying security (*e.g.*, shares in a stock) at a specified price within a specified time period.  In a short sale, an investor borrows shares of stock and immediately sells the borrowed shares at the prevailing market price, hoping that she or he can later purchase the underlying shares at a lower price and return them to the lender, thereby profiting the difference.  Short sales are conducted on the equity market. *See* Brealey, R. A., Myers, S. C., & Allen, F. (2011), *Principles of corporate finance*. 10th edition. New York, NY: McGraw-Hill/Irwin, p. 327 and p. 505.

ratio in Banc stock spiked, with trading volumes in put options reaching 300 times the volume of call options.  *Id.*

Given this abnormal trading activity before the Blog was released, Mr. Sugarman has developed evidence regarding the traders involved in this build-up of put options and short sales.  FINRA data for the end of the trading day on October 17, 2016 REDACTED

# REDACTED

Castalian Partners and Gibson also had impeccable timing.  Castalian Partners

REDACTED

.  Similarly, James Gibson REDACTED

Castalian Partners and Gibson          REDACTED

The unusual trading pattern in the options market was mirrored in the equity

market as the volume of short sales in Banc stock likewise spiked in the days prior to the

Blog's publication.          REDACTED

Through discovery, Mr.

Sugarman has identified this trader as the well-known short-selling entity, Muddy

Waters.  Muddy Waters          REDACTED

Muddy Waters          REDACTED

8

REDACTED

# REDACTED

**B.**   **When Banc's Stock Price Dropped in the Wake of the Blog, Short-and-Distort Traders Immediately Exited Their Positions and Purchased Shares of Banc's Stock in Order to Benefit from the Impending Stock Price Rebound.**

On October 18, 2016, an anonymous blogger with the pen name "Aurelius"

published the Blog entitled, "BANC: Extensive Ties to Notorious Fraudster Jason

Galanis Make Shares Un-Investible" and claiming that Banc was controlled by Jason

Galanis, an individual indicted for securities fraud.  Ex. 2.  Aurelius also claimed in the

article that all allegations were based on public information, and admitted to holding a

short position in Banc stock.  *Id.*  In the hours after the Blog was published, Banc's stock

price dropped by almost 30 percent.  This price decline is "[t]he most significant drop in

Banc share value that [the plaintiffs in the Underlying Action] complain of."  Dkt. No.

68, at 2.

    Also on October 18, 2016, immediately after the Blog was published and

Banc's stock price began to drop, both Castalian Partners and Gibson REDACTED


This well-timed behavior permitted them to maximize profit from the stock price

fall, before Banc's stock price rebounded after the close of the market on October

18, 2016 and over the ensuing days.          REDACTED




    Similarly, on October 18, 2016, in the 80 minutes following the publication of the

Blog, Muddy Waters                    REDACTED


                                                —a bet

that Banc's stock price would quickly rebound from the October 18, 2016 price drop.

# REDACTED

Late on October 18 and early on October 19, 2016, Banc issued a press release

denying the article's allegations and reported its 2016 Q3 financial results, respectively.

Exs. 3, 4.  By the time the market closed on October 19, 2018, Banc's stock had

recovered 45 percent of the previous day's decline.  Within a month and a half, the stock

price fully recovered.  On January 23, 2017, Banc announced that an internal

investigation conducted by WilmerHale LLP had found no violation of law on the part of

Banc.  Ex. 5.

## IV.   PROCEDURAL BACKGROUND

### A.   Respondents Declined to Produce Documents in Response to Mr. Sugarman's Subpoenas.

On July 17, 2018, Mr. Sugarman issued the Subpoenas to Castalian Partners and

James Gibson seeking documents detailing Respondents' trading in Banc stock and the

timing, scope, and communications regarding Respondents' knowledge of the

information in the Blog.  Exs. 7, 8.[5]  Both Subpoenas included ten common requests, with

one additional request in the subpoena to Castalian Partners.  The Subpoenas request the

following documents for the period of October 1, 2015 through April 30, 2017:

- All COMMUNICATIONS with BANC, or third parties representing BANC in connection with the COMMUNICATION;

- All DOCUMENTS that reflect YOUR TRANSACTIONS in BANC SECURITIES;

