# EXHIBIT 1

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
### FORM D

### Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

### 1. Issuer's Identity

CIK (Filer ID Number)

0001671923

Name of Issuer

Castalian Partners Value Fund, LP

Jurisdiction of Incorporation/Organization

DELAWARE

Year of Incorporation/Organization

☐ Over Five Years Ago
☒ Within Last Five Years (Specify Year) 2016
☐ Yet to Be Formed

Previous Names  ☒ None

Entity Type

☐ Corporation
☒ Limited Partnership
☐ Limited Liability Company
☐ General Partnership
☐ Business Trust
☐ Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer

Castalian Partners Value Fund, LP

Street Address 1                    Street Address 2

2030 RENAISSANCE COURT

City                State/Province/Country   ZIP/PostalCode   Phone Number of Issuer

CHANHASSEN          MINNESOTA                55317            612-481-0707

### 3. Related Persons

Last Name              First Name              Middle Name

Gibson                 James

Street Address 1       Street Address 2

2030 Renaissance Court

City                State/Province/Country   ZIP/PostalCode

Chanhassen          MINNESOTA                55317

Relationship: ☒ Executive Officer  ☐ Director  ☐ Promoter

Clarification of Response (if Necessary):

Manager of General Partner

_____

## 4. Industry Group

☐ Agriculture

Banking & Financial Services

    ☐ Commercial Banking

    ☐ Insurance

    ☐ Investing

    ☐ Investment Banking

    ☒ Pooled Investment Fund

      ☒ Hedge Fund

      ☐ Private Equity Fund

      ☐ Venture Capital Fund

      ☐ Other Investment Fund

      Is the issuer registered as an investment company under the Investment Company Act of 1940?

      ☐ Yes    ☒ No

    ☐ Other Banking & Financial Services

☐ Business Services

Energy

    ☐ Coal Mining

    ☐ Electric Utilities

    ☐ Energy Conservation

    ☐ Environmental Services

    ☐ Oil & Gas

    ☐ Other Energy

Health Care

    ☐ Biotechnology

    ☐ Health Insurance

    ☐ Hospitals & Physicians

    ☐ Pharmaceuticals

    ☐ Other Health Care

☐ Manufacturing

Real Estate

    ☐ Commercial

    ☐ Construction

    ☐ REITS & Finance

    ☐ Residential

    ☐ Other Real Estate

☐ Retailing

☐ Restaurants

Technology

    ☐ Computers

    ☐ Telecommunications

    ☐ Other Technology

Travel

    ☐ Airlines & Airports

    ☐ Lodging & Conventions

    ☐ Tourism & Travel Services

    ☐ Other Travel

☐ Other

_____

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |

| $25,000,001 - $100,000,000 | | $50,000,001 - $100,000,000 |
| Over $100,000,000 | | Over $100,000,000 |
| Decline to Disclose | | [X] Decline to Disclose |
| Not Applicable | | Not Applicable |

---

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

[X] Investment Company Act Section 3(c)

| Rule 504(b)(1) (not (i), (ii) or (iii)) | [X] Section 3(c)(1) | Section 3(c)(9) |
| Rule 504 (b)(1)(i) | Section 3(c)(2) | Section 3(c)(10) |
| Rule 504 (b)(1)(ii) | Section 3(c)(3) | Section 3(c)(11) |
| Rule 504 (b)(1)(iii) | Section 3(c)(4) | Section 3(c)(12) |
| Rule 505 | Section 3(c)(5) | Section 3(c)(13) |
| [X] Rule 506(b) | Section 3(c)(6) | Section 3(c)(14) |
| Rule 506(c) | Section 3(c)(7) | |
| Securities Act Section 4(a)(5) | | |

---

## 7. Type of Filing

[X] New Notice   Date of First Sale [X] First Sale Yet to Occur

Amendment

---

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?   [X] Yes   No

---

## 9. Type(s) of Securities Offered (select all that apply)

| Equity | [X] Pooled Investment Fund Interests |
| Debt | Tenant-in-Common Securities |
| Option, Warrant or Other Right to Acquire Another Security | Mineral Property Securities |
| Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | Other (describe) |

---

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?          Yes [X] No

Clarification of Response (if Necessary):

---

## 11. Minimum Investment

Minimum investment accepted from any outside investor $250,000 USD

---

## 12. Sales Compensation

Recipient                                                    Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None          (Associated) Broker or Dealer CRD [X] None
                                                                Number

Street Address 1                                         Street Address 2

City                                                          State/Province/Country                    ZIP/Postal
                                                                                                                  Code

State(s) of Solicitation (select all
that apply)                                    [ ] All        [ ] Foreign/non-US
Check "All States" or check            States
individual States

## 13. Offering and Sales Amounts

Total Offering Amount              USD  or [X] Indefinite

Total Amount Sold                   $0 USD

Total Remaining to be Sold       USD  or [X] Indefinite

Clarification of Response (if Necessary):

## 14. Investors

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify   [_____]
as accredited investors, and enter the number of such non-accredited investors who
already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons   [0]
who do not qualify as accredited investors, enter the total number of investors who
already have invested in the offering:

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an
expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [ ] Estimate

Finders' Fees $0 USD [ ] Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments
to any of the persons required to be named as executive officers, directors or promoters in response to Item 3
above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [ ] Estimate

Clarification of Response (if Necessary):

## Signature and Submission

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of:  (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Regulation D for one of the reasons stated in Rule 505(b)(2)(iii) or Rule 506 (d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Castalian Partners Value Fund, LP | James Gibson | James Gibson | Manager of General Partner | 2016-04-12 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

# EXHIBIT 2

Please Note: Blog posts are not selected, edited or screened by Seeking Alpha editors.

# BANC: Extensive Ties To Notorious Fraudster Jason Galanis Make Shares Un-Investible

Oct. 18, 2016 12:40 PM ET | Includes: Banc of Califo...

---

*"Despite the experience of recent years, corporate rogues continue to find their way to positions of power at the top companies. Thousands of people every year are fooled into investing in companies that turn out to be dishonest, unethical, or even downright criminal."*

*- The Forewarned Investor,* a treatise on identifying corporate fraud co-authored by BANC CEO, Steven Sugarman



VISIT WWW.BANCEXPOSED.COM TO DOWNLOAD SELECT SOURCE MATERIAL.

IMPORTANT - Please read this Disclaimer in its entirety before continuing to read our research opinion. All information for this article was derived from publicly available information. Investors are encouraged to conduct their own due diligence into these factors. Additional disclosure: This article represents the opinion of the author as of the date of this article. The information set forth in this article does not constitute a recommendation to buy or sell any security. This article represents the opinion of the author as of the date of this article. This article contains certain "forward-looking statements," which may be identified by the use of such words as "believe," "expect," "anticipate," "should," "planned," "estimated," "potential," "outlook," "forecast," "plan" and other similar terms. All are subject to various factors, any or all of which could cause actual events to differ materially from projected events. This article is based upon information reasonably available to the author and obtained from sources the author believes to be reliable; however, such information and sources cannot be guaranteed as to their accuracy or completeness. The author makes no representation as to the accuracy or completeness of the information set forth in this article and undertakes no duty to update its contents. The author may also cover his/her short position at any point in time without providing notice. **The author encourages all readers to do their own due diligence.**

**Background**

In 2010, COR Capital ("COR"), an obscure investment firm most visibly known for its associations with Pink-Sheet stocks, led the recapitalization of a Los Angeles based regional bank named First Pactrust ("FPB"). In 2012, Steven Sugarman, COR's Managing Member, became the CEO of the bank and began a "transformational" growth strategy fueled by a combination of (oftentimes related party) acquisitions and loan growth.

Growing its balance sheet by a factor of 10x and now having crossed the critical $10 Billion asset threshold, the renamed Banc of California (NYSE:BANC) has touted itself as a "community reinvestment" lender. The bank has cultivated relationships with politicians and celebrities to project an

air of success and credibility as California's Bank. Investors have increasingly adopted these promotional narratives and BANC's shares had doubled over the past year.

The PR effort hit new highs in August when BANC agreed to pay $100 million, roughly 10% of its market cap, for soccer stadium naming rights to the LA Football Club (which just happens to be part-owned by Steven's brother Jason Sugarman and Jason's father-in-law Peter Guber).

With our interest piqued by yet another related party transaction, we conducted exhaustive due diligence into BANC's leadership team, collecting tens of thousands of pages of publicly-available state, federal, and international documents. Taken together, these form to assemble one of the most ominous fact patterns we have ever seen.

**Our research establishes that BANC's senior-most officers and board members have a broad mosaic of extensive and indisputable ties to Jason Galanis. We believe this introduces a significant un-discounted risk that notorious criminals gained control over the $10 Billion taxpayer guaranteed Banc of California.**

Jason Galanis and his infamous father, John Galanis, have a **long history of secretly gaining control of banks and public companies via front men**, looting assets, and leaving unsuspecting investors and taxpayers with hundreds of millions in losses. The mere presence of a bank leadership team associated with Galanis should send diligent investors running for the hills.

We see striking similarities between BANC and Gerova Financial, a $1 Billion NYSE listed financial institution that collapsed on the revelation of Galanis' secret control. Like BANC, Gerova's executives had significant ties to Galanis and touted their community reinvestment efforts with politicians to establish credibility. In the end, the promotion was a diversion from a giant fraud that left investors with devastating losses.

***As a result, we believe Banc Of California is simply un-investible.***

A summary of key research conclusions we are releasing in this report include:

- **Jason Galanis Controlled COR, BANC's Founding Shareholder.** SEC documents detail how Galanis gained control of COR portfolio companies to orchestrate the Tribal Bonds Ponzi Scheme. Galanis laid claim to Banc of California to display his financial wherewithal and even managed the scheme out of an office in the same building as BANC's headquarters.

- **An Off-Balance Sheet Lender Controlled By BANC's Senior-Most Officers Financed Galanis.** Steven Sugarman holds an undisclosed interest in Camden Capital, an off-balance sheet lender controlled by BANC's Vice Chairman, Jeffrey Seabold. Camden was used to finance Galanis amidst the recent Tribal Bond Scheme and engaged in transactions with Galanis during the Gerova Financial fraud.

- **BANC's Lead "Independent" Director Has Strong Ties To Galanis.** BANC's Lead "Independent" Director, Chad Brownstein, has strong ties to Jason Galanis, his indicted associates, and COR Capital. Mr. Brownstein also accepted an undisclosed loan from Camden that is secured by his Los Angeles Mansion but appears to finance his outside business ventures.

- **We See Similarities Between BANC And Galanis' Gerova Financial fraud.** In wrapping BANC in the flag of "community reinvestment", Steven Sugarman has recycled a nearly identical narrative to what Galanis propagated at Gerova Financial. Further parallels include a leadership team and founding shareholder with undisclosed ties to Galanis, a bevy of suspect related party transactions, and the use of opaque assets as regulatory capital.

*Note: Neither Banc Of California or its executives have been named in any government indictments.*

*All information for this article was derived from publicly available information. The author(s) have a short position in Banc Of California. Investors are strongly encouraged to conduct their own due diligence into these factors.*

## Steven Sugarman's COR And Jason Galanis Control The Same Offshore Insurance Company

Seasoned readers will likely recall that John Galanis was one of the most notorious financial criminals of the 1970s and 1980s. Before being served with a 58-count RICO indictment in 1987, Galanis defrauded investors out of hundreds of millions through a variety of stock scams, frauds, and ponzi schemes that led to the **seizure of at least four banks**. Specific historical examples include:

- A fraudulent tax shelter scheme orchestrated by gaining control of two banks, bribing officials of another and gaining control of three California mutual funds. Rudolph Giuliani, called this "one of the largest white-collar crimes the FBI has ever had."
- The looting of Chase Bank in the early 80s as part of an "inside job" in which a series of fraudulent loans were made to Galanis companies.
- Charges brought by Canadian authorities in 1973 that allegedly involved fraudulent investment securities that were purchased by a Montreal Bank that Galanis indirectly *controlled through his control of the bank's largest shareholder*.

John has reportedly had a "heavy if not controlling influence" over his son, Jason Galanis, who became known in the early 2000s as"Porn's New King" and subsequently settled SEC accounting fraud charges related to Penthouse's bankruptcy.

In September 2015, father and son were charged by both the SEC and Department of Justice (having since pled guilty) for their role in secretly gaining control of Gerova Financial (OTC:GVFG), a Bermuda-based reinsurer. **This now infamous heist of what was then a nearly $1 Billion NYSE listed company saw its stock decline 95% after a short seller's report exposed Gerova's ties to Jason Galanis.**

In May of 2016, Jason & John Galanis, while out on bail for the Gerova fraud, were again charged by the SEC and Department of Justice along with five associates for a complex ponzi-scheme. The alleged fraud involved sham tribal bond placements, the proceeds of which were transferred into shell corporations and used to purchase luxuries and pay legal expenses.

Central to the scheme was the Valor Group ("Valor"), also a large Bermuda-based insurance holding company that, according to the SEC, "was controlled by Jason Galanis." Valor was used to finance the acquisition of asset managers who, in turn, purchased the fraudulent tribal bonds on behalf of their clients.



Management LLC ("AAM"), and put Morton in charge of the larger enterprise. Jason Galanis arranged for Valor Group Ltd. ("Valor Group"), an entity controlled by Jason Galanis, Archer, Dunkerley and others, to provide the financing for both purchases through its wholly-owned insurance company subsidiaries Wealth-Assurance AG ("Wealth-Assurance") and Valorlife Lebensversicherungs AG ("Valorlife"), informing Archer and Cooney that this acquisition promised greater "liquidity" for "their various projects."

*Source: SEC Complaint*

Two troubling ties to Steven Sugarman, who remains the Managing Member of COR Capital, immediately emerged:

- Hugh Dunkerley, a former COR-executive, was indicted along with Galanis as being a key alleged player in the fraud. Mr. Dunkerley's involvement in the scheme dates back to 2013, when he incorporated Valor while still at COR.
- Jason Sugarman, is **the Founder, Chairman & CEO of Valor**(according to both an SEC filing and an interview). During the same period, Jason served as a paid BANC consultant and continues to be described as an advisor. (Note: Jason Sugarman was not named in the complaint or accused of wrongdoing.)

Given these associations, the Tribal Bond Scheme was briefly mentioned in Bloomberg's recent profile of BANC's related party dealings. The article reported that:

*Steven Sugarman said his company had no role, and there's no direct link between Galanis and the bank or its CEO.*

**Mr. Sugarman's assertion is directly contradicted by SEC obtained documents and mysteriously deleted COR websites, all of which indicate that COR _owns_ Valor.**

1) The sworn declaration of an SEC enforcement attorney (below) states that Valor's primary insurance subsidiary (Wealth-Assurance AG) and Burnham Financial (the placement agent for the Tribal Bonds Scheme) are among COR's family of businesses. The SEC documents also describe Valor as a "strategic component of the COR Group."

> in the financial services sector. Among COR's family of businesses was Burnham Financial Group, comprised of Burnham Asset Management and Burnham Securities, and Wealth-Assurance AG, a supposed $1.5 billion regulated life and annuity insurance carrier. During the

(Case 1:15-cv-09764 Document 5)

2) Valor Group's corporate factsheet also declares COR as its owner and points readers to www.corgroupworldwide.com. The site has been deleted, but in late 2015 the home page (below) included logos of the companies in which **"COR is a principal investor."** Notably included under COR's umbrella are BANC, CS Financial (a 2013 BANC acquisition), Valor's Wealth-Assurance and Burnham.



*Source: Wayback Machine*

COR Capital's website (www.corfunds.com) previously included executive biographies of Steven Sugarman and Hugh Dunkerly. This website has also been completely deleted.

Experience has taught us that when websites start being erased, it's time to start asking serious questions.

*The critical question for BANC shareholders is how Jason Galanis could control an offshore insurance company that was simultaneously owned by COR Capital, an entity ostensibly led by Steven Sugarman?*

## **We believe Jason Galanis Controlled COR.**

Our belief is directly supported by the aforementioned SEC enforcement attorney's declaration (below) which states it was "understood that Galanis was associated with COR Capital.



Source: Case 1:15-cv-09764

In a related court transcript (below), the SEC names a "host of other companies… [that are] part of the COR Group" and that "**all of these entities...seem to be controlled by [sic] Jason Galanis.**"

```
16   which we call BFG.  And BFG our investigation has demonstrated
17   is related to a host of other companies including a company
18   called Burnham Securities and a company called Wealth Assurance
19   which is part of the Valor Group of companies which in turn is
20   part of the core group of companies.
21          Now, all of these entities, your Honor, and you will
22   see in the numerous e-mails that we've attached seem to be
23   controlled by Chase and Gollanis an individual who has been
24   charged by us in the past and is currently being charged by
```

Source: Case 1:15-cv-09764. Note: the above document mis-transcribed Jason Galanis as "Chase and Gollanis"

The same SEC declaration also describes how Galanis installed officers at COR portfolio companies to conceal his control. Michelle Morton, an indicted Galanis associate who was put in charge of the asset managers "primary contact with any of the Galanis-related companies was always Jason Galanis" but "other individuals were presented to her as officers of the companies."

Galanis even used Banc of California to portray his financial wherewithal. SEC investigators obtained an email from Galanis that attached a document titled "Introduction to COR Capital" that was used to "demonstrate who [the] financial sponsors are." BANC of California was featured as the marquee name amongst COR companies claimed by Galanis.



Source: Galanis' COR Capital Document publicly filed by the SEC pursuant to

case 1:15-cv-09764.

But most shocking is that Jason Galanis and Hugh Dunkerley orchestrated the
Tribal Bond Scheme out of a Burnham office *located in the same building as
Banc of California's corporate headquarters*.



Source: Burnham Securities Tribal Bonds Placement Agency Agreement.
Publicly filed by the SEC pursuant to case 1:15-cv-09764.

Galanis' demonstrated control over COR's portfolio companies combined with
his physical presence at BANC's headquarters building, introduces the material
risk that Galanis also gained control of Banc of California. This risk is amplified
by the trail of indisputable ties between BANC's senior-most officers and Jason
Galanis.

### An Off-Balance Sheet Lender Controlled By BANC's Senior-Most Officers Financed Galanis.

In May 2013, BANC acquired an option to purchase a mortgage lender, CS
Financial ("CS"), from then Board Member, Jeffrey Seabold. As part of the
deal, Mr. Seabold stepped down from the board to become BANC's Chief
Lending Officer (and was subsequently promoted to Vice Chairman). In 2014,
BANC exercised the option to acquire CS for $10 Million.

Two former affiliates of CS, Camden Capital Partners ("Camden") and Camden Escrow, were not acquired by BANC. In fact, Mr. Seabold'sinitial employment agreement specifically carved out his ability to continue to direct these outside companies but restricted him from serving as a loan officer (curiously, this restriction was lifted in Mr. Seabold's 2015 amended agreement).

We found that **Steven Sugarman holds an undisclosed interest in Camden Capital** and its managed real estate entity, Camden Real Estate Opportunity Fund I, LLC. A May 2015 reconveyance document obtained from the L.A. County Deed Records, signed by Jason Sugarman and Jeffrey Seabold, lists JAS Partners I, LLC as a managing member of Camden.



*Source: L.A. County Deed Records.*

We retrieved a Delaware "Certificate Of Revival" for JAS Partners 1, LLC filed in August of 2014 that is personally signed by Steven Sugarman as the Authorized Person (below). Mr. Sugarman's ownership is further confirmed by his current FINRA disclosure report, which states that he is the managing member and 67% majority owner of JAS Partners I, LLC (also below).

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:42 AM 08/19/2014
FILED 11:37 AM 08/19/2014
SRV 141085264 - 4316985 FILE

STATE OF DELAWARE
CERTIFICATE OF REVIVAL OF
A DELAWARE LIMITED LIABILITY COMPANY
PURSUANT TO TITLE 6, SEC. 18-1109

1. Name of the Limited Liability Company JAS Partners 1, LLC

2. Date of the original filing with the Delaware Secretary of State:
   3/14/07

3. The name and address of the Registered Agent is
   First Corporate Solutions, Inc.
   800 N. State Street, Suite 402
   Dover, DE 19901

4. (Insert any other matters the members determine to include herein).

5. This Certificate of Revival is being filed by one or more persons authorized to
   Execute and file the Certificate of Revival.

In witness whereof, the above name Limited Liability Company does hereby certify that
the Limited Liability Company is paying all annual Taxes, penalties and interest due to
the State of Delaware.

BY:

Authorized Person

Name: Steven Sugarman

Print or Type

Source: Delaware Division of Corporate Records.