- All DOCUMENTS that refer, reflect or relate to the basis for YOUR

---

[5] The subpoenas are identical, with the exception of Request 11 in the subpoena to Castalian Partners, which is not included in the subpoena to James Gibson.  Mr. Sugarman has also issued subpoenas to other parties whose trading patterns suggest that they were aware of the allegedly "new" information in advance of October 18, 2016. Some parties have willingly complied, and Mr. Sugarman continues to issue additional subpoenas as more information comes to light regarding the coordinated bear raid on Banc stock.

decision to engage in any TRANSACTIONS in BANC SECURITIES

- All DOCUMENTS and COMMUNICATIONS that refer, reflect or relate to the BLOG or AURELIUS;

- All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and any third party regarding BANC, SUGARMAN, GALANIS, ALLEGED GALANIS ENTITY, the BLOG, or AURELIUS;

- All COMMUNICATIONS with and DOCUMENTS that refer, reflect or relate to GALANIS or any ALLEGED GALANIS ENTITY;

- All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and COR CLEARING or COR SECURITIES HOLDINGS regarding BANC or SUGARMAN; and

- All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and certain identified third parties relating to BANC or SUGARMAN;

- All CORRESPONDENCE with certain additional identified third parties.

Exs. 7, 8. The subpoena to Castalian Partners also requests documents regarding the investors in Castalian Partners. Ex. 7.

Since FINRA's trading data includes only those trades reported by FINRA members to FINRA's NYSE and NASDAQ Trade Reporting Facility—approximately 40%-50% of the total trades on Banc stock—Mr. Sugarman sought records to understand whether the FINRA trades represent the full picture of Respondents' interest in Banc's stock price decline. The remainder of the requests seek information regarding what Respondents knew when they entered into their well-timed trades, how they obtained the information, what other parties were aware of the information, and why Respondents made the trades at issue. Mr. Sugarman believes that documents responsive to these requests will lead to evidence regarding the scope of market trading surrounding the

13

October 18 Blog, the connections between the trading patterns and the Blog, and the reasons for the resulting stock price movement—all of which may support the defendants' arguments regarding class certification, materiality, and loss causation in the Underlying Action.

Counsel for Respondents responded to Mr. Sugarman's Subpoenas with objections on August 7, 2018.  The objections asserted four grounds for not producing documents in response to the subpoena: (1) that the subpoena served on James Gibson was improperly labeled as directed to James Gibson LLC, (2) that the subpoenas sought confidential and privileged information that is not relevant to the matter, (3) that the requests for all documents or all communications concerning various topics are unduly burdensome, and implicate the attorney-client privilege and attorney work product doctrine, and (4) the definition of Castalian Partners Value Fund and You were vague, ambiguous, overly broad, and unduly burdensome because they requested documents not in Respondents' possession, custody, or control.  Ex. 9.  Respondents also attached an appendix of fourteen boilerplate General Objections that do not appear to relate to the Subpoenas.  *Id.*

In a letter dated August 15, 2018, counsel for Mr. Sugarman replied by explaining that Respondents' trading patterns—which suggest Respondents had advance knowledge of the Blog—are directly relevant to elements of the plaintiffs' cause of action in the Underlying Action.  Ex. 10.  Counsel for Mr. Sugarman requested a conference to discuss Respondents' objections.  *Id.*  During the August 28, 2018 telephonic meet and confer, counsel for Mr. Sugarman described in detail the relevance of Respondents' trading patterns to the issues of materiality, class certification, and loss causation.  *See*

14

Declaration of Andrew R. Gray ("Gray Dec.") ¶ 3.  Despite what appeared to be a productive discussion, on August 31, 2018 Respondents' counsel sent an email claiming that the FINRA trading records obtained were "incorrect or fraudulent" and questioning the "integrity of [counsel to Mr. Sugarman's] information and conclusions."  Ex. 11.  In response, Mr. Sugarman's counsel provided the FINRA production, which evidenced the trades at issue and included the FINRA declaration of custodian records.  *See id.*; Ex. 6.

Respondents then engaged different counsel to respond to the Subpoenas.  Counsel to Mr. Sugarman again set up a conference, where Respondents again challenged the relevance of the requested documents.  Gray Dec. ¶ 4.  Mr. Sugarman again described in detail the relevance of Respondents' trading patterns to the issues of materiality, class certification, and loss causation.  *Id.*  Respondents did not raise any objections beyond relevance and promised to notify Mr. Sugarman if there was any change in their position with respect to production.  *Id.*

### B. Immediately After the Meet-and-Confer, Aurelius Altered Its Website to Restrict Access to the Blog and Other Reports on Banc.