**Other Business Activities, continued**
100%, 3/2011
COR SECURITIES LLC, SANTA MONICA, CA, INVESTMENT, MANAGING MEMBER, 100%, 3/2011
COR INDEX PARTNERS LLC, SANTA MONICA, CA, CONSULTANT, MANAGING MEMBER, 100%, 3/2011
COR MERCHANT BANKING LLC, SANTA MONICA, CA, INVESTMENT BANKING, MANAGING MEMBER, 100%,
2/2011
COR SPECIAL OPPORTUNITY FUND I LLC, SANTA MONICA, CA, INVESTMENT, MANAGING MEMBER, 100%,
6/2010
COR ADVISORS LLC, SANTA MONICA, CA, INVESTOR RELATIONS, MANAGING MEMBER, 100%, 4/2010
COR EQUITY INCOME FUND (CAYMAN) LTD, CAYMAN ISLANDS, INVESTMENT, INVESTMENT MANAGER, 0%,
8/2009
COR EQUITY INCOME FUND LP, SANTA MONICA, CA, INVESTMENT, MANAGER, 1%, 8/2009
COR INVESTMENTS I LLC, SANTA MONICA, CA, INVESTMENT, ORGANIZER, 0%, 7/2009
COR CAPITAL LLC, SANTA MONICA, CA, INVESTMENT ADVISOR, MANAGING MEMBER, 100%, 6/2009
JAS PARTNERS 1 LLC, LOS ANGELES, CA, INVESTMENT, MANAGING MEMBER, 67%, 4/2007
151 RODEO CORPORATION, LOS ANGELES, CA, INVESTMENT, OFFICER/DIRECTOR, 100%, 11/2007
AUGUSTUS GARDINI LP, NEWPORT BEACH, CA, INVESTMENT, MANAGER, 5.8%, 2007
LAZY EL RANCH CORPORATION, RANCH, MINORITY OWNER, 20-30% VOTING INTEREST, 2003
SUGARMAN ENTERPRISES INC, PACIFIC PALISADES, CA, INVESTMENT, OFFICER/DIRECTOR, 100%, 11/2002
RICHARD T YEH LLC, SANTA MONICA, CA, INVESTMENT, MANAGING MEMBER, 100%, 2002

Camden has been actively transacting with employees and insiders, including
at least one independent board member. For example, Camden made a
complex series of loans to one of BANC's top mortgage producers to finance
this expensive Beverly Hills home.

**_The crucial fact is that Steven Sugarman and Jeffrey Seabold are using
an off-balance sheet entity (Camden) to make loans to insiders._**

But it gets far worse.

In June 2015, deed records show that Camden made a loan to Jason Galanis in
the midst of the alleged Tribal Bond Scheme. The loan (below) was secured by
Galanis' Beverly Hills mansion and was made directly to his Thorsdale
Fiduciary and Guaranty Company.

### DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT
### AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING
(the "Deed of Trust") made as of June 2, 2015, by and among **1920 BEL AIR RD REAL ESTATE HOLDING CO,
LLC**, a California limited liability company, whose address is 301 N. Canon Drive, Suite 207, Beverly Hills, CA 90210
("Trustor"), **FIDELITY NATIONAL TITLE INSURANCE COMPANY**, whose address is 1300 Dove Street, Suite
310, Newport Beach, CA 92660 ("Trustee") and **CAMDEN REAL ESTATE OPPORTUNITY FUND I, LLC**, a
California limited liability company, whose address is 9595 Wilshire Boulevard, Suite 801, Beverly Hills, California
90212 ("Beneficiary") as security for performance of all obligations of Thorsdale Fiduciary and Guaranty Company,
Ltd. ("Borrower") under a Secured Promissory Note of even date herewith in the stated principal amount of One Million
One Hundred Eighty-Two Thousand and 60/100 Dollars ($1,182,000.00) (the "Note") and all other agreements between
Borrower and Beneficiary (collectively, the "Loan Documents"), and all extensions, modifications, substitutions,
replacements, and renewals of any thereof (collectively, the "Obligations").



*Source: L.A. County Deed Records. Pictured above is Jason Galanis' Beverly Hills mansion that secured the loan.*

According to the SEC, Thorsdale was used as Galanis' "piggy bank" to spend ill-gotten proceeds on items such as Prada & Gucci gear. In a post-indictment court transcript, **John Galanis states that he received funds from Thorsdale in 2015** (case 1:15-cr-00643 Document 153).

An FBI agent attests that Galanis also used Thorsdale to transfer ill-gotten funds directly into the Valor Group to finance an acquisition:

> respectively; which were dismissed. In addition,
> of the Second and Third Tribal Bond Issuance.  In addition,
> during that same time period, other outbound transfers initiated
> by JASON GALANIS, the defendant, from the Thorsdale Account
> included, among others, at least $7,300,000 to Valor, which
> appears to have been used by Valor to purchase a life insurance
> entity from an insurance company in Switzerland; at least
> $350,000 to various law firms; at least $1,000,000 to a

*Source: Unsealed Criminal Complaint*

***The facts are irrefutable: BANC's senior-most officers financed the Galanis' and the entity used as a centerpiece of the Tribal Bonds Fraud.***

In addition, the Justice Department's complaint describes how allegedly ill-gotten Tribal Bond proceeds were transferred. In an email supplied by the FBI, Bevan Cooney, Galanis' "best friend of 23 years", states that a large transfer "went out to Camden Escrow for the down payment for the 1920 bel air purchase":

> h. On January 15, 2015, BEVAN COONEY, the defendant, sent an email to several individuals associated with an accounting firm. That email said, "Please send me the wire info

> 33

> on the 3.9mm that came into my account and went out to Camden escrow for the down payment for the 1920 bel air purchase."

*Source: Unsealed Criminal Complaint*

According to his current Bloomberg profile as well as corporate record websites, Mr. Seabold remains the President of Camden Escrow.

Sugarman and Seabold also used Camden to engage in transactions with Galanis-controlled entities during the Gerova fraud.

## Galanis Transferred Gerova Real Estate Assets To Camden

One of the key alleged facets of the Gerova fraud, which is still subject to civil litigation, was that Galanis and his associates stripped tens of millions in real estate assets from the Stillwater Funds. Galanis allegedly used Gerova and a related entity, Net Five, to enrich himself and insiders by transferring and diverting the assets without consideration.

Public records indisputably confirm that Galanis' Net Five transferred the Miami St. Augustine Hotel to Camden. According to the Stillwater receiver, Camden paid just $400k for a property that was appraised for $6.4 Million.

**THIS SPECIAL WARRANTY DEED**, made and executed the 6th day of June, 2012 by **NET FIVE AT SOUTH BEACH, LLC**, a Florida limited liability company, having its principal place of business at 4540 Southside Road, Suite 603, Jacksonville, FL 33216, herein called the grantor, to **CAMDEN REAL ESTATE OPPORTUNITY FUND I, LLC**, a California limited liability company, having its principal place of business at 9595 Wilshire Boulevard, Suite 801, Los Angeles, CA 90212, hereinafter called the Grantee:

(Wherever used herein the terms "grantor" and "grantee" include all the parties to this instrument and the heirs, legal representatives and assigns of individuals, and the successors and assigns of corporations)

*Source: Miami-Dade County Recorder's Office*

The Stillwater receiver also alleged that Galanis diverted Stillwater's $18.3 million note on the Pali House Hotel in West Hollywood, CA but said, "It is unclear what happened to this loan interest." We discovered that Galanis acquired an overt financial interest in the Pali-House Hotel (through his River Ranch Assets, LLC).

**WHEREAS**, Pali-Holloway, LLC, a California limited liability was the original Trustor(s), Ticor Title Insurance Company was the original Trustee, and River Ranch Assets, LLC, a Nevada limited liability company, is the successor-in-interest to Pali-Funding, LLC, a Delaware limited liability company, the original Beneficiary, under that certain Deed of Trust, Assignment of

-----

Dated: October 11, 2013

RIVER RANCH ASSETS, LLC,
a Nevada limited liability company

By:
Name:
Its:

*Source: L.A. County Deed Records.*

Prior to that, an SEC filed document reveals that a Gerova affiliate transferred the Pali-House loan interest to BANC's senior-most officers (through Camden). Camden subsequently transferred it to NORe Capital (below), a British Virgin

Islands LLC. NORe's Tortola address (which is listed in the Panama Papers),
matches that of two Galanis-controlled entities (NatProv Holdings and Allius
Ltd.) as well as that of Valor.



(a)      NORe and the Borrower hereby acknowledge that this Note:

     (i)      has been purchased by NORe from Camden Real Estate Opportunity Fund I, LLC, a California limited liability company (the "Camden
Fund") and evidences all Indebtedness formerly owed by the Borrower to Camden Fund;

     (ii)      amends and restates in its entirety replaces and supersedes in its entirety all Indebtedness of the Borrower under the Pali-Holloway Second
Deed of Trust and Note; and

     (iii)      terminates all obligations of any Person, other than the Borrower, guaranteeing any payment or performance obligation related to the
indebtedness of Borrower under the Prior Note.

Source: SEC Filings.

In a transaction that appears to have monetized the note and sent millions
offshore, NORe exchanged the Pali-House note for $19 million in shares of a
now-defunct penny stock named Inspired Builders (OTCPK:ISRB). Inspired
Builders was registered to COR Capital's address and was formerly managed
by Carlos Salas, the President ofCOR Clearing (a clearinghouse owned by
COR).

Salas' involvement in Inspired Builders, in our opinion, is revealing. COR
Clearing was fined $1 million by FINRA for Anti-Money Laundering ("AML")
violations related to OTC securities that occurred during the same time period
as these transactions. In fact, a COR compliance whistleblower (who Steven
Sugarman and Carlos Salas allegedly ordered to "stop digging" and engaged in
"abusive behavior" towards) alleged that the clearing operations were being
used to **"facilitate material or significant money laundering
activities**." (Note: the case was settled in February, 2016. COR, Steven
Sugarman, and Carlos Salas denied the whistleblower's accusations. Case
Number: 8:12-cv-00238.)

That is why we think shareholders should be dismayed to discover that BANC
has failed to disclose its recent hiring of none other than COR Clearing's Carlos
Salas in a "Consulting Role as Chief of Staff" to "recommend governance,
operational and process improvement." The fact that BANC would task the
former head of a penny stock that engaged in transactions with both Camden
and Galanis-controlled entities with operational "improvement" is farcical.

Importantly, the Camden transactions during both the Tribal Bond Scheme and Gerova fraud confirm the long-standing ties between BANC executives and Galanis. In light of the Galanis' history of concealing control of financial institutions behind undisclosed associates, we believe the indisputable ties between BANC's senior-most officers and Galanis increase the material probability that Galanis gained control of Banc of California.

Our concerns are further increased by the board's undisclosed ties to Galanis and substantial conflicts of interest.

### BANC's Lead "Independent" Director Has Strong Ties To Jason Galanis

One of BANC's largest investors, PL Capital, and its principal, Richard Lashley, have thoroughly detailed BANC's governance and board independence issues in a series of 13D filings (here, here, here). The firm has implored BANC's Lead "Independent" Director, Chad Brownstein, to enact governance improvements. In return, BANC has sent a subpoena to Mr. Lashley as part of a bizarre defamation case and hired a "special counsel" to send (in our opinion) a threatening letter to PL Capital.

Our research indicates that Mr. Brownstein has strong ties to Galanis and is actually *participating* in the very activities he is responsible to independently oversee.

To start with, Mr. Brownstein has received an undisclosed loan from BANC's senior-most officers via Camden (below). The 2013 transaction, secured by Mr. Brownstein's Los Angeles mansion, appears to finance his outside business ventures (as indicated by the address of his trust, which differs from that of other deed records). This loan may very well be disqualifying for Mr. Brownstein as NYSE independence standards extend to outside dealings between management and the board.

## DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT
## AND FIXTURE FILING

THIS DEED OF TRUST, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING (the "Deed of Trust") made as of October 28, 2013, by and among CHAD BROWNSTEIN LIVING TRUST DATED MAY 26, 2010, a California Trust whose address is 9595 Wilshire Boulevard, Suite 310, Beverly Hills, California 90212 ("Trustor"), FIRST AMERICAN TITLE INSURANCE COMPANY, whose address is 5 First American Way, Santa Ana, California 92707 ("Trustee") and CAMDEN REAL ESTATE OPPORTUNITY FUND I, LLC, a California limited liability company, whose address is 9595 Wilshire Boulevard, Suite 801, Beverly Hills, California 90212 ("Beneficiary"), as security for performance of all obligations of Trustor under a Secured Promissory Note of even date herewith in the stated principal amount of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) (the "Note") and all other agreements between Trustor and Beneficiary (collectively, the "Loan Documents"), and all extensions, modifications, substitutions, replacements, and renewals of any thereof (collectively, the "Obligations").

NOW, THEREFORE, in consideration of the above premises and other good and valuable consideration, Trustor grants and agrees as follows:

TRUSTOR

CHAD BROWNSTEIN LIVING TRUST,
a California Trust

By: _____

CHAD BROWNSTEIN
Its:   Trustee

*Source: L.A. County Deed Records.*

Most shockingly, however, are Mr. Brownstein's ties to Jason Galanis and his indicted associates. Mr. Brownstein *Co-Founded and was Vice-Chairman of* Prospect Global (PGRX). In it's Gerova Fraud complaint, the SEC plainly states that Jason Galanis transferred ill-gotten proceeds to " ***Prospect Global Resources, Inc.,"*** which it defines as a company that Galanis "owned, controlled, or was associated with."

b)   Approximately $1,300,000 was transferred to Jason Galanis and corporate entities that he owned, controlled, or was associated with, including, among others: $498,033 to Stanwich Absolute Return, Ltd.; $400,000 to Prospect Global Resources, Inc.; $373,650 to 1920 Bel Air LLC; $130,500 to Emerging Markets Global Hedge Ltd.; and, $116,000 to Jason Galanis's personal bank accounts;

Source: SEC Complaint.

In fact, we found that Mr. Brownstein (through an entity he controlled named Quincy Prelude, LLC) was one of only four shareholders of Prospect's 2011 reverse merger entity along withJason Galanis' wife, Monet Berger, and Galanis' now-indicted best friend, Bevan Cooney. Devon Archer, also recently indicted as an alleged Galanis Tribal Bonds associate, became Prospect's Audit-Chair (pictured with Mr. Brownstein below).



Following the reverse merger, COR engaged in a variety of complex transactions with Prospect and, at one point, owned 9% of the company. In a 2011 agreement signed by Steven Sugarman, COR was awarded additional shares in exchange for becoming Prospect's paid IR Consultant and to "establish an image for the company in the financial marketplace." **Even after becoming CEO of BANC, Steven Sugarman publicly promoted Prospect Global to investors unaware of Galanis' involvement,** and was quoted in 2013 as touting that:

> " *"We think Prospect Global is the best potash investment opportunity in North America"*

We note that shares of Prospect Global are now essentially worthless, leaving investors who listened to Mr. Sugarman with massive losses.



*The bottom line is that BANC's Lead Director, who has approved a number of large related party acquisitions under the guise of independence, has substantial conflicts of interest and strong ties to Jason Galanis, his indicted associates, and COR Capital.*

We also have concerns about the independence and qualifications of each of the other Independent Directors (below). It is self-evident, at least in our view, that the board cannot be trusted to protect taxpayers, let alone investors.

| Director | Role | Comments |
|---|---|---|
| **Jonah Schnel** | Chairman of Enterprise Risk | Longtime Partner of Chad Brownstein as co-founders of ITU Ventures. The LA times reported that large investors pulled out of ITU Ventures in 2006, "A big reason: The investors were troubled that the two partners, Chad Brownstein and Jonah Schnel, solicited political contributions from the fledgling firms they financed." |

| Eric Holoman | Chairman of Community Development | Was named as a potential Advisory Board candidate to Burnham's asset managers in documents sent by Jason Galanis and obtained by the SEC (below). |
|---|---|---|
| Jeffrey Karish | "Governance and Fiduciary Oversight" | Given a "special thanks" by Steven Sugarman in the acknowledgements of *The Forewarned Investor*. Was Board Member of Digital Turbine with Sugarman in-law, Peter Guber. |
| Halle Bennett | "Assessment of Capital Market Transactions" | Is a KBW Investment Banker. KBW has been paid millions by BANC as underwriter of securities offerings. A KBW analyst is also promoting shares to investors with a "Buy" rating. |
| Robert Sznewajs | Chairman of Audit Committee | Was previously CEO of West Coast Bank (Oregon) that received a FDIC Cease and Desist Order in 2009. The FDIC cited "management whose policies and practices are detrimental to the bank" and "a large volume of poor quality loans." |

## We See Similarities Between BANC and The Gerova Financial Fraud

The last time Galanis gained control of a $1 Billion financial institution was during the Gerova Financial fraud. Gerova Financial was an offshore insurance company that Jason and John Galanis originally capitalized through secretly controlled entities. Galanis then installed associates as executives and used Gerova to embark on a series of related party transactions designed to enrich insiders. Gerova's balance sheet was riddled with illiquid holdings of asset backed loans and hedge fund portfolios that, in turn, were used for regulatory capital.

**The giant fraud unraveled after Galanis' involvement in Gerova was exposed in a January, 2011 short report and the stock dropped 95% before being halted by the NYSE.**



We see striking similarities between BANC and Gerova:

**Undisclosed Ties To Galanis.**

Our research has firmly established that BANC's CEO, Vice-Chairman, Lead
Independent Director, and Founding Shareholder all have extensive
undisclosed ties to Jason Galanis. The fact that Gerova entities even
transferred real estate assets to BANC executives (through Camden) makes
the similarities particularly acute.

**Shared Promotional Narratives and Associations With Politicians.**

In wrapping BANC in the flag of "community reinvestment," Steven Sugarman
has recycled a nearly identical narrative to what Galanis propogated at Gerova
Financial.

In the below email exchange (provided below and publicly filed as part of
litigation), a Gerova-affiliated executive explains to Galanis that they need to
"get support at Mayoral and Councilman level" and states **"we need to pitch
that we are there to help build and revitalize communities and
neighborhoods**...this should be a great platform for some councilman to look
really good in the community."

Galanis discusses political contacts and the executive goes on to tell Galanis
that,

> 66 **Jay, <u>when we are with Sugarman,</u>** we need to get next to his Pal from
> Ohio.

While we don't know which Sugarman is being referenced, Steven Sugarman
has followed a similar playbook by closely associating Banc of California with a
variety of high profile politicians.

From: Robert Willison <robbie33@bellsouth.net>
Sent: Sunday, April 25, 2010 10:14 PM
To: Jason Galanis <jason@holmbycompanies.com>; Paul Rohan <prohan246@aol.com>;
Eric Halter <eric@hslending.com>
Bcc: Scott Hintz
Subject: Re:

My thinking is to try to get support and acceptance within the city. I bunch of Jews from New York are a great target .
we need to change the dynamic, get support at Mayoral and Councilman level  even State level—we need to pitch
that we are there to help build and revitalize communities and neighborhoods.
we have to be the biggest single family home owners in the city, we should be able to make an impact . We just need
to change the face of the ownership and have more of a good ole Boy.,
we want to be part of the revitalizing the neighborhood approach . One of the  mayor's campaign promises was to
clean up the vacant and abandoned housing mess in the city.
This should be a great platform for some councilman to look really good in the community and if we can get the
section 8 program working well. We will be able to sell these homes in the 40 / 50k range- we are talking about 12-15
mil- nothing to pass over  while we finish the bigger and more glamorous deals.

From: Jason Galanis <jason@holmbycompanies.com>
Sent: Sunday, April 25, 2010 11:49 PM
To: Robert Willison <robbie33@bellsouth.net>; Paul Rohan <prohan246@aol.com>
Cc: Eric Halter <eric@hslending.com>; Scott Hintz; George Turkovich <universalturk@hotmail.com>
Subject: Re:

Robble

My ohio connection is a thousand times deeper. Former US Senator Mike Dewine. His chief of staff for 17 years is
our lawyer and old family friend. Was also former assistant deputy attorney general under dick thornburg.
Dewine is THE establishment there. We can get things done in ohio.
You need to identify what it is that is needed.

Jason

From: Robert Willison <robbie33@bellsouth.net>
Date: Sun, 25 Apr 2010 20:41:45 -0400
To: Jason Galanis <jason@holmbycompanies.com>; Paul Rohan <prohan246@aol.com>
Cc: Eric Halter <eric@hslending.com>; Scott Hintz; George Turkovich <universalturk@hotmail.com>
Subject:

Jay when we are with Sugarman , we need to get next to his pal from Ohio. This guy is a major contributor
to the State politicians in Ohio. He could be a major key to our turning Columbus around
R

Source: Case 1:03-cr-00131

In a recently filed letter to employees (which used the word "community" in 25
seperate instances), Steven Sugarman touts BANC's Community Development
Committee, which has the support of former LA mayor Antonio Villaraigosa:

> "Mayor Villaraigosa also joined with our directors - led by Eric Holoman
> and Chad Brownstein - to form a Community Development Committee of
> our Board to engage with community groups"

A term sheet sent by Galanis for the purchase of asset managers as part of the
Tribal Bond Scheme (below and publicly filed by the SEC), stated that he
would: "introduce suitable candidates to request to serve on the Board of
Advisors, including an introduction to the former Los Angeles Mayor Antonio
Villaraigosa and to Mr. Eric Holoman". Galanis' document specifically
highlighted Mayor Villaraigosa's status as a "senior advisor to Steve Sugarman
and the Banc of California".