In the week after the initial meet and confer conference with Respondents' counsel—during which Mr. Sugarman's theory of loss causation was set forth in detail—Aurelius altered its website to require visitors to affirmatively agree to terms of service in order to access Aurelius's report on Banc.  In part, the new terms of service state:

> **You should assume that as of the publication date of his reports and research, Aurelius and possibly any companies affiliated with him and their members, partners, employees, consultants, clients and/or investors (the "Aurelius Affiliates") have a short position in all stocks (and/or options, swaps, and other derivatives related to the stock) and bonds of companies covered in such reports and research.  They**

15

**therefore stand to realize significant gains in the event that the prices of either equity or debt securities of the subject companies decline.**  Aurelius and the Aurelius Affiliates intend to continue transactions in the securities of issuers covered on this site for an indefinite period after his first report on a subject company, and they may be long, short, or neutral at any time hereafter regardless of initial position and the views stated in Aurelius' research.  Aurelius will not update any report or information on this website to reflect such positions or changes in such positions.

Ex. 13.[6]  This language bears a striking similarity to the terms of service used by Muddy Waters.  Muddy Waters' website also requires visitors to affirmatively opt-in in order to access Muddy Waters' research reports, including the following language:

You should assume that, as of the publication date of a Muddy Waters report, Muddy Waters Related Persons (possibly along with or through its members, partners, affiliates, employees, and/or consultants), Muddy Waters Related Persons clients and/or investors and/or their clients and/or investors have a position (long or short) in one or more of the securities of a Covered Issuer (and/or options, swaps, and other derivatives related to one or more of these securities), and therefore stand to realize significant gains in the event that the prices of either equity or debt securities of a Covered Issuer decline or appreciate. Muddy Waters Research, Muddy Waters Capital and/or the Muddy Waters Related Persons intend to continue transacting in the securities of Covered Issuers for an indefinite period after an initial report on a Covered Person, and such person may be long, short, or neutral at any time hereafter regardless of their initial position and views as stated in the research report published by Muddy Waters Research or Muddy Waters Capital. Neither Muddy Waters Research nor Muddy Waters Capital will update any report or information on its website to reflect changes in positions that may be held by a Muddy Waters Related Person.

Ex. 14.[7]  The timing and remarkably similar language suggest that Respondents, Aurelius, and Muddy Waters may be or are in communication with each other.

---

[6] *See* http://www.aureliusvalue.com/research/banc-extensive-ties-notorious-fraudster-jason-galanis-make-shares-un-investible/.

[7] *See* http://d.muddywatersresearch.com/tou/.

16

## V.     ARGUMENT

### A.     Mr. Sugarman Is Entitled to Discovery Because the Requests Are Relevant for Defenses to Plaintiffs' 10b-5 Claim.

**1.**     Mr. Sugarman Is Entitled to Take Discovery that Is Relevant and Proportional.

The scope of relevance for a third-party subpoena issued under Federal Rule of Civil Procedure ("Rule") 45 is the same as the scope of relevance under Rule 26.  *See* Fed R. Civ. P. 45, Advisory Committee Note to 1991 Amend. ("[A] non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34."); *Jackson v. Brinker*, 147 F.R.D. 189, 193–94 (S.D. Ind. 1993) ("The scope of material obtainable by a Rule 45 subpoena is as broad as permitted under the discovery rules.").  Under Rule 26(b)(1), parties may

> [O]btain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

Courts construe Rule 26 broadly to encompass "any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Orduno v. Pietrzak,* 2016 WL 5853723, at *3 (D. Minn. Oct. 5, 2016); *Azarax, Inc. v. Wireless Commc'ns Venture, LLC*, 2017 WL 7369891, at *5 (D. Minn. Dec. 21, 2017) (describing scope of relevance).  "The standard of relevance in the context of discovery is broader than in the context of admissibility." *Hodges v. Pfizer, Inc.,* 2016

WL 1222229, at *2 (D. Minn. Mar. 28, 2016).  "The party resisting production bears the

burden of establishing lack of relevancy or undue burden." *Arctic Cat, Inc. v. Bombardier*

*Recreational Prod., Inc.*, 2014 WL 12610146, at *2 (D. Minn. May 23, 2014).