Board of Advisors, including an introduction to the former Los
Angeles Mayor Antonio Villaraigosa, and to Mr. Eric Holoman.
Mayor Villaraigosa has been senior advisor to Steve Sugarman and
the Banc of California since 2013, and Mr Holoman is a Director of
the Banc of California, and is President of Magic Johnson
Enterprises, as well as on the Board of Administration and former
President of the $11 billion Los Angeles City Employees'
Retirement System.

Source: Case 1:15-cv-09764

(Note: We do not mean to imply or allege any wrongdoing on the part of
Mayor Villaraigosa or Mr. Holoman.)

## Large Holdings Of Opaque Assets For Regulatory Capital

BANC's securities portfolio has grown by nearly $2 Billion since the end of
2014 and now exceeds 25% of assets. The portfolio includes $1.3 Billion worth
of level 2 collateralized loan obligations (alternatively described as "structured
products" in call reports) that have been subject to only sparse disclosure. This
leaves BANC investors holding a portfolio of non-transparent securities that far
exceeds the bank's tangible equity.

BANC has also expanded into insurance backed lending and insurance premium finance (first referenced in its 2013 10-K). BANC has indicated that it is providing credit facilities to hedge funds backed by life insurance policies as well as other unspecified assets. In light of the Galanis' history of insurance fraud and Sugarman's ties to Valor, BANC's foray into the world of insurance and hedge fund lending concerns us greatly.

BANC's expansion into other categories, such as EB-5 escrow, foreign national lending, and "no tax return" loans, underpin our worries about BANC's broader banking activities. Steven Sugarman, who has no prior banking experience, has surrounded himself with a de-facto all-star team from the subprime era. BANC's Chief Risk Officer, Chief Investment Officer, Chief Production Officer, COO Of Home Loans, Chair of the Audit Committee and a variety of Vice Presidents were previously employed at failed or sanctioned lenders.

**A Bevy Of Related Party Transactions That Benefit Insiders**

In becoming one of the fastest growing banks in the country, BANC has engaged in a staggering number of related party transactions including CS Financial and the soccer stadium naming rights deal. These transactions have sent millions in proceeds to Sugarman family members.

In another notable deal, BANC made an equity investment in an affiliate of St. Cloud Capital, a private fund managed by Marshall Geller. Mr. Geller is a Director of COR Clearing and an investor(through St. Cloud) in both COR Securities Holdings and BANC's recapitalization. While BANC disclosed the transaction, it did not mention that Mr. Geller *appears to be a business associate of Jason Galanis*.

We discovered that Geller is the manager of EGS, LLC, a closely-held entity that includes Galanis' VL Assurance (Bermuda) Ltd. as a member (VL Assurance is a subsidiary of Valor). Mr. Geller led a 2015 financing of Merriman Holdings (where he is also a Director) that sent warrants to VL in the months preceding VL's active involvement in the Tribal Bonds Scheme. We think that BANC's willingness to use taxpayer-guaranteed deposits to finance Mr. Geller is a profound warning sign.

*Note: Neither Mr. Geller or St. Cloud have been named in Government complaints or accused of wrongdoing.*

## Red Flags In The Accounting Suite

Gerova's fraudulent activities were made evident by a series of accounting related red flags and executive departures.

BANC has had near constant turnover in its accounting and finance department. Six key financial officers have resigned since 2011, with the most recent CFO departing just last month after less than a year on the job.

| Executive | Position | Start Date | Resignation Date | Comments |
|-----------|----------|------------|------------------|----------|
| **Marangal Domingo** | *CFO* | May 2011 | November 2012 | 8-K filed the day after Christmas. Payment of $75k for consulting services and release of claims against BANC. |
| **Lonny D Robinson** | *CFO/CAO* | November 2012 | March 2014 | |
| **Ronald J. Nicolas** | *CFO* | November 2012 | August 2015 | Signed a "separation and settlement" agreement, paid $750k lump sum plus $250k consulting fee. |
| **Craig S. Naselow** | *Treasurer & CIO* | November 2012 | Unknown | No disclosure of resignation and disappeared from filings after May 2014. Not listed on webpage after October 2014. |

| Nathan Duda | *CAO* | March 2014 | July 2015 | Announcement buried in an 8-K announcing the sale of a bank owned office building. |
|---|---|---|---|---|
| **James McKinney** | *CFO* | November 2015 | September 2016 | Annoucement buried in a press releasetitled "BANC to consolidate office of finance." |
| **Brian Kuelbs** | *CIO* | November 2015 | Present | Former Countrywide Capital Markets Executive |

Source: Internal Analysis From Company SEC Filings and Disclosures

Perhaps most glaring is the 2015 resignation of BANC's long tenured CFO who signed a "Separation and Settlement" agreement that paid him $1 million and included a release of claims.

Finally, we note that the bank has a history of delayed financial reporting, complex executive compensation packages, recently experienced a sharp increase in audit fees, and has had previously disclosed (but since remediated) material weaknesses of internal controls.

## Conclusion

In the Forewarned Investor, Steven Sugarman states:

*"Investors have fallen for the same bag of tricks again and again. This occurs despite the fact that every business rogue leaves tracks in the sand. In isolation, these signs are usually minor and can be explained away. But viewed in their totality, a damning picture emerges."*

The totality of our research establishes that BANC has a broad mosaic of ties to the notorious fraudster Jason Galanis. In light of Galanis' demonstrated history of secretly gaining control of publicly traded companies and large financial institutions, we believe there is a material risk that Galanis gained

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 36 of 130   Page ID #:143

control of Banc of California. Our belief is strengthened by the striking paralells between BANC and Galanis' Gerova Financial which left unsuspecting investors with enormous losses as part of a giant fraud.

**As a result, we believe Banc Of California is simply un-investible.**

*Investors are strongly encouraged to conduct their own due diligence into these factors and to take one more piece of advice from Steven Sugarman:*

> "The signs of fraud are often uncovered first by a small number of people who have been watching a company closely. When those people start to make their findings public, they may be the voice of the minority, but they may have important information to share... Skeptics can come from a variety of places. One place to look for them is among short sellers, who are betting that a company's stock will decline. **When executives blame short sellers for the decline in their stock price, you can be pretty sure that something else is wrong with the business.**"

- *The Forewarned Investor,* a treatise on identifying corporate fraud co-authored by BANC's CEO, Steven Sugarman

**Disclosure:** I am/we are short BANC.

# EXHIBIT 3

Case 8:19-mc-00005-AG-DFM    Document 16-1    Filed 09/28/18    Page 38 of 130    Page ID
#:145



# Banc of California Update



NEWS PROVIDED BY
**Banc of California, Inc. ➞**
Oct 18, 2016, 19:05 ET

IRVINE, Calif., Oct. 18, 2016 /PRNewswire/ -- Banc of California, Inc. (NYSE: BANC) today announced it is aware of allegations posted in a financial blog.  The Company's Board of Directors has been aware of matters relating to Jason Galanis including certain claims he had made suggesting an affiliation with members of the Company, its Board, and/or its Executive team.  The Board, acting through its Disinterested Directors, immediately initiated a thorough independent investigation led by Winston & Strawn, and has received regular reports including related to regulatory and governmental communications over the past year.

The complaint filed by the Department of Justice against Mr. Galanis and others dated May 9, 2016, which is found here, clearly states that Mr. Galanis' claims to be affiliated with COR Capital were fraudulent.  See paragraphs 40 and 41 of the Sworn Statement of the Special Agent of the Federal Bureau of Investigation which states:

"40.  Based on my conversation with a representative of COR Capital, I have learned that, contrary to the representations made in the June 3, 2014 email sent by JASON GALANIS, the defendant, to MICHELE MORTON, the defendant, (referenced in paragraph 39c above), Burnham, CORFA and Wealth-Assurance AG were not affiliates of COR Capital.

41.  Based on my review of documents, I have learned that on June 3, 2014, JASON GALANIS, the defendant, sent an email to BEVAN COONEY, the defendant, which forwarded the email JASON GALANIS sent to MICHELLE MORTON, the defendant, earlier that same day, attaching the description of COR Capital which fraudulently asserted that certain entities were affiliates of COR Capital.  In JASON GALANIS's email to COONEY, JASON GALANIS wrote "whoring it out shamelessly[.]  thank you [first name of COR Capital representative.]"

Banc of California and its Disinterested Directors will make further facts publicly available as appropriate.

**About Banc of California, Inc.**

Banc of California, Inc. (NYSE: BANC) provides comprehensive banking services to California's diverse businesses, entrepreneurs and communities. Banc of California operates over 100 offices in California and the West.

**Forward-Looking Statements**

This press release includes forward-looking statements within the meaning of the "Safe-Harbor" provisions of the Private Securities Litigation Reform Act of 1995. These statements are necessarily subject to risk and uncertainty and actual results could differ materially from those anticipated due to various factors, including those set forth from time to time in the documents filed or furnished by Banc of California, Inc. with the Securities and Exchange Commission. You should not place undue reliance on forward-looking statements and Banc of California, Inc.

undertakes no obligation to update any such statements to reflect circumstances or events that occur after the date on which the forward-looking statement is made.

**Investor Relations Inquiries:**      **Media Inquiries:**

Banc of California, Inc.                Vectis Strategies

Timothy Sedabres, (855) 361-2262      David Herbst, (213) 973-4113 x101

SOURCE Banc of California, Inc.

Related Links

http://bancofcal.com

# EXHIBIT 4

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 42 of 130   Page ID
#:149



# Banc of California Reports Record Third Quarter Earnings



NEWS PROVIDED BY
**Banc of California, Inc.** ➞
Oct 19, 2016, 06:00 ET

IRVINE, Calif., Oct. 19, 2016 /PRNewswire/ -- Banc of California, Inc. (NYSE: BANC) today reported record quarterly net income of $35.9 million for the third quarter of 2016, resulting in earnings per share of $0.59 for the quarter, fully diluted.  Third quarter net income increased 147% compared to the third quarter of 2015. Net income available to common shareholders for the third quarter was $30.8 million, an increase of 168% compared to the third quarter of 2015.

Highlights for the quarter included:

Case 8:19-mc-00005-AG-DFM    Document 16-1    Filed 09/28/18    Page 43 of 130    Page ID #:150

- Record quarterly deposit growth of $1.1 billion, or 15%, and annual deposit growth of $3.7 billion, or 67%.
- Quarterly loan production of $2.6 billion, driven by quarterly commercial banking segment loan and lease originations of $1.1 billion, an increase of 44% from a year ago.
- Held for investment loan growth of $333 million for the third quarter, an increase of $1.8 billion, or 39% from a year ago
- The Company's return on average assets for the quarter was 1.3% and its return on average tangible common equity for the quarter was 19.5%.

The Company finished the quarter with consolidated assets totaling $11.2 billion, an increase of $1.1 billion, or 10%, compared to the prior quarter, and an increase of $4.0 billion, or 55%, compared to a year ago.

"Our third quarter financial performance showcases the strong credit discipline and growing earnings power of our franchise," said Steven Sugarman, Chairman and Chief Executive Officer of Banc of California. "We remain focused on ensuring that as we grow, we maintain the controls, culture and values that are making Banc of California great. We continue to see meaningful opportunities to capture market share by empowering California through its diverse businesses, entrepreneurs and communities."

During the quarter, Banc of California grew its recurring net interest income by $5.9 million, or 7% from the prior quarter, grew total deposits by $1.1 billion, increased held for investment loans by $333 million, or 5% from the prior quarter and reduced FHLB borrowings by $160 million or 17% from the prior quarter.

"We continue to see growth in assets, deposits and loans across our business units. Our consistent progress has now resulted in our franchise meeting or exceeding all of our stated financial targets for 2016, including return on tangible common equity over 15% and return on assets over 1%," said Francisco Turner, Chief Strategy Officer of Banc of California.

"We have built and strengthened our balance sheet and liquidity position, supported by the strong deposit inflows we continued to experience in the third quarter," said James McKinney, Chief Financial Officer of Banc of California. "We maintain a strong capital position and have implemented numerous sources of contingent capital including our increased holding company line of credit. As of the end of the third quarter, we now maintain over $7 billion of contingent liquidity to support Banc of California's balance sheet and to adequately serve all of the diverse needs of our clients. I could not be prouder of the success we have made in ensuring a strong and durable balance sheet with the best possible liquidity to withstand diverse market conditions."

The Company also announced that it has accelerated the date of its conference call to discuss third quarter financial results to Wednesday, October 19, 2016 at 7:00 a.m. Pacific Time (PT). Interested parties are welcome to attend the conference call by dialing 888-317-6003, and referencing event code 8186667. A live audio webcast will also be available and the webcast link will be posted on the Company's Investor Relations website at www.bancofcal.com/investor. The slide presentation for the call will also be available on the Company's Investor Relations website prior to the call.

**About Banc of California, Inc.**

Banc of California, Inc. (NYSE: BANC) provides comprehensive banking services to California's diverse businesses, entrepreneurs and communities. Banc of California operates over 100 offices in California and the West.

**Forward-Looking Statements**

This press release includes forward-looking statements within the meaning of the "Safe-Harbor" provisions of the Private Securities Litigation Reform Act of 1995. These statements are necessarily subject to risk and uncertainty and actual results could differ materially from those anticipated due to various factors, including those set forth from time to time in the documents filed or furnished by Banc of California, Inc. with the Securities and Exchange Commission. You should not place undue reliance on forward-looking statements and Banc of California, Inc. undertakes no obligation to update any such statements to reflect circumstances or events that occur after the date on which the forward-looking statement is made.

| INVESTOR RELATIONS INQUIRIES: | MEDIA INQUIRIES: |
|---|---|
| Banc of California, Inc. | Vectis Strategies |
| Timothy Sedabres, (855) 361-2262 | David Herbst, (213) 973-4113 x101 |

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 46 of 130   Page ID
#:153

**Banc of California, Inc.**

**Consolidated Statements of Financial Condition**

(Dollars in thousands)

(Unaudited)

| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and cash equivalents | $ 372,603 | $ 271,732 | $ 215,012 | $ 156,124 | $ 378,963 |
| Time deposits in financial institutions | 1,500 | 1,500 | 1,500 | 1,500 | 1,900 |
| Securities available for sale | 1,941,588 | 1,302,785 | 1,663,711 | 833,596 | 693,219 |
| Securities held to maturity | 962,315 | 962,282 | 962,262 | 962,203 | 529,532 |
| Loans held for sale | 846,844 | 893,782 | 863,944 | 668,841 | 596,565 |
| Loans and leases receivable | 6,568,791 | 6,236,115 | 5,463,068 | 5,184,394 | 4,730,077 |
| Allowance for loan and lease losses | (40,233) | (37,483) | (35,845) | (35,533) | (34,774) |
| Federal Home Loan Bank and other bank stock | 69,190 | 81,115 | 61,146 | 59,069 | 40,643 |
| Servicing rights, net | 63,843 | 53,650 | 49,406 | 50,727 | 41,646 |
| Other real estate owned, net | 275 | 429 | 325 | 1,097 | 34 |
| Premises and equipment, net | 133,228 | 120,755 | 114,668 | 111,539 | 34,689 |
| Goodwill | 39,244 | 39,244 | 39,244 | 39,244 | 39,244 |
| Other intangible assets, net | 15,335 | 16,514 | 17,836 | 19,158 | 20,504 |
| Deferred income tax | 408 | 7,270 | 7,441 | 11,341 | 13,388 |
| Income tax receivable | 12,487 | 5,904 | - | 604 | 2,649 |
| Bank-owned life insurance investment | 101,909 | 101,314 | 100,734 | 100,171 | 99,570 |
| Other assets | 127,077 | 100,754 | 92,520 | 71,480 | 68,961 |
| **Total assets** | **$ 11,216,404** | **$ 10,157,662** | **$ 9,616,972** | **$ 8,235,555** | **$ 7,256,810** |
| | | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | |
| Deposits | | | | | |
| Noninterest-bearing deposits | $ 1,267,363 | $ 1,093,686 | $ 1,398,728 | $ 1,121,124 | $ 1,011,169 |
| Interest-bearing deposits | 7,810,956 | 6,835,270 | 5,438,873 | 5,181,961 | 4,410,821 |
| Total deposits | 9,078,319 | 7,928,956 | 6,837,601 | 6,303,085 | 5,421,990 |
| Advances from Federal Home Loan Bank | 770,000 | 930,000 | 1,195,000 | 930,000 | 830,000 |
| Securities sold under repurchase agreements | - | - | 257,100 | - | - |
| Other borrowings | 49,903 | - | - | - | - |
| Notes payable, net | 176,579 | 177,743 | 260,896 | 261,876 | 262,779 |
| Reserve for loss on repurchased loans | 11,369 | 10,438 | 9,781 | 9,700 | 9,098 |
| Income taxes payable | 908 | - | 12,303 | 1,241 | 5,939 |
| Accrued expenses and other liabilities | 157,902 | 170,641 | 176,761 | 77,248 | 83,470 |
| Total liabilities | 10,244,980 | 9,217,778 | 8,749,442 | 7,583,150 | 6,613,276 |
| Commitments and contingent liabilities | | | | | |

| | | | | | |
|---|---:|---:|---:|---:|---:|
| Preferred stock, Series A, non-cumulative perpetual | - | - | 31,934 | 31,934 | 31,934 |
| Preferred stock, Series B, non-cumulative perpetual | - | - | 10,000 | 10,000 | 10,000 |
| Preferred stock, Series C, 8.00% non-cumulative perpetual | 37,943 | 37,943 | 37,943 | 37,943 | 37,943 |
| Preferred stock, Series D, 7.375% non-cumulative perpetual | 110,873 | 110,873 | 110,873 | 110,873 | 110,873 |
| Preferred stock, Series E, 7.00% non-cumulative perpetual | 120,255 | 120,255 | 120,258 | - | - |
| Common stock | 536 | 510 | 454 | 395 | 393 |
| Common stock, class B non-voting non-convertible | 2 | 2 | 1 | 1 | - |
| Additional paid-in capital | 611,069 | 608,303 | 509,123 | 429,790 | 427,599 |
| Retained earnings | 112,751 | 88,385 | 73,179 | 63,534 | 52,277 |
| Treasury stock | (29,070) | (29,070) | (29,070) | (29,070) | (29,070) |
| Accumulated other comprehensive income/ (loss), net | 7,065 | 2,683 | 2,835 | (2,995) | 1,585 |
| Total stockholders' equity | 971,424 | 939,884 | 867,530 | 652,405 | 643,534 |
| **Total liabilities and stockholders' equity** | **$ 11,216,404** | **$ 10,157,662** | **$ 9,616,972** | **$ 8,235,555** | **$ 7,256,810** |

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 49 of 130   Page ID
#:156

**Banc of California, Inc.**

**Consolidated Statements of Operations**

(Dollars in thousands, except per share data)

(Unaudited)

| | Three Months Ended | | | | | Nine Months End | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 | September 30, 2016 | Septem 2( |
| Interest and dividend income | | | | | | | |
| Loans, including fees | $ 80,370 | $ 73,743 | $ 67,144 | $ 62,248 | $ 60,454 | $ 221,257 | $ |
| Securities | 19,934 | 19,393 | 16,047 | 11,163 | 5,054 | 55,374 | |
| Dividends and other interest-earning assets | 1,931 | 1,504 | 1,049 | 788 | 1,007 | 4,484 | |
| Total interest and dividend income | 102,235 | 94,640 | 84,240 | 74,199 | 66,515 | 281,115 | |
| Interest expense | | | | | | | |
| Deposits | 11,224 | 8,385 | 8,107 | 6,862 | 6,395 | 27,716 | |
| Federal Home Loan Bank advances | 1,413 | 1,966 | 1,262 | 890 | 587 | 4,641 | |
| Securities sold under repurchase agreements | 48 | 389 | 160 | 15 | 3 | 597 | |
| Notes payable and other interest-bearing liabilities | 2,589 | 2,863 | 4,294 | 4,366 | 3,980 | 9,746 | |
| Total interest expense | 15,274 | 13,603 | 13,823 | 12,133 | 10,965 | 42,700 | |
| Net interest income | 86,961 | 81,037 | 70,417 | 62,066 | 55,550 | 238,415 | |
| Provision for loan and lease losses | 2,592 | 1,769 | 321 | 1,260 | 735 | 4,682 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Net interest income after provision for loan and lease losses | 84,369 | 79,268 | 70,096 | 60,806 | 54,815 | 233,733 |
| Noninterest income | | | | | | |
| Customer service fees | 1,566 | 1,173 | 848 | 957 | 1,118 | 3,587 |
| Loan servicing (loss) income | 2,096 | (3,347) | (5,288) | 3,663 | (2,254) | (6,539) |
| Net gain on sale of securities available for sale | 487 | 12,824 | 16,789 | 1,510 | 1,750 | 30,100 |
| Net gain on sale of loans | 11,063 | 2,147 | 2,195 | 15,164 | 9,737 | 15,405 |
| Mortgage banking income | 50,159 | 43,795 | 33,684 | 30,334 | 37,015 | 127,638 |
| Advisory service fees | - | 510 | 997 | 1,942 | 2,294 | 1,507 |
| Loan brokerage income | 1,384 | 759 | 874 | 678 | 660 | 3,017 |
| Gain on sale of building | - | - | - | - | - | - |
| All other income | 7,875 | 7,743 | 1,860 | 2,571 | 407 | 17,478 |
| Total noninterest income | 74,630 | 65,604 | 51,959 | 56,819 | 50,727 | 192,193 |
| Noninterest expense | | | | | | |
| Salaries and employee benefits | 68,033 | 61,022 | 57,183 | 54,008 | 53,215 | 186,238 |
| Occupancy and equipment | 12,728 | 11,943 | 11,740 | 11,200 | 10,109 | 36,411 |
| Professional fees | 6,732 | 6,763 | 6,212 | 4,808 | 5,261 | 19,707 |
| Data processing | 2,837 | 2,838 | 2,194 | 2,104 | 2,170 | 7,869 |