> **2.** The Requested Discovery Is Relevant to the Issues of Materiality, Loss Causation, and the Presumption of Reliance for Class Adjudication.

Here, Mr. Sugarman has developed evidence of Respondents' significant financial

interest in the decline of Banc stock, Respondents' unusual trading activity in the days

immediately prior to the publication of the Blog, and the strikingly similar trading

activity conducted by a group of other shareholders.  *See* Voetmann Dec. at 4-5; Ex. 6.

This evidence strongly suggests coordination amongst the Short-and-Distort Traders and

the author of the Blog.[8]  It is also indicative of a trading strategy that both knew of the

existence of the Blog and believed that its contents would have only a temporary effect

on Banc's stock price.[9]  Mr. Sugarman is entitled to develop evidence regarding the

information known by these market participants, the sources of the information, the

timing of their acquisition of knowledge, the scope of the dissemination, and the bases for

---

[8] *See, e.g.*, "Short Sale Position and Transaction Reporting", prepared by the Staff of the Division of Economic and Risk Analysis of the SEC, June 5, 2014, pp 6-7, accessed on July 31, 2018;  Alexander Ljungqvist & Wenlan Qian, *How constraining are limits to arbitrage?*,  29 The Review of Financial Studies 1975, 1976 (2016) ("By presenting new facts that are impossible to ignore or dismiss out of hand, the arbs hope to induce a stampede (similar to a bank run), in which no long investor wants to be the last to sell.").

[9] *See* Mitts, J., 2018, "Short and distort," *Working Paper*, p. 7 ("That kind of well-timed options trading suggests that someone knew the article was about to be published, and that the price would revert to its prior level thereafter because the article did not contain sufficient information to bring about a downward revision in the price of the magnitude observed on the day of publication.").

the trades.

Further evidence regarding what Respondents knew when they entered into the well-timed trades, how they obtained the information, what other parties were aware of the information, and why Respondents made the trades at issue is highly likely to support Mr. Sugarman's materiality, class certification, and loss causation arguments. *See City of Farmington Hills Employee Ret. Sys. v. Wells Fargo Bank, N.A.*, 2012 WL 12898810, at *5 (D. Minn. Mar. 23, 2012) (where discovery could be relevant to defendant's argument that it was not the cause of plaintiff's damages, the Court found discovery was "relevant to either party's claims or defenses and that it certainly may lead to the discovery of admissible evidence"). Indeed, if Mr. Sugarman can demonstrate that the information in the Blog was previously disclosed or publicly available, there could be no "revelation to the market" or corrective disclosure that caused the plaintiffs' loss. *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010) (granting summary judgment to defendants when loss causation could not be established). Similarly, if documents from Respondents show that the information in the Blog "was already in the public domain, the alleged omissions could not have altered 'the total mix of information available' to the public and were also immaterial as a matter of law." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 565, 577 (S.D.N.Y. 2013).

During meet-and-confer discussions, Respondents argued that the documents would not be relevant to Mr. Sugarman's scienter or the falsity of the statements at issue. Gray Dec. ¶ 4. They have failed, however, to develop a cogent argument as to why the requested documents are not relevant to materiality and loss causation, which are separate

elements of the underlying cause of action. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (establishing materiality and loss causation as elements of a claim under section 10(b) of the Securities and Exchange Act of 1934); *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (to demonstrate loss causation adequately, a plaintiff must establish "that the defendant's fraud was 'revealed to the market and caused the resulting losses'").[10]  Respondents also argued that Mr. Sugarman should be able to demonstrate the lack of materiality and loss causation based on the statements in the Blog such that information from Respondents were not necessary.  Gray Dec. ¶ 4.  But Respondents belief that the discovery is not necessary (a point that is contradicted by the court's holdings in the Underlying Action and disputed by Mr. Sugarman) does not make the requested discovery irrelevant.  Respondents also have failed to rebut the relevancy to arguments regarding the efficiency of the market of incorporating known information, which underlies the presumption of reliance for class adjudication of the underlying claims.

### B.    Respondents' Remaining Objections Are Meritless.

Respondents noted a few additional objections in their initial response to Mr. Sugarman's subpoena.  Respondents have not raised these further objections in subsequent discussions.  To the extent they intend to rely on them, the objections are meritless.