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 52 of 130   Page ID #:159

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loss on investments in alternative energy partnerships, net | 17,660 | - | - | - | - | 17,660 | |
| Amortization of intangible assets | 1,179 | 1,322 | 1,322 | 1,346 | 1,401 | 3,823 | 4 |
| All other expenses | 15,093 | 16,187 | 10,449 | 13,193 | 9,587 | 41,729 | 30 |
| Total noninterest expense | 124,262 | 100,075 | 89,100 | 86,659 | 81,743 | 313,437 | 245 |
| Income before income taxes | 34,737 | 44,797 | 32,955 | 30,966 | 23,799 | 112,489 | 73 |
| Income tax (benefit) expense | (1,200) | 18,269 | 13,268 | 11,928 | 9,263 | 30,337 | 30 |
| **Net income** | **35,937** | **26,528** | **19,687** | **19,038** | **14,536** | **82,152** | **43** |
| Preferred stock dividends | 5,112 | 5,114 | 4,575 | 3,030 | 3,040 | 14,801 | 6 |
| **Net income available to common stockholders** | $ **30,825** | $ **21,414** | $ **15,112** | $ **16,008** | $ **11,496** | $ **67,351** | $ **36** |
| | | | | | | | |
| Basic earnings per total common share | $ 0.60 | $ 0.44 | $ 0.36 | $ 0.40 | $ 0.29 | $ 1.42 | $ |
| Diluted earnings per total common share | $ 0.59 | $ 0.43 | $ 0.36 | $ 0.39 | $ 0.29 | $ 1.40 | $ |

Case 8:19-mc-00005-AG-DFM    Document 16-1    Filed 09/28/18    Page 53 of 130    Page ID
#:160

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 54 of 130   Page ID
#:161

**Banc of California, Inc.**

**Selected Financial Data**

(Dollars in thousands)

(Unaudited)

| | Three Months Ended | | | | | Nine Months Ended | |
|---|---|---|---|---|---|---|---|
| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 | September 30, 2016 | Septeml 201 |
| **Average balances** | | | | | | | |
| Total assets | $ 10,860,257 | $ 10,061,237 | $ 8,833,176 | $ 7,590,781 | $ 6,681,590 | $ 9,921,657 | $ 6,29 |
| Total gross loans and leases | 7,245,472 | 6,663,340 | 5,995,436 | 5,531,539 | 5,271,293 | 6,636,978 | 5,22 |
| Investment Securities | 2,776,304 | 2,696,524 | 2,128,882 | 1,506,626 | 828,326 | 2,534,788 | 53 |
| Total interest earning assets | 10,432,247 | 9,619,937 | 8,344,167 | 7,264,341 | 6,449,862 | 9,468,979 | 6,04 |
| Total interest-bearing deposits | 7,164,061 | 5,696,893 | 5,332,032 | 4,685,145 | 4,314,330 | 6,068,343 | 4,16 |
| Total borrowings | 1,297,382 | 2,067,234 | 1,309,710 | 1,141,554 | 745,959 | 1,557,157 | 65 |
| Total interest bearing liabilities | 8,461,443 | 7,764,127 | 6,641,742 | 5,826,699 | 5,060,289 | 7,625,500 | 4,81 |
| Total stockholders' equity | 968,684 | 898,164 | 762,923 | 654,106 | 645,713 | 876,922 | 59 |
| **Profitability and other ratios** | | | | | | | |
| Return on average assets[1] | 1.32% | 1.06% | 0.90% | 1.00% | 0.86% | 1.11% | |
| Return on average equity [1] | 14.76% | 11.88% | 10.38% | 11.55% | 8.93% | 12.51% | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Return on average tangible common equity[2] | 19.51% | 15.65% | 14.46% | 16.57% | 12.25% | 16.84% | 1 |
| Dividend payout ratio [3] | 20.00% | 27.27% | 33.33% | 30.00% | 41.38% | 25.35% | 3 |
| Net interest spread | 3.18% | 3.26% | 3.22% | 3.22% | 3.23% | 3.22% | |
| Net interest margin[1] | 3.32% | 3.39% | 3.39% | 3.39% | 3.42% | 3.36% | |
| Noninterest income to total revenue [4] | 46.18% | 44.74% | 42.46% | 47.79% | 47.73% | 44.63% | 5 |
| Noninterest income to average total assets[1] | 2.73% | 2.62% | 2.37% | 2.97% | 3.01% | 2.59% | |
| Noninterest expense to average total assets[1] | 4.55% | 4.00% | 4.06% | 4.53% | 4.85% | 4.22% | |
| Efficiency ratio[5] | 76.90% | 68.24% | 72.81% | 72.89% | 76.92% | 72.79% | 7 |
| Adjusted efficiency ratio for including the pre-tax effect of investments in alternative energy partnerships [2], [5] | 62.38% | 68.24% | 72.81% | 72.89% | 76.92% | 67.23% | 7 |
| Average held for investment loans and leases to average deposits | 75.92% | 83.88% | 79.76% | 86.98% | 86.98% | 79.97% | 6 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Average investment securities to average total assets | 25.56% | 26.80% | 24.10% | 19.85% | 12.40% | 25.55% | | |
| Average stockholders' equity to average total assets | 8.92% | 8.93% | 8.64% | 8.62% | 9.66% | 8.84% | | |
| **Allowance for loan and lease losses (ALLL)** | | | | | | | | |
| Balance at beginning of period | $ 37,483 | $ 35,845 | $ 35,533 | $ 34,774 | $ 34,787 | $ 35,533 | $ | 2 |
| Loans and leases charged off | (393) | (772) | (102) | (718) | (788) | (1,267) | | (1 |
| Recoveries | 551 | 641 | 93 | 217 | 40 | 1,285 | | |
| Provision for loan and lease losses | 2,592 | 1,769 | 321 | 1,260 | 735 | 4,682 | | |
| Balance at end of period | $ 40,233 | $ 37,483 | $ 35,845 | $ 35,533 | $ 34,774 | $ 40,233 | $ | 3 |
| Annualized net loan charge-offs to average total gross loans held for investment | -0.01% | 0.01% | 0.00% | 0.04% | 0.07% | -0.01% | | |
| **Reserve for loss on repurchased loans** | | | | | | | | |
| Balance at beginning of period | $ 10,438 | $ 9,781 | $ 9,700 | $ 9,098 | $ 9,411 | $ 9,700 | $ | |
| Provision for loan repurchases | 1,241 | 851 | 270 | 725 | 716 | 2,471 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Change in estimates | - | - | - | 846 | - | - | |
| Utilization of reserve for loan repurchases | (310) | (194) | (298) | (979) | (1,029) | (802) | (2,82 |
| Balance at end of period | $ 11,369 | $ 10,438 | $ 9,781 | $ 9,700 | $ 9,098 | $ 11,369 | $ 9,0 |

*(1) Ratios are presented on an annualized basis.*

*(2) Non-GAAP measure. See Non-GAAP measures section for reconciliation of the calculation.*

*(3) Dividends declared per common share divided by basic earnings per share.*

*(4) Total revenue is equal to the sum of net interest income before provision and noninterest income.*

*(5) The ratios were calculated by dividing noninterest expense by the sum of net interest income before provision for loan and lease losse and noninterest income.*



Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 58 of 130   Page ID #:165

**Banc of California, Inc.**

**Selected Financial Data, Continued**

(Dollars in thousands)

(Unaudited)

| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 |
|---|---|---|---|---|---|
| **Asset quality information and ratios** | | | | | |
| 30 to 89 days delinquent, excluding PCI loans | $ 39,054 | $ 50,494 | $ 36,022 | $ 39,946 | $ 48,550 |
| 90+ days delinquent, excluding PCI loans | 22,827 | 28,675 | 27,469 | 23,338 | 23,725 |
| Total delinquent loans, excluding PCI loans | 61,881 | 79,169 | 63,491 | 63,284 | 72,275 |
| PCI loans, 30 to 89 days delinquent | 39,113 | 48,255 | 44,191 | 40,291 | 17,593 |
| PCI loans, 90+ days delinquent | 6,145 | 8,952 | 9,806 | 6,894 | 6,223 |
| Total delinquent PCI loans | 45,258 | 57,207 | 53,997 | 47,185 | 23,816 |
| Total delinquent loans | $ 107,139 | $ 136,376 | $ 117,488 | $ 110,469 | $ 96,091 |
| Total delinquent non-PCI loans to total non-PCI loans | 1.04% | 1.44% | 1.33% | 1.42% | 1.66% |
| Total delinquent loans to gross loans | 1.63% | 2.19% | 2.15% | 2.13% | 2.03% |
| | | | | | |
| Non-performing loans, excluding PCI loans | $ 35,223 | $ 45,012 | $ 44,216 | $ 45,129 | $ 45,188 |
| 90+ days delinquent and still accruing loans, excluding PCI loans | - | - | - | - | - |
| Other real estate owned | 275 | 429 | 325 | 1,097 | 34 |
| Non-performing assets | $ 35,498 | $ 45,441 | $ 44,541 | $ 46,226 | $ 45,222 |
| ALLL to non-performing loans | 114.22% | 83.27% | 81.07% | 78.74% | 76.95% |
| Non-performing loans to gross loans | 0.54% | 0.72% | 0.81% | 0.87% | 0.96% |
| Non-performing assets to total assets | 0.32% | 0.45% | 0.46% | 0.56% | 0.62% |
| | | | | | |
| Troubled Debt Restructings (TDRs) | | | | | |
| Performing TDRs | $ 11,160 | $ 14,450 | $ 15,128 | $ 7,842 | $ 9,378 |
| Non-performing TDRs | 520 | 2,864 | 2,545 | 1,970 | 2,017 |
| Total TDRs | $ 11,680 | $ 17,314 | $ 17,673 | $ 9,812 | $ 11,395 |

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 59 of 130   Page ID
#:166

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 60 of 130   Page ID #:167

**Banc of California, Inc.**

**Selected Financial Data, Continued**

(Dollars in thousands)

(Unaudited)

| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 |
|---|---|---|---|---|---|
| **Loan and lease breakdown by ALLL evaluation type** | | | | | |
| Originated loans and leases | | | | | |
| Individually evaluated for impairment | $ 22,306 | $ 25,661 | $ 26,565 | $ 30,654 | $ 31,008 |
| Collectively evaluated for impairment | 4,789,155 | 4,254,975 | 3,484,995 | 3,117,528 | 2,776,601 |
| Acquired loans not impaired at acquisition | | | | | |
| Individually evaluated for impairment | 3,397 | 3,470 | 3,530 | 3,629 | 1,704 |
| Collectively evaluated for impairment | 958,135 | 1,022,696 | 1,079,711 | 1,124,874 | 1,174,573 |
| Seasoned SFR mortgage loan pools - non-impaired | | | | | |
| Individually evaluated for impairment | 6,581 | 9,717 | 9,287 | - | - |
| Collectively evaluated for impairment | 146,850 | 168,352 | 175,004 | 194,978 | 373,634 |
| Acquired with deteriorated credit quality | 642,367 | 751,244 | 683,976 | 712,731 | 372,557 |
| Total loans | $ 6,568,791 | $ 6,236,115 | $ 5,463,068 | $ 5,184,394 | $ 4,730,077 |
| **ALLL breakdown** | | | | | |
| Originated loans and leases | | | | | |
| Individually evaluated for impairment | $ 137 | $ 215 | $ 365 | $ 369 | $ 512 |
| Collectively evaluated for impairment | 37,858 | 34,575 | 32,202 | 32,713 | 31,419 |
| Acquired loans not impaired at acquisition | | | | | |
| Individually evaluated for impairment | - | - | - | - | - |
| Collectively evaluated for impairment | 1,606 | 1,458 | 2,061 | 2,245 | 2,637 |
| Seasoned SFR mortgage loan pools - non-impaired | | | | | |
| Individually evaluated for impairment | 528 | 1,131 | 1,011 | - | - |
| Collectively evaluated for impairment | - | - | - | - | - |
| Acquired with deteriorated credit quality | 104 | 104 | 206 | 206 | 206 |
| Total ALLL | $ 40,233 | $ 37,483 | $ 35,845 | $ 35,533 | $ 34,774 |
| **Discount on Purchased/Acquired Loans** | | | | | |
| Acquired loans not impaired at acquisition | $ 18,400 | $ 20,136 | $ 20,781 | $ 21,366 | $ 21,759 |
| Seasoned SFR mortgage loan pools - non-impaired | 9,789 | 11,304 | 11,862 | 12,545 | 27,699 |
| Acquired with deteriorated credit quality | 57,780 | 76,505 | 66,573 | 68,372 | 41,280 |
| Total Discount | $ 85,969 | $ 107,945 | $ 99,216 | $ 102,283 | $ 90,738 |
| **Ratios** | | | | | |

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 61 of 130   Page ID
#:168

| | | | | | |
|---|---|---|---|---|---|
| To originated loans and leases: | | | | | |
|     Individually evaluated for impairment | 0.61% | 0.84% | 1.37% | 1.20% | 1.65% |
|     Collectively evaluated for impairment | 0.79% | 0.81% | 0.92% | 1.05% | 1.13% |
|     Total ALLL | 0.79% | 0.81% | 0.93% | 1.05% | 1.14% |
| To originated loans and leases and acquired loans | | | | | |
|   not impaired at acquisition: | | | | | |
|     Individually evaluated for impairment | 0.53% | 0.74% | 1.21% | 1.08% | 1.57% |
|     Collectively evaluated for impairment | 0.69% | 0.68% | 0.75% | 0.82% | 0.86% |
|     Total ALLL | 0.69% | 0.68% | 0.75% | 0.83% | 0.87% |
|     Total ALLL and discount [1] | 1.00% | 1.06% | 1.21% | 1.33% | 1.41% |
| To total loans and leases: | | | | | |
|     Individually evaluated for impairment | 2.06% | 3.46% | 3.49% | 1.08% | 1.57% |
|     Collectively evaluated for impairment | 0.67% | 0.66% | 0.72% | 0.79% | 0.79% |
|     Total ALLL | 0.61% | 0.60% | 0.66% | 0.69% | 0.74% |
|     Total ALLL and discount [1] | 1.92% | 2.33% | 2.47% | 2.66% | 2.65% |

*(1) The ratios were calculated by dividing a sum of ALLL and discounts by carrying value of loans.*

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 62 of 130   Page ID
#:169

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 63 of 130   Page ID #:170

**Banc of California, Inc.**

**Selected Financial Data, Continued**

(Dollars in thousands)

(Unaudited)

| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 |
|---|---|---|---|---|---|
| **Composition of held for investment loans and leases** | | | | | |
| Commercial real estate | $ 721,838 | $ 725,107 | $ 713,693 | $ 727,707 | $ 690,862 |
| Multi-family | 1,199,207 | 1,147,597 | 1,021,097 | 904,300 | 823,415 |
| Construction | 99,086 | 86,852 | 68,241 | 55,289 | 39,475 |
| Commercial and industrial | 1,531,041 | 1,306,866 | 983,961 | 876,999 | 822,690 |
| SBA | 67,737 | 65,477 | 71,640 | 57,706 | 52,985 |
| Lease financing | 234,540 | 228,663 | 212,836 | 192,424 | 162,504 |
| Total commercial loans | 3,853,449 | 3,560,562 | 3,071,468 | 2,814,425 | 2,591,931 |
| Single family residential mortgage | 2,601,375 | 2,555,344 | 2,282,445 | 2,255,584 | 2,013,450 |
| Other consumer | 113,967 | 120,209 | 109,155 | 114,385 | 124,696 |
| Total consumer loans | 2,715,342 | 2,675,553 | 2,391,600 | 2,369,969 | 2,138,146 |
| Total gross loans and leases | $ 6,568,791 | $ 6,236,115 | $ 5,463,068 | $ 5,184,394 | $ 4,730,077 |
| **Composition percentage of held for investment loans and leases** | | | | | |
| Commercial real estate | 11.0% | 11.6% | 13.1% | 14.0% | 14.6% |
| Multi-family | 18.3% | 18.4% | 18.7% | 17.4% | 17.4% |
| Construction | 1.5% | 1.4% | 1.2% | 1.1% | 0.8% |
| Commercial and industrial | 23.3% | 21.0% | 18.0% | 16.9% | 17.4% |
| SBA | 1.0% | 1.0% | 1.3% | 1.1% | 1.1% |
| Lease financing | 3.6% | 3.7% | 3.9% | 3.7% | 3.4% |
| Total commercial loans | 58.7% | 57.1% | 56.2% | 54.2% | 54.7% |
| Single family residential mortgage | 39.6% | 41.0% | 41.8% | 43.6% | 42.7% |
| Other consumer | 1.7% | 1.9% | 2.0% | 2.2% | 2.6% |
| Total consumer loans | 41.3% | 42.9% | 43.8% | 45.8% | 45.3% |
| Total gross loans and leases | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Composition of deposits** | | | | | |
| Noninterest-bearing checking | $ 1,267,363 | $ 1,093,686 | $ 1,398,728 | $ 1,121,124 | $ 1,011,169 |
| Interest-bearing checking | 2,369,332 | 2,053,656 | 2,052,507 | 1,697,055 | 1,458,208 |
| Money market | 2,900,248 | 2,343,561 | 1,534,492 | 1,479,931 | 1,238,180 |
| Savings | 880,712 | 909,242 | 844,177 | 823,618 | 814,230 |
| Certificates of deposit | 1,660,664 | 1,528,811 | 1,007,697 | 1,181,357 | 900,203 |
| Total deposits | $ 9,078,319 | $ 7,928,956 | $ 6,837,601 | $ 6,303,085 | $ 5,421,990 |

**Composition percentage of deposits**

| | | | | | |
|---|---|---|---|---|---|
| Noninterest-bearing checking | 14.0% | 13.8% | 20.5% | 17.8% | 18.6% |
| Interest-bearing checking | 26.1% | 25.9% | 30.0% | 26.8% | 26.9% |
| Money market | 31.9% | 29.5% | 22.4% | 23.5% | 22.8% |
| Savings | 9.7% | 11.5% | 12.3% | 13.1% | 15.0% |
| Certificates of deposit | 18.3% | 19.3% | 14.8% | 18.8% | 16.7% |
| Total deposits | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Banc of California Reports Record Third Quarter Earnings                    Page 24 of 40
Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 65 of 130   Page ID
#:172

**Banc of California, Inc.**

**Average Balance, Average Yield Earned, and Average Cost Paid**

(Dollars in thousands)