First, Respondents object to the subpoena to James Gibson because it states that it

---

[10] Because the Underlying Action is pending in the Central District of California, the plaintiffs' claim will be evaluated under Ninth Circuit law.

was directed to James Gibson, LLC instead of James Gibson.  Respondents do not contest that the subpoena was properly served on James Gibson and properly defined the subject of the subpoena as James Gibson.  Exs. 8, 12.  Where, as here, a subpoena is properly served, courts consistently reject attempts to avoid production obligations due to similar misspellings and typographical errors.  *See DeVizzio v. Commissioner of Soc. Sec.*, 2015 WL 2238155, at *4 (N.D.N.Y. May 12, 2015) (misspelling of responding party's name in subpoena was "inconsequential").  Counsel for Gibson has participated in the meet and confer process, and the typographical error on the subpoena does not excuse the obligation to produce documents.

Second, Respondents suggest that the subpoenas are "invasive" or drafted so broadly that they are unduly burdensome.  It is Respondents' burden to demonstrate that a request for relevant documents is unduly burdensome, *Regents of the Univ. of Minnesota v. AT&T Mobility LLC*, 2016 WL 7972908, at *3 (D. Minn. Dec. 13, 2016), and Respondents have provided no information about the volume and scope of potential review and production.  *Ispat Inland, Inc. v. Kemper Envtl., Ltd*., 2007 WL 737786, at *2 (D. Minn. Mar. 8, 2007) (where a party "made no showing that it will be unduly burdened" but rather "makes only sweeping, broad statements that producing any of the documents would be burdensome" the seeking party's "specific need for the documents outweighs the burden broadly asserted"); *see also Baer v. G & T Trucking Co.*, 2004 WL 6340449, at *5 (D. Minn. Aug. 26, 2004) ("Broad allegations of burdensomeness, without more, will not suffice.").  Additionally, Respondents have significant resources to respond to this request—even if only considering the profits made on the transactions

at issue—and have declined Mr. Sugarman's invitation to negotiate a narrower scope of review based on Respondents understanding of where responsive information may exist. Gray Dec. ¶ 5; *see McKey v. U.S. Bank Nat'l Ass'n*, 2018 WL 3344239, at *2 (D. Minn. July 9, 2018) (granting a motion to compel where a party failed to demonstrate "the cost of producing the records would be unduly burdensome relative to the value of the information to the case").

Third, Respondents object to the requests to the extent they seek documents protected by the attorney-client privilege and the attorney work-product doctrine.  Again, the burden is on Respondents to establish the protection of these privileges, and then to produce an appropriate privilege log.  *Ispat Inland*, 2007 WL 737786, at *3 (denying motion to quash subpoena on claim that documents sought were privileged because, "at this point, [the non-party] has only generally claimed privilege by making broad statements [and] has failed to produce a privilege log or make a specific showing as to why these documents are in fact privileged."); *Baranski v. United States*, 2015 WL 3505517, at *12 n.13 (E.D. Mo. June 3, 2015) ("Rule 45 places the burden to establish privilege on the subpoenaed party asserting it.").  The suggestion that requests may include privileged materials does not excuse production of non-privileged documents or the burden to establish any asserted privilege.

Finally, Respondents object to the definitions of "Castalian Partners Value Fund LP" and the definition of "You" in the Subpoenas because "Respondents have no obligation to produce and will not produce documents or information in the possession, custody, or control of third parties."  Ex. 9.  Obviously, the Subpoenas to Castalian

Partners and James Gibson require production of only documents in the possession, custody, or control of these Respondents.  This objection does not excuse the production of those documents.

## VI.    CONCLUSION

For the reasons set forth above, Mr. Sugarman respectfully requests that the Court grant his motion to compel.

Dated:  September 28, 2018

**FOX ROTHSCHILD**

By:   s/Samuel J. Tunheim
      Bret A. Puls  (#305157)
      Samuel J. Tunheim (#397717)

Of Counsel:

**LATHAM & WATKINS LLP**
Andrew R. Gray (*pro hac vice*)
(andrew.gray@lw.com)
650 Town Center Drive, 20th Floor
Costa Mesa, CA  92626-1925
(714) 540-1235

Campbell Mithun Tower
222 South Ninth Street, Suite 2000
Minneapolis MN 55402-3338
Telephone: (612) 607-7000
Facsimile: (612) 607-7100
Email:  bpuls@foxrothschild.com
        stunheim@foxrothschild.com

*Counsel for Movant Steven A. Sugarman*