(Unaudited)

| | Three Months Ended | | | | | | | |
| | September 30, 2016 | | | June 30, 2016 | | | March 31, 20 | |
| | Average Balance | Interest | Yield / Cost | Average Balance | Interest | Yield / Cost | Average Balance | Interes |
|---|---|---|---|---|---|---|---|---|
| **Interest earning assets** | | | | | | | | |
| Loans held for sale and SFR mortgage | $ 2,618,879 | $ 24,365 | 3.70% | $ 2,428,168 | $ 22,488 | 3.72% | $ 2,144,834 | $ 19,80 |
| Seasoned SFR mortgage loan pools | 907,387 | 11,924 | 5.23% | 878,068 | 12,404 | 5.68% | 876,142 | 12,71 |
| Commercial real estate, multi-family, and construction | 2,033,718 | 23,097 | 4.52% | 1,907,649 | 21,049 | 4.44% | 1,760,646 | 19,81 |
| Commercial and industrial, SBA, and lease financing | 1,576,379 | 19,734 | 4.98% | 1,343,961 | 16,642 | 4.98% | 1,105,971 | 13,66 |
| Other consumer | 109,109 | 1,250 | 4.56% | 105,494 | 1,160 | 4.42% | 107,843 | 1,14 |
| Gross loans and leases | 7,245,472 | 80,370 | 4.41% | 6,663,340 | 73,743 | 4.45% | 5,995,436 | 67,14 |
| Securities | 2,776,304 | 19,934 | 2.86% | 2,696,524 | 19,393 | 2.89% | 2,128,882 | 16,04 |
| Other interest-earning assets | 410,471 | 1,931 | 1.87% | 260,073 | 1,504 | 2.33% | 219,849 | 1,04 |
| Total interest-earning assets | 10,432,247 | 102,235 | 3.90% | 9,619,937 | 94,640 | 3.96% | 8,344,167 | 84,24 |
| Allowance for loan and lease losses | (38,258) | | | (37,637) | | | (35,575) | |
| BOLI and non-interest earning assets | 466,268 | | | 478,937 | | | 524,584 | |
| Total assets | $ 10,860,257 | | | $ 10,061,237 | | | $ 8,833,176 | |
| **Interest-bearing liabilities** | | | | | | | | |
| Savings | $ 887,973 | $ 1,704 | 0.76% | $ 866,051 | $ 1,603 | 0.74% | $ 834,965 | $ 1,57 |
| Interest-bearing checking | 2,300,128 | 3,972 | 0.69% | 1,981,702 | 3,135 | 0.64% | 1,900,834 | 3,2 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Certificates of deposit | 1,548,604 | 2,322 | 0.60% | 1,176,478 | 1,685 | 0.58% | 1,158,901 | 1,612 |
| Total interest-bearing deposits | 7,164,061 | 11,224 | 0.62% | 5,696,893 | 8,385 | 0.59% | 5,332,032 | 8,107 |
| FHLB advances | 1,104,663 | 1,413 | 0.51% | 1,663,791 | 1,966 | 0.48% | 955,659 | 1,262 |
| Securities sold under repurchase agreements | 12,539 | 48 | 1.52% | 210,299 | 389 | 0.74% | 90,395 | 160 |
| Long-term debt and other interest-bearing liabilities | 180,180 | 2,589 | 5.72% | 193,144 | 2,863 | 5.96% | 263,656 | 4,294 |
| Total interest-bearing liabilities | 8,461,443 | 15,274 | 0.72% | 7,764,127 | 13,603 | 0.70% | 6,641,742 | 13,823 |
| Noninterest-bearing deposits | 1,178,849 | | | 1,205,987 | | | 1,230,991 | |
| Non-interest-bearing liabilities | 251,281 | | | 192,959 | | | 197,520 | |
| Total liabilities | 9,891,573 | | | 9,163,073 | | | 8,070,253 | |
| Total stockholders' equity | 968,684 | | | 898,164 | | | 762,923 | |
| Total liabilities and stockholders' equity | $ 10,860,257 | | | $ 10,061,237 | | | $ 8,833,176 | |
| Net interest income/spread | | $ 86,961 | 3.18% | | $ 81,037 | 3.26% | | $ 70,417 |
| Net interest margin | | | 3.32% | | | 3.39% | | |
| Ratio of interest-earning assets to interest-bearing liabilities | 123.29% | | | 123.90% | | | 125.63% | |
| Total deposits | $ 8,342,910 | $ 11,224 | 0.54% | $ 6,902,880 | $ 8,385 | 0.49% | $ 6,563,023 | $ 8,107 |
| Total funding [1] | $ 9,640,292 | $ 15,274 | 0.63% | $ 8,970,114 | $ 13,603 | 0.61% | $ 7,872,733 | $ 13,823 |

*(1) Total funding is the sum of interest-bearing liabilities and noninterest-bearing deposits. The cost of total funding is calculated as annual total interest expense divided by average total funding.*

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 68 of 130   Page ID
#:175

**Banc of California, Inc.**

**Average Balance, Average Yield Earned, and Average Cost Paid, Continued**

(Dollars in thousands)

(Unaudited)

| | Three Months Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | December 31, 2015 | | | September 30, 2015 | | |
| | Average Balance | Interest | Yield / Cost | Average Balance | Interest | Yield / Cost |
| **Interest earning assets** | | | | | | |
| Loans held for sale and SFR mortgage | $ 1,903,331 | $ 17,584 | 3.67% | $ 1,966,373 | $ 18,123 | 3.66% |
| Seasoned SFR mortgage loan pools | 858,601 | 12,098 | 5.59% | 689,666 | 10,901 | 6.27% |
| Commercial real estate, multi-family, and construction | 1,638,329 | 19,006 | 4.60% | 1,568,975 | 17,643 | 4.46% |
| Commercial and industrial, SBA, and lease financing | 1,020,306 | 12,754 | 4.96% | 914,811 | 12,125 | 5.26% |
| Other consumer | 110,972 | 806 | 2.88% | 131,468 | 1,662 | 5.02% |
| Gross loans and leases | 5,531,539 | 62,248 | 4.46% | 5,271,293 | 60,454 | 4.55% |
| Securities | 1,506,626 | 11,163 | 2.94% | 828,326 | 5,054 | 2.42% |
| Other interest-earning assets | 226,176 | 788 | 1.38% | 350,243 | 1,007 | 1.14% |
| Total interest-earning assets | 7,264,341 | 74,199 | 4.05% | 6,449,862 | 66,515 | 4.09% |
| Allowance for loan and lease losses | (35,894) | | | (34,810) | | |
| BOLI and non-interest earning assets | 362,334 | | | 266,538 | | |
| Total assets | $ 7,590,781 | | | $ 6,681,590 | | |
| | | | | | | |
| **Interest-bearing liabilities** | | | | | | |
| Savings | $ 805,445 | $ 1,538 | 0.76% | $ 832,006 | $ 1,575 | 0.75% |
| Interest-bearing checking | 1,475,461 | 2,663 | 0.72% | 1,282,066 | 2,273 | 0.70% |
| Money market | 1,343,683 | 1,267 | 0.37% | 1,294,554 | 1,337 | 0.41% |
| Certificates of deposit | 1,060,556 | 1,394 | 0.52% | 905,704 | 1,210 | 0.53% |
| Total interest-bearing deposits | 4,685,145 | 6,862 | 0.58% | 4,314,330 | 6,395 | 0.59% |
| FHLB advances | 869,457 | 890 | 0.41% | 476,848 | 587 | 0.49% |
| Securities sold under repurchase agreements | 7,010 | 15 | 0.85% | 2,681 | 3 | 0.44% |
| Long-term debt and other interest-bearing liabilities | 265,087 | 4,366 | 6.53% | 266,430 | 3,980 | 5.93% |
| Total interest-bearing liabilities | 5,826,699 | 12,133 | 0.83% | 5,060,289 | 10,965 | 0.86% |
| Noninterest-bearing deposits | 1,037,966 | | | 916,670 | | |
| Non-interest-bearing liabilities | 72,010 | | | 58,918 | | |
| Total liabilities | 6,936,675 | | | 6,035,877 | | |
| Total stockholders' equity | 654,106 | | | 645,713 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total liabilities and stockholders' equity | $ 7,590,781 | | | $ 6,681,590 | | |
| Net interest income/spread | | $ 62,066 | 3.22% | | $ 55,550 | 3.23% |
| Net interest margin | | | 3.39% | | | 3.42% |
| Ratio of interest-earning assets to interest-bearing liabilities | 124.67% | | | 127.46% | | |
| Total deposits | $ 5,723,111 | $ 6,862 | 0.48% | $ 5,231,000 | $ 6,395 | 0.49% |
| Total funding [1] | $ 6,864,665 | $ 12,133 | 0.70% | $ 5,976,959 | $ 10,965 | 0.73% |

*(1) Total funding is the sum of interest-bearing liabilities and noninterest-bearing deposits. The cost of total funding is calculated as annualized total interest expense divided by average total funding.*

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 71 of 130   Page ID
#:178

**Banc of California, Inc.**

**Average Balance, Average Yield Earned, and Average Cost Paid, Continued**

(Dollars in thousands)

(Unaudited)

| | Nine Months Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2016 | | | September 30, 2015 | | |
| | Average Balance | Interest | Yield / Cost | Average Balance | Interest | Yield / Cost |
| **Interest earning assets** | | | | | | |
| Loans held for sale and SFR mortgage | $ 2,398,101 | $ 66,661 | 3.71% | $ 1,931,759 | $ 54,584 | 3.78% |
| Seasoned SFR mortgage loan pools | 887,273 | 37,037 | 5.58% | 624,642 | 30,004 | 6.42% |
| Commercial real estate, multi-family, and construction | 1,901,157 | 63,962 | 4.49% | 1,790,108 | 61,703 | 4.61% |
| Commercial and industrial, SBA, and lease financing | 1,342,959 | 50,041 | 4.98% | 729,529 | 28,234 | 5.17% |
| Other consumer | 107,488 | 3,556 | 4.42% | 146,252 | 4,783 | 4.37% |
| Gross loans and leases | 6,636,978 | 221,257 | 4.45% | 5,222,290 | 179,308 | 4.59% |
| Securities | 2,534,788 | 55,374 | 2.92% | 530,124 | 9,100 | 2.30% |
| Other interest-earning assets | 297,213 | 4,484 | 2.02% | 293,891 | 3,731 | 1.70% |
| Total interest-earning assets | 9,468,979 | 281,115 | 3.97% | 6,046,305 | 192,139 | 4.25% |
| Allowance for loan and lease losses | (37,161) | | | (31,312) | | |
| BOLI and non-interest earning assets | 489,839 | | | 276,543 | | |
| Total assets | $ 9,921,657 | | | $ 6,291,536 | | |
| | | | | | | |
| **Interest-bearing liabilities** | | | | | | |
| Savings | $ 863,088 | $ 4,878 | 0.75% | $ 881,273 | $ 4,929 | 0.75% |
| Interest-bearing checking | 2,061,761 | 10,352 | 0.67% | 1,113,267 | 6,309 | 0.76% |
| Money market | 1,847,906 | 6,867 | 0.50% | 1,177,538 | 3,324 | 0.38% |
| Certificates of deposit | 1,295,588 | 5,619 | 0.58% | 988,274 | 4,359 | 0.59% |
| Total interest-bearing deposits | 6,068,343 | 27,716 | 0.61% | 4,160,352 | 18,921 | 0.61% |
| FHLB advances | 1,240,872 | 4,641 | 0.50% | 446,571 | 1,230 | 0.37% |
| Securities sold under repurchase agreements | 104,076 | 597 | 0.77% | 903 | 3 | 0.44% |
| Long-term debt and other interest-bearing liabilities | 212,209 | 9,746 | 6.13% | 208,252 | 10,334 | 6.63% |
| Total interest-bearing liabilities | 7,625,500 | 42,700 | 0.75% | 4,816,078 | 30,488 | 0.85% |
| Noninterest-bearing deposits | 1,205,179 | | | 820,385 | | |
| Non-interest-bearing liabilities | 214,056 | | | 56,738 | | |
| Total liabilities | 9,044,735 | | | 5,693,201 | | |
| Total stockholders' equity | 876,922 | | | 598,335 | | |

Case 8:19-mc-00005-AG-DFM    Document 16-1    Filed 09/28/18    Page 73 of 130    Page ID
#:180

| | | | | | | |
|---|---|---|---|---|---|---|
| Total liabilities and stockholders' equity | $ 9,921,657 | | | $ 6,291,536 | | |
| Net interest income/spread | | $ 238,415 | 3.22% | | $ 161,651 | 3.40% |
| Net interest margin | | | 3.36% | | | 3.57% |
| Ratio of interest-earning assets to interest-bearing liabilities | 124.18% | | | 125.54% | | |
| Total deposits | $ 7,273,522 | $ 27,716 | 0.51% | $ 4,980,737 | $ 18,921 | 0.51% |
| Total funding [1] | $ 8,830,679 | $ 42,700 | 0.65% | $ 5,636,463 | $ 30,488 | 0.72% |

*(1) Total funding is the sum of interest-bearing liabilities and noninterest-bearing deposits. The cost of total funding is calculated as annualized total interest expense divided by average total funding.*

**Banc of California, Inc.**

**Capital Ratios**

(Unaudited)

| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 |
|---|---|---|---|---|---|
| **Capital Ratios** | | | | | |
| Banc of California, Inc. | | | | | |
| Total risk-based capital ratio | 12.79% | 13.45% | 13.59% | 11.18% | 12.56% |
| Tier 1 risk-based capital ratio | 12.54% | 13.14% | 13.17% | 10.71% | 12.06% |
| Common equity tier 1 capital ratio | 8.85% | 9.16% | 8.14% | 7.36% | 8.19% |
| Tier 1 leverage ratio | 8.47% | 8.87% | 9.27% | 8.07% | 8.97% |
| Banc of California, NA | | | | | |
| Total risk-based capital ratio | 14.38% | 14.96% | 14.03% | 13.45% | 14.93% |
| Tier 1 risk-based capital ratio | 13.83% | 14.38% | 13.42% | 12.79% | 14.19% |
| Common equity tier 1 capital ratio | 13.83% | 14.38% | 13.42% | 12.79% | 14.19% |
| Tier 1 leverage ratio | 9.31% | 9.70% | 9.44% | 9.64% | 10.53% |

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 74 of 130   Page ID
#:181

**Banc of California, Inc.**

**Non-GAAP Measures**

(Dollars in thousands, except per share data)

(Unaudited)


**Non-GAAP performance measure:**

Tangible equity to tangible assets, tangible common equity to tangible assets ratios, return on average tangible common equity, and adjusted efficiency ratio are supplemental financial information determined by a method other than in accordance with U.S. generally accepted accounting principles (GAAP). These non-GAAP measures are used by management in the analysis of Banc of California, Inc.'s capital strength and performance of businesses. Tangible equity is calculated by subtracting goodwill and other intangible assets from total stockholders' equity and tangible common equity is calculated by subtracting preferred stock from tangible equity. Banking and financial institution regulators also exclude goodwill and other intangible assets from total stockholders' equity when assessing the capital adequacy of a financial institution. Adjusted efficiency ratio is calucated by subtracting loss on investments in alternative energy partnerships from noninterest expense and adding total pretax return, which includes the loss on investments in alternative energy partnerships, from investments in alternative energy partnerships to noninterest income.. Management believes the presentation of these financial measures excluding the impact of these items provides useful supplemental information that is essential to a proper understanding of the capital and financial strength of Banc of California, Inc. This disclosure should not be viewed as a substitution for results determined in accordance with GAAP, nor is it necessarily comparable to non-GAAP performance measures that may be presented by other companies.

The following tables reconcile this non-GAAP performance measures to the GAAP performance measures for the periods indicated:

| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 |
|---|---|---|---|---|---|
| **Tangible common equity to tangible assets ratio** | | | | | |
| Total assets | $ 11,216,404 | $ 10,157,662 | $ 9,616,972 | $ 8,235,555 | $ 7,256,810 |
| Less goodwill | (39,244) | (39,244) | (39,244) | (39,244) | (39,244) |
| Less other intangible assets | (15,335) | (16,514) | (17,836) | (19,158) | (20,504) |
| Tangible assets | $ 11,161,825 | $ 10,101,904 | $ 9,559,892 | $ 8,177,153 | $ 7,197,062 |
| | | | | | |
| Total stockholders' equity | $ 971,424 | $ 939,884 | $ 867,530 | $ 652,405 | $ 643,534 |
| Less goodwill | (39,244) | (39,244) | (39,244) | (39,244) | (39,244) |
| Less other intangible assets | (15,335) | (16,514) | (17,836) | (19,158) | (20,504) |
| Tangible equity | 916,845 | 884,126 | 810,450 | 594,003 | 583,786 |
| Less preferred stock | (269,071) | (269,071) | (311,008) | (190,750) | (190,750) |
| Tangible common equity | $ 647,774 | $ 615,055 | $ 499,442 | $ 403,253 | $ 393,036 |
| | | | | | |
| Total stockholders' equity to total assets | 8.66% | 9.25% | 9.02% | 7.92% | 8.87% |
| Tangible equity to tangible assets | 8.21% | 8.75% | 8.48% | 7.26% | 8.03% |

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 76 of 130   Page ID #:183

| | | | | | |
|---|---|---|---|---|---|
| Tangible common equity to tangible assets | 5.80% | 6.09% | 5.22% | 4.93% | 5.46% |
| Common stock outstanding | 49,531,321 | 49,478,348 | 43,907,587 | 38,002,267 | 37,751,445 |
| Class B non-voting non-convertible common stock outstanding | 201,922 | 161,841 | 91,066 | 37,355 | - |
| Total common stock outstanding | 49,733,243 | 49,640,189 | 43,998,653 | 38,039,622 | 37,751,445 |
| Minimum number of shares issuable under purchase contracts [1] | 188,742 | 218,928 | 253,155 | 601,299 | 828,246 |
| Total common stock outstanding and shares issuable under purchase contracts | 49,921,985 | 49,859,117 | 44,251,808 | 38,640,921 | 38,579,691 |

*(1) Purchase contracts relating to the tangible equity units*

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Tangible common equity per common stock | $ | 13.02 | $ | 12.39 | $ | 11.35 | $ | 10.60 | $ | 10.41 |
| Book value per common stock | $ | 14.12 | $ | 13.51 | $ | 12.65 | $ | 12.14 | $ | 11.99 |
| Tangible common equity per common stock and shares issuable under purchase contracts | $ | 12.98 | $ | 12.34 | $ | 11.29 | $ | 10.44 | $ | 10.19 |
| Book value per common stock and shares issuable under purchase contracts | $ | 14.07 | $ | 13.45 | $ | 12.58 | $ | 11.95 | $ | 11.74 |

Case 8:19-mc-00005-AG-DFM   Document 16-1   Filed 09/28/18   Page 77 of 130   Page ID #:184

**Banc of California, Inc.**

**Non-GAAP Measures, Continued**

(Dollars in thousands, except per share data)

(Unaudited)

| | Three Months Ended | | | | | Nine Months E... | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 | September 30, 2016 | Sep... |
| **Return on tangible common equity** | | | | | | | |
| Average total stockholders' equity | $ 968,684 | $ 898,164 | $ 762,923 | $ 654,106 | $ 645,713 | $ 876,922 | $ |
| Less average preferred stock | (269,071) | (269,073) | (260,959) | (190,750) | (190,750) | (266,377) | |
| Less average goodwill | (39,244) | (39,244) | (39,244) | (39,244) | (31,674) | (39,244) | |
| Less average other intangible assets | (16,039) | (17,299) | (18,601) | (19,877) | (21,320) | (17,308) | |
| Average tangible common equity | $ 644,330 | $ 572,548 | $ 444,119 | $ 404,235 | $ 401,969 | $ 553,993 | $ |
| Net income | $ 35,937 | $ 26,528 | $ 19,687 | $ 19,038 | $ 14,536 | $ 82,152 | $ |
| Less preferred stock dividends | (5,112) | (5,114) | (4,575) | (3,030) | (3,040) | (14,801) | |
| Add amortization of intangible assets | 1,179 | 1,322 | 1,322 | 1,346 | 1,401 | 3,823 | |
| Add impairment on intangible assets | - | - | - | - | - | - | |
| Less tax effect on amortization and impairment of intangible assets [1] | (413) | (463) | (463) | (471) | (490) | (1,338) | |
| Net income available to common stockholders | $ 31,591 | $ 22,273 | $ 15,971 | $ 16,883 | $ 12,407 | $ 69,836 | $ |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Return on average equity | 14.76% | 11.88% | 10.38% | 11.55% | 8.93% | 12.51% | |
| Return on average tangible common equity | 19.51% | 15.65% | 14.46% | 16.57% | 12.25% | 16.84% | |

*(1) Utilized a 35% effective tax rate*

| | Three Months Ended | | | | | Nine Months En | |
|---|---|---|---|---|---|---|---|
| | September 30, 2016 | June 30, 2016 | March 31, 2016 | December 31, 2015 | September 30, 2015 | September 30, 2016 | Sep |
| **Adjusted efficiency ratio for including the pre-tax effect of investments in alternative energy partnerships** | | | | | | | |
| Noninterest expense | $ 124,262 | $ 100,075 | $ 89,100 | $ 86,659 | $ 81,743 | $ 313,437 | $ |
| Loss on investments in alternative energy partnerships, net | (17,660) | - | - | - | - | (17,660) | |
| Adjusted noninterest expense | $ 106,602 | $ 100,075 | $ 89,100 | $ 86,659 | $ 81,743 | $ 295,777 | $ |
| Net interest income | $ 86,961 | $ 81,037 | $ 70,417 | $ 62,066 | $ 55,550 | $ 238,415 | $ |
| Noninterest income | 74,630 | 65,604 | 51,959 | 56,819 | 50,727 | 192,193 | |
| Total revenue | 161,591 | 146,641 | 122,376 | 118,885 | 106,277 | 430,608 | |
| Tax credit from investments in alternative energy partnerships | 19,357 | - | - | - | - | 19,357 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Deferred tax expense on investments in alternative energy partnerships | (3,387) | - | - | - | - | (3,387) |
| Tax effect on tax credit and deferred tax expense[1] | 11,002 | - | - | - | - | 11,002 |
| Loss on investments in alternative energy partnerships, net | (17,660) | - | - | - | - | (17,660) |
| Total pre-tax adjustemnts for investments in alternative energy partnerships | 9,312 | - | - | - | - | 9,312 |
| Total adjusted revenue | $ 170,903 | $ 146,641 | $ 122,376 | $ 118,885 | $ 106,277 | $ 439,920 | $ 3 |
| Efficiency ratio | 76.90% | 68.24% | 72.81% | 72.89% | 76.92% | 72.79% | |
| Adjusted efficiency ratio for excluding the effect of investments in alternative energy partnerships | 62.38% | 68.24% | 72.81% | 72.89% | 76.92% | 67.23% | |

(1) Utilized a 40.79% effective tax rate

<       >

SOURCE Banc of California, Inc.

Case 8:19-mc-00005-AG-DFM    Document 16-1    Filed 09/28/18    Page 81 of 130    Page ID
#:188

Related Links

http://bancofcal.com

# EXHIBIT 5

## Banc of California Board Provides Update on Independent Investigation; Plans Improvements to Corporate Governance Policies

Company Release - 01/23/2017 08:29

IRVINE, Calif., Jan. 23, 2017 /PRNewswire/ -- Banc of California, Inc. (the "Company") (NYSE: BANC) today issued the following update on the independent investigation into previously disclosed blogger allegations.

Robert D. Sznewajs, current Chair of the Joint Audit Committee and new Chairman of the Board said: "The matters which were the subject of the Special Committee investigation do not bear upon the Company's operating results or financial condition, and Banc of California remains well positioned to continue to fulfill its mission and vision as California´s Bank."

On October 18, 2016, an anonymous blog post raised questions about related party transactions and other issues with respect to the Company. As previously disclosed, in response to these allegations, the Board formed a Special Committee which commenced a process to review the allegations. Shortly thereafter, on October 27, 2016, the Company's independent auditor, KPMG, sent a letter to Mr. Sznewajs in his capacity as Chair of the Company's Joint Audit Committee (the "KPMG Letter") raising concerns about allegations of "inappropriate relationships with third parties" and "potential undisclosed related party relationships."

On October 30, 2016, the Special Committee retained WilmerHale, a law firm with no prior relationship with the Company, to conduct an independent investigation to address certain issues raised by the blog post, as well as questions raised by the KPMG Letter. In accordance with the KPMG Letter, WilmerHale will make a final report to the Special Committee and KPMG on the results of its investigation. The Special Committee expects that this final report will take place within weeks.

While certain work remains to be completed, to date WilmerHale's inquiry has not found any violation of law. In addition, contrary to the claims in the blog post, the inquiry has not found evidence that Jason Galanis has any direct or indirect control or undue influence over the Company. Furthermore, the inquiry has not found evidence establishing that any loan, related party transaction, or any other circumstance has impaired the independence of any director.

Through the inquiry, however, the Special Committee has determined that a press release issued on October 18, 2016 contained inaccurate statements. In that press release, the Company stated that the "Board of Directors, acting through its Disinterested Directors" had, as of October 18, 2016, investigated issues raised in the blog post. This press release was inaccurate in certain respects. The review established that although an investigation had been conducted, it was not initiated by the Board of Directors; rather, it appears to have been directed by Company management rather than any subset of independent directors. In addition, the press release characterized the investigation as "independent" without disclosing that the law firm conducting the investigation had previously represented both the Company and the Company's CEO individually. Furthermore, the press release stated that the Board or a group of "Disinterested Directors" had received "regular reports including related to regulatory and governmental communications." This overstated both the degree to which the Company had been in contact with regulatory agencies about the subject matter referenced in the blog post, as well as the involvement of the directors in oversight or direction of the inquiry.

Related to this matter, on January 12, 2017, the Securities and Exchange Commission ("SEC") issued a formal order of investigation directed at certain of the issues that the Special Committee is reviewing. Also on January 12, 2017, the SEC issued a subpoena seeking certain documents from the Company, primarily relating to the October 18, 2016 press release and associated public statements. The Company intends to fully cooperate with the SEC; in addition, the Special Committee will share the results of its review with the SEC staff.

The Company expects to report fourth quarter financial results on Monday, January 30. The Company currently expects to timely file its Annual Report on Form 10-K for the year ended December 31, 2016 and the Company intends to file its unaudited Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 on or prior to timely filing its 10-K.

### Changes in Corporate Governance Policies
The Board is in the process of considering various measures to enhance its overall corporate governance. The Board has separated the roles of Board Chair and Chief Executive Officer, effective immediately. In addition, the Board approved a separation of the Compensation, Nominating and Corporate Governance Committee into two separate committees; one focusing on compensation matters and one on governance matters. At the Board's direction, the Company is in the process of preparing a more rigorous policy to govern review and approval of proposed related party transactions. Further changes in corporate governance may be implemented as the Board continues its review.

### About Banc of California, Inc.
Banc of California, Inc. (NYSE: BANC) provides comprehensive banking services to California's diverse businesses, entrepreneurs and communities. Banc of California operates over 100 offices in California and the West.  The Company was recently recognized by Forbes for the second straight year as one of the 100 Best Banks in America for 2017.

### Forward-Looking Statements
This press release includes forward-looking statements within the meaning of the "Safe-Harbor" provisions of the Private Securities Litigation Reform Act of 1995. These statements are necessarily subjct to risk and uncertainty and actual results could differ materially from those anticipated due to various factors. You should not place undue reliance on

forward-looking statements and Banc of California, Inc. undertakes no obligation to update any such statements to reflect circumstances or events that occur after the date on which the forward-looking statement is made.

| **Investor Relations Inquiries:** | **Media Inquiries:** |
|---|---|
| Banc of California, Inc. | Abernathy MacGregor |
| Timothy Sedabres, (855) 361-2262 | Ian Campbell / Joe Hixson / Kristin Cole, (213) 630-6550 |
| | idc@abmac.com / jrh@abmac.com / kec@abmac.com |

To view the original version on PR Newswire, visit:http://www.prnewswire.com/news-releases/banc-of-california-board-provides-update-on-independent-investigation-plans-improvements-to-corporate-governance-policies-300394631.html

SOURCE Banc of California, Inc.

Click here for Printer-Friendly Version

# EXHIBIT 6



Valentina Judge
Senior Paralegal
Office of General Counsel
Phone: 202.728.8850
Fax:  202.728.8894
valentina.judge@finra.org

April 30, 2018

<u>Via FINRA Secure File Share</u>

Manuel A. Abascal, Esq.
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA  90071

Re:    *In re Banc of California Securities Litigation*, United States District Court for the Central District of California, Civil Action No. 8:17-cv-00118

Dear Mr. Abascal:

In further response to the third-party subpoena served on FINRA in the above-referenced proceeding (the "Subpoena"), please find with this letter a zipped file containing options transactions and holdings data, and equities order data pertaining to Banc of California (BANC:NYSE) securities for the period September 1, 2016 though January 30, 2017 (the "Relevant Period"). Also enclosed is a Declaration of FINRA's Custodian of Records. The original hard copy of the Declaration will be sent separately, via U.S. Mail.

The documents can be accessed through the secure link included in the email transmission. Please let me know if you have any issues opening the file.

Additional details about the enclosed documents can be found below. Please review this information prior to opening the enclosed files.

**OPTIONS DATA**

1. COATS Data Sep012016 through Jan302017 (DIVER).xlsx [Sorted by Event Dt and Rep Trd Time] (options trades)
2. COATS Data Fields and Definitions (DIVER) Apr092018.pdf
3. OCC LPOR (Large Options Position Report) Data Sep012016 through Jan302017 (DIVER).pdf [Sorted by Event Dt and Effective Dt] (options holdings)
4. OCC LOPR Data Fields and Definitions Apr092018 (DIVER).pdf

Please be advised of the following:

- The LOPR data set contains personal and confidential information ("PCI") of individuals, including but not limited to account numbers, tax identification numbers, and addresses. FINRA has redacted this information pursuant to its internal policies as well as the California Evidence Code.
- The LOPR data represents a minimum reporting threshold of 200 aggregate contracts on the same side of the market, so there is a chance that an account may hold small positions that would not appear on LOPR. Once the aggregate size of all positions for the account, or accounts acting in-concert, exceed 200 contracts for the same side of the market and underlying, then all positions for that account, or accounts acting in-concert have to be

Investor protection. Market integrity.          1735 K Street, NW          t  202 728 8000
                                                Washington, DC            www.finra.org
                                                20006-1506

Manuel A. Abascal, Esq.
April 30, 2018
Page 2 of 4

reported for that underlying and side of the market. We should also note that LOPR also contains Conventional (OTC) Option positions, however, short contracts where the issuer is the same as the underlying may not be reported, as they do not meet the definition of "Option" under FINRA Rule 2360(a)(21).

**OATS DATA**

**Data Retrieval Instructions**

1. Six zipped data files are included in this delivery for the Relevant Period:
   a. NEW_ORDERS Part1.zip and NEW_ORDERS Part2.zip files contain data where the Event Type Code is equal to New (event_type_cd = 'NW'), Combined Order/Route (event_type_cd = 'OR'), Cancel/Replace (event_type_cd = 'CR'), or Combined Order/Execution (event_type_cd = 'OE'). [1599 zip files]
   b. PROCESS_ORDERS.zip file contains data where the Event Type Code is equal to Desk (Event Type Code = 'DS'), Route (Event Type Code = 'RT'), Cancel (Event Type Code = 'CL') or Execution (Event Type Code = 'EX') report. [1756 zip files]
   c. EXCTN_MTCH.zip file contains Execution Match data where the Execution dates are the requested dates listed above and has been matched to TRF Trade report. [26 zip files]
   d. RTNG_MTCH.zip file contains Routing Match data where the Order Sent dates are the requested dates listed above and has been matched to Exchange Order for the requested symbol and dates. [275 zip files]
   e. OATS_OLA_LINK.zip file contains linkages between firm to firm routing where OATS ROE IDs exist in the New Order data and the Link Publish Availability Dates and OATS Processing Dates are the requested dates listed above. [545 zip files]
2. The following five data dictionary files and one column heading file are also included in the enclosed materials:
   a. The "OATS NEW_ORDERS Data Dictionary (vATS) May162017.pdf" file contains the data dictionary for attributes (data elements) for new orders.
   b. The "OATS PROCESS_ORDERS Data Dictionary (vATS) May162017.pdf" file contains the data dictionary for attributes (data elements) for process orders.
   c. The "OATS EXCTN_MTCH Data Dictionary May152017.pdf" file contains the data dictionary for attributes (data elements) for execution matches data.
   d. The "OATS Routing Match Data Dictionary Aug072017.pdf" file contains the data dictionary for attributes (data elements) for routing matches data.
   e. The "OATS_OLA_LINK Data Dictionary Jul072017.pdf" file contains the data dictionary for attributes (data elements) for OLA (Order Lifecycle Assembly) data.
   f. The "Header File for all five OATS data types.xlsx" file contains column heading for all five data types described above in item 1 (stored in five tabs).
3. All data files are compressed in the .gz format.
   a. Data fields were delimited by special character "ctrl-A" ("\001")  (without quotes).
   b. Cell value "\N" (without quotes) means no value was populated for the field.
4. Individual data files can be opened with the following steps:
   a. Copy the data file to a local location.
   b. Right click on the file, then select "Open with", then pick "WinZip", this will bring up the WinZip screen.
   c. Click OK when you see the message "Please enter the full name of the file contained …"

Manuel A. Abascal, Esq.
April 30, 2018
Page 3 of 4

    d.  From the WinZip screen, click on 1-Click Unzip, a temporary file (in text file
        format) with the same name will pop up in the same folder you started with.

    e.  Drag the temp file to "Notepad++" or open it in "Notepad++"

    f.  Copy SHO, then select "Replace" Under "Search"

    g.  Paste SHO (you can only see a block size of three characters without content on
        the screen) into the "Find what" area and type in "\t" (this is the TAB delimiter) in
        the "Replace with" area.  Make sure "Extended" is selected under Search Mode.
          i.  This process may take a long time, depending on the file size.
         ii.  If the file size is relatively large, you may need to exercise the
            replacement procedure multiple times – use a block of data (e.g. 22,500
            records/rows) each time.

    h.  Click on "Replace all" – this will take some time for a large file.

    i.  Save the file in txt format.

    j.  Open the file in Excel with "tab" delimited.

### Data Linkage Instructions

The following table explains how to link the individual primary order event to the related secondary
event:

| event_type_cd = OR, NW, CR, OE | event_type_cd = RT, DS, CL, EX |
|---|---|
| firm_order_id | firm_order_id |
| order_rcvd_dt | order_rcvd_dt |
| ns_cstmr_id | ns_cstmr_id |

In the event an order was cancelled/replaced (Event Type Code is equal to CR), to determine the
"replaced" order, the following fields must be linked together:

| event_type_cd = CR | event_type_cd = NW, OR, OE, CR |
|---|---|
| rplcd_firm_ordr_id | firm_order_id |
| rplcd_ordr_rcvd_dt | order_rcvd_dt |
| ns_cstmr_id | ns_cstmr_id |

In order to follow a lifecycle of an order that was routed to another Member Firm (Event Type
Code is equal to RT or OR), the following fields must be linked together:

| event_type_cd = RT or | event_type_cd = NW, OR, OE, CR |
|---|---|
| firm_order_id | drvd_rt_frm_ord_id |
| order_rcvd_dt | drvd_rtng_firm_dt |
| ns_cstmr_id | rtng_ns_cstmr_id |

**Other**

    Please be advised, FINRA has redacted personal and confidential information ("PCI") of non-
claimant customers and other persons contained in the enclosed materials, including but not limited
to, account numbers, social security numbers, dates of birth, residential addresses, and/or phone
numbers. To the extent that any PCI has been inadvertently produced, FINRA expects that the
parties will notify FINRA and that the information will not be used or disclosed.

Manuel A. Abascal, Esq.
April 30, 2018
Page 4 of 4

The enclosed documents are being produced in response to the Subpoena, and are FINRA confidential business records. FINRA expects the parties to safeguard these documents, keep them non-public, and use them only in this proceeding.

FINRA does not intend to waive the attorney-client, investigative file, work product, trial preparation, or any other applicable privileges in connection with any inadvertent production of documents made in response to the Subpoena.  If you identify any documents in FINRA's production that appear to be potentially privileged, FINRA requests to be notified immediately and that the applicable documents be returned to FINRA.

This completes FINRA's response to the Subpoena. This letter does not waive any additional objections that FINRA could choose to assert in the future. If you have any questions, please feel free to contact me.

Very truly yours,



Valentina Judge


Enclosures

Cc:      Andrew Gray, Esq.

## DECLARATION OF FINRA CUSTODIAN OF RECORDS

I, Jennifer Piorko Mitchell, being first duly sworn, hereby declare, depose and state as follows:

1. I am the Vice President and Deputy Corporate Secretary of the Financial Industry Regulatory Authority, Inc. ("FINRA"), and am familiar with and am a custodian of FINRA business records, including interpretations, policies and rules adopted by the FINRA Board of Governors.

2. Attached are true, accurate and complete copies of the documents listed below, redacted for personal and confidential information, that were prepared, kept and maintained in the ordinary course of FINRA's business at or near the time of the act, condition or event:

    I.    Options Holdings Data Pertaining to Banc of California (NYSE:BANC), for the period September 1, 2016 through January 30, 2017
        a. Data Dictionaries
           i. COATS Data Fields and Definitions as of April 9, 2018
          ii. OCC LOPR Data Fields and Definitions as of April 9, 2018
        b. Data
           i. COATS Data (1 file)
          ii. LPOR Data, redacted for personal and confidential information (1 file)

    II.    OATS Data Pertaining to Banc of California (NYSE:BANC), for the period September 1, 2016 through January 30, 2017
        a. Data Dictionaries
           i. OATS Execution Match Data Dictionary as of May 15, 2017
          ii. OATS New Orders Data Dictionary as of May 16, 2017
          iii. OATS Process Orders Data Dictionary as of May 16, 2017
          iv. OATS Routing Match Data Dictionary as of August 7, 2017
          v. OATS OLA Link Data Dictionary as of July 7, 2017
        b. Data
           i. Header File for all data types listed in II.b.ii – vii.
          ii. OATS Execution Match Data (26 zip files)
          iii. OATS New Orders Data Part 1 (895 zip files)
          iv. OATS New Orders Data Part 2 (704 zip files)
          v. OATS Process Orders (1756 zip files)
          vi. OATS Routing Match Data (275 zip files)
          vii. OATS OLA Link Data (545 zip files)

3. These records are business records of FINRA as defined in Article 7 of the California Evidence Code.

4. I declare, under penalty of perjury under the laws of the State of California that the foregoing is true of my own knowledge.

Washington, DC
April 30, 2018

Jennifer Piorko Mitchell
Vice President and Deputy Corporate Secretary

# EXHIBIT 7

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
### Central District of California

| | |
|---|---|
| In re Banc of California Securities Litigation | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. SACV 17-00118 AG (DFMx) |
| | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:       Castalian Partners Value Fund LP, c/o Harvard Business Services, Inc.,
          16192 Coastal Highway, Lewes Delaware 19958

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: First Legal Records c/o Metro Legal Services, Inc., 330 Second Ave. South, Ste. 150, Minneapolis, MN  55401, (877) 591-9979 | Date and Time: 08/08/2018 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:       07/17/2018

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/  Kristen M. Tuey |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Defendant Steven A. Sugarman _____ , who issues or requests this subpoena, are:

Latham & Watkins LLP, 355 S. Grand Ave., Ste 100, Los Angeles, CA 90071, 213.485.1234, kristen.tuey@lw.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   SACV 17-00118 AG (DFMx)

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

## I.  DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows:

1.      "Affiliate" shall mean a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

2.      "And" and "or" shall be construed either disjunctively or conjunctively, as necessary by the context, to bring within the scope of the definition, instruction, or request all responses that might otherwise be construed to be outside of its scope by any other construction.

3.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

4.      "Aurelius" shall mean the author listed on the byline of the blog post entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible," posted on the website *SeekingAlpha.com* on October 18, 2016.

5.      "Banc" shall collectively refer to Defendant Banc of California, Inc., Banc of California, N.A., and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf. As used herein, "Banc" shall be construed either disjunctively or conjunctively, to include Banc of California, Inc. individually as well as collectively with Banc of California, N.A. or any other affiliate, and as necessary by the context, to bring within the scope of the definition, instruction, or request all responses that might otherwise be construed to be outside of its scope by any other construction.

6.      "Banc Securities" means any security, financial interest, preferred share, common share, option, note, treasury stock, bond, debenture, evidence of indebtedness, collateral trust certificate, transferable share, voting trust certificate or any other certificate of interest or participation (whether permanent, temporary or interim), or any warrant, contract, option

(including puts or calls), or right to subscribe to, purchase, borrow against, or sell any of the foregoing concerning Banc.

7.        "Blog" refers to the blog post entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible," posted on the website *SeekingAlpha.com* by "Aurelius" on October 18, 2016.

8.        "Bloomberg News" shall mean Bloomberg News and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

9.        "Board" or "Boards" shall mean individually and collectively the Board of Directors of Banc of California, Inc. and Banc of California, N.A.

10.        "Castalian Partners Value Fund, LP" shall mean Castalian Partners Value Fund, LP, and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on its behalf.

11.        "Communication" or "communications" means e-mail, text message, letter (including attachments) or any other transmittal of information (in the form of facts, ideas, inquiries or otherwise).

12.        "Concerning" means relating to, referring to, describing, evidencing, or constituting.

13.        "COR Clearing" shall mean COR Clearing, LLC and, without limitation, its current or former predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

14.        "COR Securities Holdings" shall mean COR Securities Holdings, Inc. and, without limitation, its current or former predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives,

consultants, internal and external attorneys, or any other person acting on their behalf.

15.     "CSS LLC" shall mean CSS LLC and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

16.     "Document" or "documents" is defined to mean all documents, electronically stored information, and tangible things in the broadest sense under Rule 34 of the Federal Rules of Civil Procedure, and shall mean anything that can be read, viewed, heard, or otherwise understood. Subject to and in accordance with the Instructions herein, "document" shall not be limited in any way with respect to medium, embodiment, or process of creation, generation, or reproduction; "document" shall include, without limitation, all preliminary, intermediate, and final versions thereof, as well as any notations, comments, and marginalia (handwritten or otherwise) appearing thereon or therein; "document" shall include originals (or high quality duplicates), all non-identical copies or drafts, and all attachments, exhibits, or similar items. Any document bearing on any sheet or side thereof, any marks, including, without limitation, initials, notations, comments, or marginalia of any character which are not part of the original text or reproduction thereof, shall be considered a separate document. Document or documents shall include without limitation any and all Communications.

17.     "Electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital, or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail or "e-mail" receipts or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs, and outlines, electronic mail, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file

layouts, or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file, or file fragment.  "Electronic data" also includes, without limitation, any items stored on computer memory or memories, hard drives, zip drives, CD-ROM discs or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

18.     "Endicott Management Co." shall mean Endicott Management Company and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

19.     "FIG Partners" shall mean FIG Partners and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

20.     "G2 Trading LLC" shall mean G2 Trading LLC or G-2 Trading LLC and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

21.     "Galanis" shall mean Jason W. Galanis and any of his agents, representatives, consultants, attorneys, or any other person acting on his behalf.

22.     "Alleged Galanis Entity" shall mean Gerova Financial Group, Ltd., Hughes Capital Management, LLC, Atlantic Asset Management LLC, Burnham Securities, Inc., Burnham Financial Group, Burnham Asset Management Corporation, BAM Holdings, LLC, Thorsdale Fiduciary and Guaranty Company Ltd., Valor Group Ltd., Valorlife, Wealth Assurance Holdings Ltd., Wealth-Assurance AG, Wealth Assurance Private Client Corporation, Valorlife Lebensversicherungs AG, Holmby Capital Group, IP Global Investors

Ltd., Prospect Global Resources, Inc., Private Equity Management LLC, Malaga Asset Management, LLC, Stanwich Absolute Return, Ltd., Bel Air LLC, Emerging Markets Global Hedge Ltd., Little Giggles LLC, Galanis Family Trust, Rosemont Seneca Bohai LLC, BOE Capital LLC, BFG Socially Responsible Investing Limited, GMT Duncan LLC, COR Fund Advisors, and COR International, including, without limitation, any of their predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, principals, trustees, agents, representatives, consultants, attorneys, or any other person acting on their behalf. Nothing in this definition shall admit, concede, or suggest that Jason Galanis had any control over such entities.

23.     "Investors" shall mean persons or entities who engage in TRANSACTIONS in SECURITIES and with respect to Castalian Partners Value Fund, LP, any individual or entity which invested in or owns a financial interest in Castalian Partners Value Fund, LP.

24.     "JCSD Partners LP" shall mean JCSD Partners LP and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

25.      "KBW" shall mean Keefe, Bruyette & Woods, Inc. and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

26.     "Patriot Capital" shall mean Patriot Capital and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

27.     "Peak 6 Capital Management LLC" shall mean Peak 6 Capital Management, LLC and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives,

consultants, internal and external attorneys, or any other person acting on their behalf.

28.    "PL Capital" shall mean PL Capital, LLC and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

29.    "Person" shall mean any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

30.    "Refer, reflect, or relate to" and similar terms, used together or alone, shall mean all information, facts, or documents that directly, indirectly, or in any other way support, concern, negate, bear upon, touch upon, incorporate, affect, include, pertain to, or are otherwise connected with the subject matter about which the request is made.

31.    "Regulators" shall refer to the regulatory agencies responsible for overseeing the securities industry or banking industry, including without limitation the Federal Reserve Board, United States Department of the Treasury, the Office of the Comptroller of the Currency, or the Financial Industry Regulatory Authority (FINRA).

32.    "SEC" shall mean the United States Securities and Exchange Commission, including all present or former officers, employees, directors, employees, agents, attorneys, advisors, accountants, consultants, and all other persons acting or purporting to act on its behalf.

33.    "Securities" shall have the meaning set forth in the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, *et seq.*

34.    "Seeking Alpha" shall mean SeekingAlpha of SeekingAlpha.com, any of its direct or indirect subsidiaries, divisions or affiliates, parents, predecessors, successors, present or former officers, employees, directors, employees, agents, advisors, and all other persons acting or purporting to act on its behalf.

35.    "Shorts" shall mean INVESTORS engaged in the practice of short selling SECURITIES, including without limitation INVESTORS who sold BANC short in October

2016.

36.     "Sparrow Fund Management" shall mean any of the following entities and their direct or indirect subsidiaries, divisions or affiliates, parents, predecessors, successors, present and former officers, directors, employees, agents, advisors, and all other persons acting or purporting to act on their behalf, including Sparrow Fund Management LP, Sparrow Fund Management LLP, Sparrow GP, LLC, Sparrow Partners, LP, and Sparrow Fund Performance, LLC.

37.     "Stifel" shall mean Stifel Financial Corp., any of its direct or indirect subsidiaries, divisions or affiliates, parents, predecessors, successors, present or former officers, employees, directors, employees, agents, advisors, and all other persons acting or purporting to act on its behalf.

38.     "Sugarman" shall mean Steven A. Sugarman and any of his agents, representatives, consultants, attorneys, or any other person acting on his behalf.

39.     "This action" shall mean the present lawsuit, *In re Banc of California Securities Litigation*, Case No. SACV 17-00118 AG (DFMx), pending in the United States District Court for the Central District of California.

40.     "Transactions" shall mean any actual or attempted orders, purchases, acquisitions, sales, swaps, dispositions, tenders, donations, receipt, gifts, transfers, puts, calls, short sales, equities, debt, derivatives, or any other means by which YOU, whether for your own account or benefit or for the account or benefit of any other person, acquired or disposed of any interest in securities.

41.     "Wellington Management" shall mean Wellington Management Company LLP and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

42.     "You," or "your" means (a) Castalian Partners Value Fund, LP; (b) any owned, operated or affiliated predecessors, successors, parents, subsidiaries, affiliates, divisions,

advisors, partnerships, funds, investment vehicles owned, controlled by, associated with Castalian Partners Value Fund, LP or in which Castalian Partners Value Fund, LP invested (collectively "Castalian Affiliates"); and (c) any directors, officers, employees, agents, advisors, representatives, and all other persons acting or purporting to act on behalf of Castalian Partners Value Fund, LP or Castalian Affiliates.

43.     As used herein, the use of the singular form of any word shall include the plural form of the same and vice versa.

## II.    INSTRUCTIONS

1.     In responding to these requests, you shall produce all responsive documents which are in your possession, custody, or control, or in the possession, custody, or control of your predecessors, successors, partners, managing agents, agents, employees, accountants, or any other representative.  A document shall be deemed to be within your control if you have the ability or right to secure the document or a copy of the document from another person having possession or custody of the document.

2.     All documents should be produced: (a) as they are kept in the ordinary course of business, complete with legible copies of the labels of file folders, binders, containers, or other devices from which they were taken, or (b) organized according to the request to which they respond.

3.     If any responsive document was, but no longer is, in your possession or subject to your control, state whether the document is: (a) missing or lost; (b) destroyed; (c) transferred voluntarily or involuntarily to others; or (d) otherwise disposed of, and in each instance identify the name and address of its current or last known custodian, and the circumstances surrounding such disposition.

4.     If you claim any form of privilege or any other objection, whether based on statute, common law, or otherwise, as a ground for not producing any requested document, please furnish a list identifying each document for which the privilege or other objection is claimed together with the following information:

a.    the privilege being asserted;

b.    the person on whose behalf the privilege is asserted;

c.    a precise statement of the facts upon which the claim of privilege is based; and

d.    identify the purported privileged document, including:

(1)    its nature, e.g., letter, memorandum, tape, etc.;

(2)    the date it was prepared;

(3)    the date the document bears;

(4)    the date the document was sent;

(5)    the date it was received;

(6)    the name of the person who prepared the document;

(7)    the name(s) of the person(s) who received the document;

(8)    the name of each person to whom it was sent or was intended to be sent, including all addressees and all recipients of copies; and

(9)    a statement of whom each identified person represented or purported to represent at all relevant times.

5.    If a portion of any document responsive to these requests is withheld under claim of privilege pursuant to Instruction 4, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

6.    You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instructions 4 and 5 above) regardless of whether you consider the entire document to be relevant or responsive to the requests.

7.    The singular of any term includes the plural, the use of one gender or pronoun shall include all others, as appropriate in the context, and the disjunctive shall include the conjunctive, and vice versa. Construe the terms "and" and "or" as used in this document in the conjunctive and disjunctive so as to produce the broadest scope of documents pursuant to each

request.

8.      The requests herein are continuing so that any additional documents responsive to the requests herein that you acquire or discover, up to and including the time of trial, shall be furnished through prompt supplemental responses as required by Fed. R. Civ. P. 26(e). This paragraph shall not be construed to alter your obligations to comply with all other instructions herein.

## III.    RELEVANT TIME PERIOD

Unless otherwise specifically indicated, the requests herein refer to the period from October 1, 2015 to April 30, 2017 (the "Relevant Period"), and shall include documents and information that relate to such period, even though prepared or published outside of the Relevant Period. If a document prepared before this period is necessary for a correct or complete understanding of any document covered by a request, you must produce the earlier document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the request.

## IV.    DOCUMENT REQUESTS

REQUEST NO. 1:

All COMMUNICATIONS with BANC, or third parties representing BANC in connection with the COMMUNICATION, including without limitation:

- Non-disclosure agreements;
- Due diligence materials obtained from BANC;
- Documents regarding potential investments in BANC;
- COMMUNICATIONS with BANC board members, officers, or other representatives; and
- COMMUNICATIONS regarding SUGARMAN, GALANIS, any ALLEGED GALANIS ENTITY, AURELIUS, or Winston & Strawn LLP.

REQUEST NO. 2:

All DOCUMENTS that reflect YOUR TRANSACTIONS in BANC SECURITIES,

including without limitation:

- The total position YOU held in BANC SECURITIES at the end of the trading day of October 17, 2016;

- The total amount of put options YOU held in BANC SECURITIES at the end of the trading day of October 17, 2016;

- YOUR transactions in BANC SECURITIES on October 18, 19, 20, and 21, 2016, and throughout the Relevant Period; and

- Documents sufficient to reflect or calculate the amount of profit YOU earned on all put options YOU held in BANC SECURITIES that were set to expire on or after October 21, 2016.

REQUEST NO. 3:

All DOCUMENTS that refer, reflect or relate to the basis for YOUR decision to engage in any TRANSACTIONS in BANC SECURITIES including without limitation:

- All investment memorandum, emails, models, and other analysis relating to TRANSACTIONS in BANC SECURITIES;

- All investment committee minutes, resolutions or other COMMUNICATIONS regarding any TRANSACTION in BANC SECURITIES; and

- All research, investigations, analysis or reports prepared by YOU, private investigators, investigation research firms or other third parties regarding BANC, GALANIS, or any ALLEGED GALANIS ENTITY.

REQUEST NO. 4:

All DOCUMENTS and COMMUNICATIONS that refer, reflect or relate to the BLOG or AURELIUS, including without limitation any COMMUNICATIONS with AURELIUS or SEEKING ALPHA, and including without limitation any DOCUMENTS relating to AURELIUS's identity.

REQUEST NO. 5:

All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU

and any third party regarding BANC, SUGARMAN, GALANIS, ALLEGED GALANIS ENTITY, the BLOG, or AURELIUS, including without limitation COMMUNICATIONS between YOU and any of the following people or entities:  BLOOMBERG NEWS, PEAK 6 CAPITAL MANAGEMENT LLC, James Gibson, Gary Robert Mathews, CSS LLC, Keith Allen Dilling, David Mathews, Rosemary Norris Hall, Kalyn Mathews Denno, Adam Denno, JCSD PARTNERS LP, G2 TRADING LLC, Jacques Brousseau, Andrew Left, Michael David Gold, Kenneth Gold, Zeke Faux, Jenny Surane, Dakin Campbell, Eben Novy-Williams, Steven Didion, Richard Lashley, PL CAPITAL, W. Kirk Wycoff, PATRIOT CAPITAL, ENDICOTT MANAGEMENT CO., Basswood, Halle Bennett, KBW, STIFEL, Jeffrey Karish, Jonah Schnel, Robert Sznewajs, SUGARMAN, Francisco Turner, Jason Sugarman, Nathan Koppikar, SPARROW FUND MANAGEMENT, Andrew Secrist, Christopher Carroll, Tim Coffey, FIG PARTNERS, Thomas Michaud (or Thomas Beaulieu Michaud), BofI Holding Inc., COR CLEARING, COR SECURITIES HOLDINGS, Zeke Faux, Jenny Surane, Dakin Campbell, or GALANIS.

REQUEST NO. 6:

All COMMUNICATIONS with and DOCUMENTS that refer, reflect or relate to GALANIS or any ALLEGED GALANIS ENTITY.

REQUEST NO. 7:

All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and COR CLEARING or COR SECURITIES HOLDINGS regarding BANC or SUGARMAN.

REQUEST NO. 8:

All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and Robbins Geller Rudman & Dowd, Bragar Eagel & Squire, P.C., Bronstein, Gewirtz & Grossman, LLC, Faruqi & Faruqi, LLP, Glancy Prongay & Murray LLP, Goldberg Law PC, Hagens Berman Sobol Shapiro LLP, Holzer & Holzer, LLC, Hynes Keller & Hernandez, LLC, Johnson & Weaver, LLP, Khang & Khang LLP, Law Offices of Howard G. Smith, Levi & Korsinsky, LLP, Lifshitz & Miller Law Firm, Lundin Law PC, Rosen Law Firm, the SEC, other REGULATORS, or other

BANC INVESTORS or SHORTS, or any representatives thereof, relating to BANC or SUGARMAN.

REQUEST NO. 9:

All CORRESPONDENCE with any of the following people or entities from 2013 to the present: PATRIOT CAPITAL (including W. Kirk Wycoff); PL CAPITAL (including Richard Lashley); Halle Benett, Jeffrey Karish, SUGARMAN, Francisco Turner, Jonah Schnel, Chad Brownstein, COR CLEARING or its current or former employees, PEAK 6 CAPITAL MANAGEMENT LLC, James Gibson, Nathan Koppikar, SPARROW FUND MANAGEMENT, BLOOMBERG NEWS (or its journalists), or FIG PARTNERS.

REQUEST NO. 10:

All CORRESPONDENCE with any of the following people or entities: GALANIS, John Galanis, Jared Galanis, Hugh Dunkerely, Gary T. Hirst, Bevan T. Cooney, Michelle A. Morton, Devon D. Archer, Ymer Shahini, Derek Hamels, Francisco Martin or Monet Berger.

REQUEST NO. 11:

All INVESTORS in YOU as of October 18, 2016, including contact information sufficient to identify the principals, addresses, and contact information associated with the INVESTOR.

# EXHIBIT 8

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In re Banc of California Securities Litigation | ) |
| _____ | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   SACV 17-00118 AG (DFMx) |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          James Gibson, LLC 200 Water Street, Suite 200 Excelsior, MN 55331

_____

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: First Legal Records c/o Metro Legal Services, Inc., 330 Second Ave. South, Ste. 150, Minneapolis, MN  55401, (877) 591-9979 | Date and Time: <br><br> 08/08/2018 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:          07/17/2018

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | /s/  Kristen M. Tuey |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____

Defendant Steven A. Sugarman _____ , who issues or requests this subpoena, are:

Latham & Watkins LLP, 355 S. Grand Ave., Ste 100, Los Angeles, CA 90071, 213.485.1234, kristen.tuey@lw.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   SACV 17-00118 AG (DFMx)

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____   on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

 **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**ATTACHMENT A**

## I.   DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows:

1.      "Gibson," "you," or "your" shall mean James Gibson and any employees, agents, advisors, representatives, consultants, attorneys, and all other persons acting or purporting to act on your behalf.

2.      "Affiliate" shall mean a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

3.      "And" and "or" shall be construed either disjunctively or conjunctively, as necessary by the context, to bring within the scope of the definition, instruction, or request all responses that might otherwise be construed to be outside of its scope by any other construction.

4.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

5.      "Aurelius" shall mean the author listed on the byline of the blog post entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible," posted on the website *SeekingAlpha.com* on October 18, 2016.

6.      "Banc" shall collectively refer to Defendant Banc of California, Inc., Banc of California, N.A., and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf. As used herein, "Banc" shall be construed either disjunctively or conjunctively, to include Banc of California, Inc. individually as well as collectively with Banc of California, N.A. or any other affiliate, and as necessary by the context, to bring within the scope of the definition, instruction, or request all responses that might otherwise be construed to be outside of its scope by any other construction.

7.      "Banc Securities" means any security, financial interest, preferred share, common

share, option, note, treasury stock, bond, debenture, evidence of indebtedness, collateral trust certificate, transferable share, voting trust certificate or any other certificate of interest or participation (whether permanent, temporary or interim), or any warrant, contract, option (including puts or calls), or right to subscribe to, purchase, borrow against, or sell any of the foregoing concerning Banc.

8.      "Blog" refers to the blog post entitled "BANC: Extensive Ties to Notorious Fraudster Jason Galanis Make Shares Un-Investible," posted on the website *SeekingAlpha.com* by "Aurelius" on October 18, 2016.

9.      "Bloomberg News" shall mean Bloomberg News and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

10.      "Board" or "Boards" shall mean individually and collectively the Board of Directors of Banc of California, Inc. and Banc of California, N.A.

11.      "Castalian Partners Value Fund, LP" shall mean Castalian Partners Value Fund, LP, and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on its behalf.

12.      "Communication" or "communications" means e-mail, text message, letter (including attachments) or any other transmittal of information (in the form of facts, ideas, inquiries or otherwise).

13.      "Concerning" means relating to, referring to, describing, evidencing, or constituting.

14.      "COR Clearing" shall mean COR Clearing, LLC and, without limitation, its current or former predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

15.     "COR Securities Holdings" shall mean COR Securities Holdings, Inc. and, without limitation, its current or former predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

16.     "CSS LLC" shall mean CSS LLC and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

17.     "Document" or "documents" is defined to mean all documents, electronically stored information, and tangible things in the broadest sense under Rule 34 of the Federal Rules of Civil Procedure, and shall mean anything that can be read, viewed, heard, or otherwise understood. Subject to and in accordance with the Instructions herein, "document" shall not be limited in any way with respect to medium, embodiment, or process of creation, generation, or reproduction; "document" shall include, without limitation, all preliminary, intermediate, and final versions thereof, as well as any notations, comments, and marginalia (handwritten or otherwise) appearing thereon or therein; "document" shall include originals (or high quality duplicates), all non-identical copies or drafts, and all attachments, exhibits, or similar items. Any document bearing on any sheet or side thereof, any marks, including, without limitation, initials, notations, comments, or marginalia of any character which are not part of the original text or reproduction thereof, shall be considered a separate document. Document or documents shall include without limitation any and all Communications.

18.     "Electronic data" refers to any original and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations, or highlighting of any kind), mechanical, facsimile, electronic, magnetic, digital, or other programs (whether private, commercial, or work-in-progress), programming notes or instructions, activity listings of electronic mail or "e-mail" receipts or transmittals, output resulting from the use of any software program, including word processing documents,

spreadsheets, database files, charts, graphs, and outlines, electronic mail, operating systems, source code of all types, programming languages, linkers and compilers, peripheral drives, PDF files, PRF files, batch files, ASCII files, crosswalks, code keys, pull down tables, logs, file layouts, or any miscellaneous files or file fragments, regardless of the media on which they reside and regardless of whether said electronic data consists of an active file, backup file, deleted file, or file fragment.  "Electronic data" also includes, without limitation, any items stored on computer memory or memories, hard drives, zip drives, CD-ROM discs or in any other vehicle for electronic or digital data storage or transmittal, files, folder tabs, or containers and labels appended to or associated with any physical storage device associated with each original and each copy.

19.    "Endicott Management Co." shall mean Endicott Management Company and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

20.    "FIG Partners" shall mean FIG Partners and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

21.    "G2 Trading LLC" shall mean G2 Trading LLC or G-2 Trading LLC and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

22.    "Galanis" shall mean Jason W. Galanis and any of his agents, representatives, consultants, attorneys, or any other person acting on his behalf.

23.    "Alleged Galanis Entity" shall mean Gerova Financial Group, Ltd., Hughes Capital Management, LLC, Atlantic Asset Management LLC, Burnham Securities, Inc., Burnham Financial Group, Burnham Asset Management Corporation, BAM Holdings, LLC,

Thorsdale Fiduciary and Guaranty Company Ltd., Valor Group Ltd., Valorlife, Wealth Assurance Holdings Ltd., Wealth-Assurance AG, Wealth Assurance Private Client Corporation, Valorlife Lebensversicherungs AG, Holmby Capital Group, IP Global Investors Ltd., Prospect Global Resources, Inc., Private Equity Management LLC, Malaga Asset Management, LLC, Stanwich Absolute Return, Ltd., Bel Air LLC, Emerging Markets Global Hedge Ltd., Little Giggles LLC, Galanis Family Trust, Rosemont Seneca Bohai LLC, BOE Capital LLC, BFG Socially Responsible Investing Limited, GMT Duncan LLC, COR Fund Advisors, and COR International, including, without limitation, any of their predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, principals, trustees, agents, representatives, consultants, attorneys, or any other person acting on their behalf. Nothing in this definition shall admit, concede, or suggest that Jason Galanis had any control over such entities.

24.    "Investors" shall mean persons or entities who engage in TRANSACTIONS in SECURITIES.

25.    "JCSD Partners LP" shall mean JCSD Partners LP and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

26.     "KBW" shall mean Keefe, Bruyette & Woods, Inc. and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

27.    "Patriot Capital" shall mean Patriot Capital and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

28.    "Peak 6 Capital Management LLC" shall mean Peak 6 Capital Management,

LLC and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

29.      "PL Capital" shall mean PL Capital, LLC and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

30.      "Person" shall mean any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

31.      "Refer, reflect, or relate to" and similar terms, used together or alone, shall mean all information, facts, or documents that directly, indirectly, or in any other way support, concern, negate, bear upon, touch upon, incorporate, affect, include, pertain to, or are otherwise connected with the subject matter about which the request is made.

32.      "Regulators" shall refer to the regulatory agencies responsible for overseeing the securities industry or banking industry, including without limitation the Federal Reserve Board, United States Department of the Treasury, the Office of the Comptroller of the Currency, or the Financial Industry Regulatory Authority (FINRA).

33.      "SEC" shall mean the United States Securities and Exchange Commission, including all present or former officers, employees, directors, employees, agents, attorneys, advisors, accountants, consultants, and all other persons acting or purporting to act on its behalf.

34.      "Securities" shall have the meaning set forth in the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, *et seq.*

35.      "Seeking Alpha" shall mean SeekingAlpha of SeekingAlpha.com, any of its direct or indirect subsidiaries, divisions or affiliates, parents, predecessors, successors, present or former officers, employees, directors, employees, agents, advisors, and all other persons acting or purporting to act on its behalf.

36.     "Shorts" shall mean INVESTORS engaged in the practice of short selling SECURITIES, including without limitation INVESTORS who sold BANC short in October 2016.

37.     "Sparrow Fund Management" shall mean any of the following entities and their direct or indirect subsidiaries, divisions or affiliates, parents, predecessors, successors, present and former officers, directors, employees, agents, advisors, and all other persons acting or purporting to act on their behalf, including Sparrow Fund Management LP, Sparrow Fund Management LLP, Sparrow GP, LLC, Sparrow Partners, LP, and Sparrow Fund Performance, LLC.

38.     "Stifel" shall mean Stifel Financial Corp., any of its direct or indirect subsidiaries, divisions or affiliates, parents, predecessors, successors, present or former officers, employees, directors, employees, agents, advisors, and all other persons acting or purporting to act on its behalf.

39.     "Sugarman" shall mean Steven A. Sugarman and any of his agents, representatives, consultants, attorneys, or any other person acting on his behalf.

40.     "This action" shall mean the present lawsuit, *In re Banc of California Securities Litigation*, Case No. SACV 17-00118 AG (DFMx), pending in the United States District Court for the Central District of California.

41.     "Transactions" shall mean any actual or attempted orders, purchases, acquisitions, sales, swaps, dispositions, tenders, donations, receipt, gifts, transfers, puts, calls, short sales, equities, debt, derivatives, or any other means by which YOU, whether for your own account or benefit or for the account or benefit of any other person, acquired or disposed of any interest in securities.

42.     "Wellington Management" shall mean Wellington Management Company LLP and, without limitation, its predecessors, successors, parents, subsidiaries, affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives, consultants, internal and external attorneys, or any other person acting on their behalf.

ATTACHMENT A TO SUBPOENA (DOCUMENTS) TO JAMES GIBSON

43.     As used herein, the use of the singular form of any word shall include the plural

form of the same and vice versa.

## II.     INSTRUCTIONS

1.     In responding to these requests, you shall produce all responsive documents

which are in your possession, custody, or control, or in the possession, custody, or control of

your predecessors, successors, partners, managing agents, agents, employees, accountants, or any

other representative.  A document shall be deemed to be within your control if you have the

ability or right to secure the document or a copy of the document from another person having

possession or custody of the document.

2.     All documents should be produced: (a) as they are kept in the ordinary course of

business, complete with legible copies of the labels of file folders, binders, containers, or other

devices from which they were taken, or (b) organized according to the request to which they

respond.

3.     If any responsive document was, but no longer is, in your possession or subject to

your control, state whether the document is: (a) missing or lost; (b) destroyed; (c) transferred

voluntarily or involuntarily to others; or (d) otherwise disposed of, and in each instance identify

the name and address of its current or last known custodian, and the circumstances surrounding

such disposition.

4.     If you claim any form of privilege or any other objection, whether based on

statute, common law, or otherwise, as a ground for not producing any requested document,

please furnish a list identifying each document for which the privilege or other objection is

claimed together with the following information:

a.     the privilege being asserted;

b.     the person on whose behalf the privilege is asserted;

c.     a precise statement of the facts upon which the claim of privilege is

based; and

d.     identify the purported privileged document, including:

ATTACHMENT A TO SUBPOENA (DOCUMENTS) TO JAMES GIBSON

(1)     its nature, e.g., letter, memorandum, tape, etc.;

(2)     the date it was prepared;

(3)     the date the document bears;

(4)     the date the document was sent;

(5)     the date it was received;

(6)     the name of the person who prepared the document;

(7)     the name(s) of the person(s) who received the document;

(8)     the name of each person to whom it was sent or was
        intended to be sent, including all addressees and all
        recipients of copies; and

(9)     a statement of whom each identified person represented or
        purported to represent at all relevant times.

5.      If a portion of any document responsive to these requests is withheld under claim
of privilege pursuant to Instruction 4, any non-privileged portion of such document must be
produced with the portion claimed to be privileged redacted.

6.      You are to produce each document requested herein in its entirety, without
deletion or excision (except as qualified by Instructions 4 and 5 above) regardless of whether you
consider the entire document to be relevant or responsive to the requests.

7.      The singular of any term includes the plural, the use of one gender or pronoun
shall include all others, as appropriate in the context, and the disjunctive shall include the
conjunctive, and vice versa.  Construe the terms "and" and "or" as used in this document in the
conjunctive and disjunctive so as to produce the broadest scope of documents pursuant to each
request.

8.      The requests herein are continuing so that any additional documents responsive to
the requests herein that you acquire or discover, up to and including the time of trial, shall be
furnished through prompt supplemental responses as required by Fed. R. Civ. P. 26(e). This
paragraph shall not be construed to alter your obligations to comply with all other instructions

ATTACHMENT A TO SUBPOENA (DOCUMENTS) TO JAMES GIBSON

herein.

## III.  RELEVANT TIME PERIOD

Unless otherwise specifically indicated, the requests herein refer to the period from October 1, 2015 to April 30, 2017 (the "Relevant Period"), and shall include documents and information that relate to such period, even though prepared or published outside of the Relevant Period. If a document prepared before this period is necessary for a correct or complete understanding of any document covered by a request, you must produce the earlier document as well. If any document is undated and the date of its preparation cannot be determined, the document shall be produced if otherwise responsive to the request.

## IV.  DOCUMENT REQUESTS

REQUEST NO. 1:

All COMMUNICATIONS with BANC, or third parties representing BANC in connection with the COMMUNICATION, including without limitation:

- Non-disclosure agreements;
- Due diligence materials obtained from BANC;
- Documents regarding potential investments in BANC;
- COMMUNICATIONS with BANC board members, officers, or other representatives; and
- COMMUNICATIONS regarding SUGARMAN, GALANIS, any ALLEGED GALANIS ENTITY, AURELIUS, or Winston & Strawn LLP.

REQUEST NO. 2:

All DOCUMENTS that reflect YOUR TRANSACTIONS in BANC SECURITIES, including without limitation:

- The total position YOU held in BANC SECURITIES at the end of the trading day of October 17, 2016;
- The total amount of put options YOU held in BANC SECURITIES at the end of the trading day of October 17, 2016;

- YOUR transactions in BANC SECURITIES on October 18, 19, 20, and 21, 2016, and throughout the Relevant Period; and

- Documents sufficient to reflect or calculate the amount of profit YOU earned on all put options YOU held in BANC SECURITIES that were set to expire on or after October 21, 2016.

REQUEST NO. 3:

All DOCUMENTS that refer, reflect or relate to the basis for YOUR decision to engage in any TRANSACTIONS in BANC SECURITIES including without limitation:

- All investment memorandum, emails, models, and other analysis relating to TRANSACTIONS in BANC SECURITIES;

- All investment committee minutes, resolutions or other COMMUNICATIONS regarding any TRANSACTION in BANC SECURITIES; and

- All research, investigations, analysis or reports prepared by YOU, private investigators, investigation research firms or other third parties regarding BANC, GALANIS, or any ALLEGED GALANIS ENTITY.

REQUEST NO. 4:

All DOCUMENTS and COMMUNICATIONS that refer, reflect or relate to the BLOG or AURELIUS, including without limitation any COMMUNICATIONS with AURELIUS or SEEKING ALPHA, and including without limitation any DOCUMENTS relating to AURELIUS's identity.

REQUEST NO. 5:

All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and any third party regarding BANC, SUGARMAN, GALANIS, ALLEGED GALANIS ENTITY, the BLOG, or AURELIUS, including without limitation COMMUNICATIONS between YOU and any of the following people or entities:  BLOOMBERG NEWS, PEAK 6 CAPITAL MANAGEMENT LLC, James Gibson, Gary Robert Mathews, CSS LLC, Keith Allen Dilling, David Mathews, Rosemary Norris Hall, Kalyn Mathews Denno, Adam Denno,

JCSD PARTNERS LP, G2 TRADING LLC, Jacques Brousseau, Andrew Left, Michael David Gold, Kenneth Gold, Zeke Faux, Jenny Surane, Dakin Campbell, Eben Novy-Williams, Steven Didion, Richard Lashley, PL CAPITAL, W. Kirk Wycoff, PATRIOT CAPITAL, ENDICOTT MANAGEMENT CO., Basswood, Halle Bennett, KBW, STIFEL, Jeffrey Karish, Jonah Schnel, Robert Sznewajs, SUGARMAN, Francisco Turner, Jason Sugarman, Nathan Koppikar, SPARROW FUND MANAGEMENT, Andrew Secrist, Christopher Carroll, Tim Coffey, FIG PARTNERS, Thomas Michaud (or Thomas Beaulieu Michaud), BofI Holding Inc., COR CLEARING, COR SECURITIES HOLDINGS, Zeke Faux, Jenny Surane, Dakin Campbell, or GALANIS.

REQUEST NO. 6:

All COMMUNICATIONS with and DOCUMENTS that refer, reflect or relate to GALANIS or any ALLEGED GALANIS ENTITY.

REQUEST NO. 7:

All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and COR CLEARING or COR SECURITIES HOLDINGS regarding BANC or SUGARMAN.

REQUEST NO. 8:

All DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and Robbins Geller Rudman & Dowd, Bragar Eagel & Squire, P.C., Bronstein, Gewirtz & Grossman, LLC, Faruqi & Faruqi, LLP, Glancy Prongay & Murray LLP, Goldberg Law PC, Hagens Berman Sobol Shapiro LLP, Holzer & Holzer, LLC, Hynes Keller & Hernandez, LLC, Johnson & Weaver, LLP, Khang & Khang LLP, Law Offices of Howard G. Smith, Levi & Korsinsky, LLP, Lifshitz & Miller Law Firm, Lundin Law PC, Rosen Law Firm, the SEC, other REGULATORS, or other BANC INVESTORS or SHORTS, or any representatives thereof, relating to BANC or SUGARMAN.

REQUEST NO. 9:

All CORRESPONDENCE with any of the following people or entities from 2013 to the present: PATRIOT CAPITAL (including W. Kirk Wycoff); PL CAPITAL (including Richard

Lashley); Halle Benett, Jeffrey Karish, SUGARMAN, Francisco Turner, Jonah Schnel, Chad Brownstein, COR CLEARING or its current or former employees, PEAK 6 CAPITAL MANAGEMENT LLC, James Gibson, Nathan Koppikar, SPARROW FUND MANAGEMENT, CASTALIAN PARTNERS VALUE FUND, LP, BLOOMBERG NEWS (or its journalists), or FIG PARTNERS.

REQUEST NO. 10:

All CORRESPONDENCE with any of the following people or entities: GALANIS, John Galanis, Jared Galanis, Hugh Dunkerely, Gary T. Hirst, Bevan T. Cooney, Michelle A. Morton, Devon D. Archer, Ymer Shahini, Derek Hamels, Francisco Martin or Monet Berger.

# EXHIBIT 9

## VAN NURDEN LAW, PLLC

1515 CANADIAN PACIFIC PLAZA
120 SOUTH SIXTH STREET
MINNEAPOLIS, MN 55402
PHONE: 612-455-8945

Joel D. Van Nurden
joel@vannurdenlaw.com

August 7, 2018

**VIA EMAIL ONLY**
*kristen.tuey@lw.com*

Kristen Tuey
Latham & Watkins LLP
335 South Grand Avenue, Suite 100
Los Angeles, CA  90071

Re:   Defendant's Subpoenas to James Gibson and Castalian Partners Value Fund LP issued in
      *In re Banc of California Securities Litigation* SACV17-00118 AG (DFMx) (the
      "Underlying Action").

Dear Ms. Tuey:

I represent James Gibson and Castalian Partners Value Fund LP ("Respondents") and am writing
this letter to object and respond to the subpoenas referenced above. In addition to the objections
listed below, Respondents reserve the objections listed in Appendix A hereto.

**First,** Respondents object to the subpoena directed to "James Gibson LLC" because no such
legal entity exists.

**Second,** after reviewing the pleadings in the Underlying Action, it appears that the subpoenas are
nothing but a fishing expedition to gather extensive confidential or privileged information about
Respondents that has nothing to do with the issues in the action. For example, the subpoenas
contain invasive demands for information about Respondents' investments, client lists, and
correspondence with regulators and other market participants that is wholly irrelevant to whether
certain statements made in Banc of California's securities filings were materially misleading.
The subpoenas also continue to seek documents and information that the Court has already found
to be outside the scope of permissible discovery. *See,* the Court's February 14, 2018 discovery
ruling (Dkt. No. 146).

**Third,** all of the requests seek some variation of "All Documents" or "All Communications"
concerning various topics, and are thus not only unduly burdensome, but also seek information
protected by the attorney-client privilege and the attorney work-product doctrine. Respondents
object to producing any such documents.

**Fourth,** Respondents object to several of the definitions and instructions. Respondents object to
the definition of "Castalian Partners Value Fund LP" as including "predecessors, successors,
affiliates, divisions, directors, officers, employees, principals, trustees, agents, representatives,

Kristen Tuey
Latham & Watkins LLP
August 8, 2018
Page 2 of 5

consultants, internal or external attorneys…" Respondents also object to the definition of "You"
as including "affiliated predecessors, successors, parents, subsidiaries, affiliates, divisions,
advisors, partnerships, funds, investment vehicles…associated with [Castalian Partners] or in
which [Castalian Partners] invested…and any directors, officers employees, agents, advisors,
representatives, and all other persons acting or purporting to act on behalf of" Castalian Partners.
These definitions are vague, ambiguous, overly broad, and unduly burdensome. Respondents
have no obligation to produce and will not produce documents or information in the possession,
custody, or control of third parties.

Based on the claims and defenses presented in the pleadings, I trust that this should satisfy the
obligations pursuant to the subpoena. In the event you wish to discuss this matter further, please
do not hesitate to contact me.

Very truly yours,

Joel D. Van Nurden

Kristin Tuey
Latham Watking LLP
August 7, 2018
Page 3 of 5

### *APPENDIX A*

James Gibson and Castalian Partners Value Fund LP ("Respondents") assert the following objections to the subpoena issued by Defendant in connection with the lawsuit styled *In re Banc of California Securities Litigation* SACV 17-00118 AG (DFMx) (the "Underlying Action"). These objections are made to the subpoena in general, as well as to each and every individual request for production of documents.

## PREFATORY STATEMENT

These general objections are in addition to the specific objections Respondents raise in their August 7, 2018 letter that accompanies these general objections. In providing these general objections, Respondents are not submitting to the jurisdiction of any Court and reserve their right to object to this and any other proceeding on jurisdictional grounds. In addition, by asserting these objections, Respondents do not waive their right to seek further relief from the appropriate forum, including motions to quash or modify the subpoena, or for entry of a protective order. These objections are made in good faith after a preliminary inquiry within the agreed-upon time frame. Respondents' inquiries and analyses are continuing. Without in any way undertaking any obligation to do so, Respondents reserve the right to alter, supplement, amend, or otherwise modify these objections in any way at any time in light of additional facts revealed through subsequent inquiry and investigation.

## GENERAL OBJECTIONS

1.      Respondents object to each and every document request to the extent they seek information not specifically related to the action, as such requests are unduly burdensome and not relevant.

2.      Respondents object because the Subpoena is not reasonably calculated to lead to the discovery of admissible evidence and fails to satisfy Rule 26's proportionality standard.

3.      Respondents object to the subpoenas to the extent that they seek or call for information or documents that are protected from discovery on the basis of: (a) the attorney-client privilege; (b) the work-product doctrine; (c) the self-critical analysis privilege; (d) any joint defense, common interest, or other shared privilege; or (e) any other applicable discovery rule, privilege, or other reason for non-production. Respondents do not intend to waive any applicable privilege or protection and will not disclose any privileged or protected documents. In the event Respondents inadvertently disclose any such documents, the disclosure is not intended and shall not be deemed to be a waiver of any privilege or protection. Respondents reserve the right to demand that Defendant return any inadvertently produced document.

4.      Respondents object to the subpoenas, including the Instructions and Definitions contained therein, to the extent that they: (a) purport to impose upon Respondents obligations greater than or different than those imposed by the Federal Rules of Civil Procedure or any other applicable law or rule; (b) call for information or documents that are not relevant to any issues

Kristin Tuey
Latham Watking LLP
August 7, 2018
Page 4 of 5

that are or may be involved in the Underlying Action; or (c) are overly broad, vague, ambiguous, indefinite, costly, and/or unduly burdensome.

5.       Respondents object to the subpoenas to the extent that they require the creation of documents that do not exist or request documents that are not in the possession, custody, or control of Respondents, including, without limitation, documents in the possession, custody or control of predecessors, successors, parents, subsidiaries, divisions, or affiliates of Respondents having corporate identities separate and apart from Respondents.

6.       Respondents object to the subpoenas to the extent that they seek information and documents that are already in the possession, custody, or control of Defendant, or available to Defendant from other sources, including parties to the Underlying Action.

7.       Respondents object to the subpoenas as vague and ambiguous to the extent that they contain terms or phrases that Respondents cannot interpret or understand and to the extent the terms and/or phrases used therein are undefined or fail to meaningfully distinguish between similar (but not identical) terms and phrases used in other requests.

8.       Respondents object to the subpoenas to the extent that they demand confidential information of Respondents and/or non-public personal information of their customers ("Confidential Information"). Such Confidential Information is protected from disclosure under laws and regulations governing the privacy rights of consumers and other persons. Defendant's requests for production raises obvious concerns in this regard.

9.       Respondents object to the subpoenas to the extent that they demand confidential and/or proprietary business, financial, or technical information or documents, or documents constituting or reflecting commercial, financial, competitively sensitive, or trade secret information of Respondents or any third parties.

10.       Respondents object to the subpoenas to the extent that they seek the production of information and documents in violation of a legal and/or contractual obligation of nondisclosure to a third party. Respondents will not produce such documents without either the consent of the relevant third party or an order from the Court compelling production.

11.       Respondents object to the subpoenas to the extent they seek publicly available information or documents. Such documents are as readily available to Defendant as they are to Respondents, and Defendant is directed to these publicly available materials for such information or documents.

12.       Respondents object to the subpoenas to the extent that they purport to require the production of: (a) electronically stored information that is not stored on active systems but is stored on systems, backup tapes, archival sources, and other media that are no longer part of Respondents' normal business operations, (b) deleted files or "file fragment[s]," (c) load files, (d) operating systems, (e) source code, (f) programming notes or instructions, (g) social network sites, or (h) "cloud metadata." Such electronically stored information is not reasonably accessible

Kristin Tuey
Latham Watking LLP
August 7, 2018
Page 5 of 5

and is likely duplicative of electronically stored information available from other, more readily accessible sources. Because of the lack of relevance of such electronically stored information, and the cost associated with accessing and searching these data sources, Respondents will not produce such electronically stored information in response to the subpoenas.

13.     Respondents object to the subpoena's Instructions to the extent that they seek the production of electronically stored documents in their native format. The production of documents, including electronically stored information, in native format would prevent Respondents from adequately labeling and controlling the production.

14.     Respondents reserve their right to (a) further object to the subpoenas, the document requests, or the Instructions or Definitions provided by Defendant; (b) object on any basis permitted by law to any other discovery requests involving or relating to the subject matter of these objections; and (c) alter, amend or supplement its objections to the subpoenas in the event discussions between Respondent and Defendant with regard to the subpoenas progress.