UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

IN RE BANC OF CALIFORNIA
SECURITIES LITIGATION,

Case No.  0:18-mc-00076-WMW-KMM

---

**CASTALIAN PARTNERS VALUE FUND LP AND JAMES GIBSON'S
MEMORANDUM OF LAW IN OPPOSITION TO
STEVEN SUGARMAN'S MOTION TO COMPEL**

TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................. 1

BACKGROUND .................................................................................. 2

A.      THE UNDERLYING ACTION ................................................ 2

     1.      Nature and scope of the claims ................................. 2

     2.      The narrow, surviving issues in the Underlying Action ............................. 3

B.      NON-PARTIES CASTALIAN AND JAMES GIBSON ....................................... 4

C.      THE SUBPOENAS ................................................................ 4

D.      CASTALIAN'S RESPONSE TO THE SUBPOENAS ................................. 5

E.      SUGARMAN'S MOTION TO COMPEL .............................................. 6

ARGUMENT ...................................................................................... 9

I.      LEGAL STANDARD .......................................................... 9

II.     THE SUBPOENAS SEEK DOCUMENTS AND INFORMATION THAT
        ARE IRRELEVANT TO THE ISSUES AND CLAIMS PENDING IN
        THE UNDERLYING ACTION .......................................... 10

     A.      Castalian's investment decisions are irrelevant to whether defendants
                made material misrepresentations in their public disclosures ................... 10

     B.      Fraud-on-the-market cases concern the knowledge of the *market as a
                whole*, not the knowledge of individual investors like Castalian .............. 12

     C.      Courts in analogous proceedings have quashed subpoenas aimed at
                third-party investors ................................................. 14

     D.      The authority relied upon by Sugarman has nothing whatsoever to
                do with the issues or facts in this case .................................. 16

III.    THE SUBPOENAS SEEK DOCUMENTS AND INFORMATION THAT
        THE COURT IN THE UNDERLYING ACTION HAS ALREADY
        FOUND TO BE OUTSIDE THE SCOPE OF PERMISSIBLE
        DISCOVERY .............................................................. 19

IV.     THE MOTION SHOULD BE DENIED BECAUSE THE SUBPOENAS
        SEEK CONFIDENTIAL COMMERCIAL INFORMATION ......................... 21

V.      THE SUBPOENAS SEEK DOCUMENTS AND INFORMATION THAT
        WOULD VIOLATE THE FIRST AMENDMENT RIGHTS OF OTHER
        THIRD PARTIES ......................................................... 23

VI.     THE SUBPOENAS ARE UNDULY BURDENSOME ON THEIR FACE ........ 26

i

Table of Contents
(continued)

Page

VII.   THE SUBPOENAS ARE DIRECTED TO AN ENTITY THAT DOES
         NOT EXIST.................................................................................................. 28

CONCLUSION .......................................................................................................... 28

## INTRODUCTION

The Court should deny movant Steven Sugarman's ("Sugarman") motion to compel third parties Castalian Partners and James Gibson (collectively, "Castalian") to produce irrelevant and highly sensitive documents in the underlying securities fraud case against Sugarman.[1]  The limited question in the Underlying Action is whether Sugarman made material omissions in statements to the investing public that led to a decline in the stock price for the bank where he formerly served as CEO.  Sugarman's subpoenas to Castalian are part of an ill-conceived effort to blame short-selling investors for the decline of his former bank's share price.  The applicable authorities, however, show that the only materials relevant to his theory would include public documents and information available to the market as a whole – *not* personal and confidential materials related to the private investment decisions of individual investors like Castalian.

As discussed below, the court in the Underlying Action has already found that similar materials are beyond the scope of permissible discovery.  Moreover, the subpoenas seek to impose obligations on Castalian that are not even remotely proportional to the needs of the Underlying Action because Castalian has nothing to do with the Underlying Action, documents responsive to the subpoenas are irrelevant to the limited issues in the Underlying Action, and producing responsive documents would result in severe and undue prejudice to Castalian and its investors.

---

[1] The securities fraud case is captioned *In re Banc of Cal. Sec. Lit.*, No. SACV 17-00118 AG (DFMx) (C.D. Cal. Jan. 23, 2017) (the "Underlying Action").

Accordingly, the motion to compel should be denied for the following reasons:

- ***First***, Castalian's sensitive trading records and analyses are wholly irrelevant to the Underlying Action.  For this reason, courts that have analyzed this *same* issue in fraud-on-the-market securities cases have flatly rejected Sugarman's arguments and quashed subpoenas aimed at third-party investors.

- ***Second***, the court in the Underlying Action has already determined that analogous document requests are outside the scope of permissible discovery, and this Court should do the same.

- ***Third***, any need Sugarman could have for Castalian's confidential and proprietary commercial information is entirely outweighed by the harm Castalian would suffer by having its competitive position in the marketplace compromised by the disclosures.

- ***Fourth***, Sugarman's subpoenas seek documents that would violate the First Amendment rights of third-parties who wish to remain anonymous.

- ***Fifth***, the subpoenas exemplify the overbroad and unduly burdensome requests that courts routinely reject when directed at non-parties.

For these reasons, explained in detail below, Sugarman's motion should be denied and his subpoena should be quashed in its entirety.

## BACKGROUND

### A.     THE UNDERLYING ACTION

### 1.     Nature and scope of the claims

From 2012 to 2017, Sugarman was the CEO of Banc of California ("Banc"), a national lender with more than $10 million in assets.  (ECF No. 41.)[2]  In the Underlying Action, certain aggrieved shareholders allege that during his tenure as CEO, Sugarman

---

[2] All citations to the docket refer to the ECF filings in the Underlying Action.

and Banc violated federal securities laws by making materially false and misleading statements and omissions to the investing public. (*Id.* ¶ 4.)

In particular, plaintiffs allege that in connection with Banc's April 2016 proxy, defendants intentionally omitted Sugarman's ties to convicted securities fraudster Jason Galanis ("Galanis"), and Galanis's use and control of entities owned and managed by Sugarman. (*Id.* ¶¶ 67-72.) Galanis pled guilty to securities fraud in July 2015 and was sentenced to a six-year prison term in February 2017. (*Id.* ¶ 31.) On January 23, 2017, Banc disclosed that the SEC had launched a formal investigation against Banc and that Sugarman had "resign[ed]." (*Id.* ¶¶ 10, 88-89.)

Plaintiffs in the Underlying Action allege that Banc's stock price fell sharply after an anonymous short seller with a pen-name "Aurelius," published a blog post on October 18, 2016 (the "Blog Post") citing *publicly-available* information (including hundreds of pages of court filings) that exposed the truth about the connections between defendants and Galanis. (*Id.* ¶¶ 84.)

### 2. The narrow, surviving issues in the Underlying Action

In an order denying defendants' motion to dismiss the Underlying Action, the Central District of California held that the April 2016 proxy may have been misleading if the entities owned and managed by Sugarman were controlled by Galanis and yet Galanis's securities fraud indictment was omitted from the proxy. (ECF No. 68.)

In light of the court's ruling on the motion to dismiss, and as expressly acknowledged in recent filings by Banc (ECF Nos. 345; 358), the sole remaining issues in the Underlying Action are whether the statement in the April 2016 proxy regarding

Sugarman's affiliation with the entities purportedly controlled by Galanis was false or misleading and whether Sugarman omitted information from the proxy regarding his connection with Galanis with an intent to defraud shareholders. (*See* ECF No. 68 at 10-14; ECF No. 112 at 1-2.) These limited questions have nothing to do with the private investment decisions of individual investors like Castalian.

### B.     NON-PARTIES CASTALIAN AND JAMES GIBSON

Gibson is the principal of Castalian Partners. (Gibson Decl. ¶ 1.) Castalian conducts fundamental research to identify mispriced publicly traded securities. (*Id*. ¶¶ 4, 6, 10.) While Castalian is often a long term investor in businesses it finds attractive, it also engages in the short sale of securities of companies that it believes are overvalued or led by dishonest managers. (*Id*. ¶ 4.) Castalian's research and the reasons for its investment and trading decisions are proprietary and highly confidential. (*Id*. ¶ 6.) Neither Gibson nor Castalian Partners are parties in the Underlying Action. They have no alleged ties to any party in the Underlying Action, and they had no involvement in the litigation until Sugarman served them with subpoenas.

### C.     THE SUBPOENAS

The two subpoenas, served on Castalian Partners and "James Gibson, LLC," are nearly identical. (Gray Decl. Exhs. 7-8.) While James Gibson is the name of Castalian's owner and manager, James Gibson, LLC does not exist. (Gibson Decl. ¶ 3.) The subpoenas seek the production of nearly a dozen broad categories of confidential documents—spanning a period of nearly twenty months to five years—that are irrelevant to the issues and claims in the Underlying Action:

- All documents reflecting Castalian's transactions in Banc securities, including profits earned, and the bases for its decision to engage in such transactions, including investment models, analyses, reports, research and investigations (Gray Decl. Ex. 7, Request Nos. 2 and 3);

- The personal identities and contact information for all of Castalian's investors as of October 18, 2016 (*Id.*, Request No. 11);

- All documents and communications referring, reflecting or relating to Aurelius, Aurelius's identity, the Blog Post or *Seeking Alpha.com* (*Id.*, Request No. 4);

- All documents or communications with *any* third party, including journalists, regarding Banc, Sugarman, Galanis, the Blog Post or Aurelius (*Id.*, Request Nos. 5 and 6);

- All documents or communications with dozens of third-parties, including legal counsel, Banc investors, other short-sellers, the SEC and other securities and banking regulators, regarding Banc or Sugarman. (*Id.*, Request Nos. 7 and 8);

- All communications, *regardless of subject matter*, with Banc or third-parties representing Banc (*Id.*, Request No. 1);

- All communications, *regardless of subject matter*, with nearly thirty separate individuals or entities, including journalists and Castalian's own principal James Gibson (*Id.*, Request No. 9).

Collectively, these requests constitute a sweeping fishing expedition that would purport to: (1) force a non-party investor to turn over its proprietary trading records, including client lists, securities analyses, the bases for its transactions, and confidential communications with other market participants, journalists, law firms and regulators; and (2) elicit documents, to the extent any exist, that would potentially reveal the identity of the Blog Post's anonymous author. (*Id.*)

### D.    CASTALIAN'S RESPONSE TO THE SUBPOENAS

Castalian objected to the subpoenas on the basis that James Gibson, LLC does not exist and they purport to elicit information that: (1) is irrelevant to the Underlying Action;

(2) is grossly overbroad and unduly burdensome; and (3) would purport to require Castalian to divulge proprietary and confidential information as well as attorney-client privilege and attorney work product.  (*Id*., Ex. 9.)  In response, Sugarman offered ever-changing theories in an attempt to establish relevance, refused to agree to abandon or limit the scope of any request, declined Castilian's offer of a declaration, and then moved to compel responses.  (*Id*., Exs. 10-11.)

### E.    SUGARMAN'S MOTION TO COMPEL

Sugarman's subpoenas and his related motion to compel establish no connection between the limited issues in the Underlying Litigation—*i.e.,* whether he made material omissions in statements to the investing public—and the documents he seeks to discover. Rather, Sugarman is pursuing a tangential theory that Castalian conspired with a group of "traders" to "drive the stock price downward based on false information and make money when the stock rebounded after the public realized the Blog [Post] was false." (Sugarman Memo at 2.)  These allegations, in addition to being far afield of the narrow, *relevant* issues in the Underlying Action, are factually baseless and constitute little more than an ill-conceived effort by Sugarman to scapegoat short sellers, and obfuscate his own alleged misconduct.

Sugarman's attempt to assign a nefarious motive to Castalian's short position is not grounded in any reality.  (*See* Sugarman Memo at 4-6.)  On August 23, 2016 and September 7, 2016, respectively (*i.e.*, before Castalian took short positions in Banc's stock), Bloomberg News published two articles that raised questions about Sugarman's ties to Galanis and identified "red flags" and "warning signs" regarding Banc's stock.

6

(Gibson Decl. Ex. 2.)   After Banc's stock price began to fall in the wake of these Bloomberg News articles, Castalian made the informed decision to take a short position on Banc's stock based upon its comprehensive market analysis that included a review of these articles and other publicly-available resources, all of which demonstrated Sugarman's ties to Galanis.   (Gibson Decl. ¶ 9.)   Notably, Castalian's invitation to provide an affidavit testifying to these realities was flatly rejected by Sugarman's litigation team during a September 10, 2018 meet-and-confer.  (Thomas Decl. ¶ 5.)

The cornerstone of Sugarman's "short and distort" theory is that after taking short positions, certain so-called "Short-and-Distort Traders" "flipped their investment position completely by buying more than 350,000 equity shares in Banc stock (twice as many as necessary to cover their short position)." (Sugarman Memo at 3, 6-12; Voetmann Decl.) Sugarman does not expressly allege that Castalian participated in this supposed scheme, but he refers generically throughout his brief to "*certain* of the Short-and-Distort Traders," ostensibly to create the pregnant implication that Castalian was one such trader. (*Id.*)  But as Sugarman well knows from the subpoenaed FINRA records referenced in his brief and provided to the Court, Castalian *never* took any long equity position following the publication of the Blog Post.  (Gray Decl. ¶ 11; Gibson Decl. ¶ 11.)  Nor did it otherwise engage in any trading activity aimed at benefiting from a subsequent stock price rebound.  (Gibson Decl. ¶ 11.)  In fact, Castalian maintains its short position in Banc stock today.  (*Id*. ¶ 12.)

Ironically, while Sugarman tries to blame short sellers for the drop in Banc's stock price, his efforts cannot be reconciled with his own words on the topic.  In a 2006 book

aptly-titled *The Forewarned Investor: Don't Get Fooled Again by Corporate Fraud*, Sugarman rejected precisely what he attempts to do now: evade a reckoning for his own misdeeds by blaming the market's reaction to alleged securities fraud on short sellers. Sugarman writes:

> The signs of fraud are often uncovered first by a small number of people who have been watching a company closely.  When those people start to make their findings public, they may be the voice of the minority, but they may have important information to share . . . . Skeptics can come from a variety of places.  One place to look for them is among short sellers, who are betting that a company's stock will decline.  ***When executives blame short sellers for the decline in their stock price, you can be pretty sure that something else is wrong with the business***.

(Thomas Decl., Ex. D at 2 (emphasis added).)  Consistent with Sugarman's own thoughts on the topic, short-selling is entirely legal and provides an important service and benefit to the market by exposing corporate fraud.  (Gibson Decl. Ex. 1.)  Finally, even if Sugarman's market manipulation theory had any merit at all, which it does not, such allegations fall within the purview of the regulators who have identified no malfeasance.

As discussed below, the court in the Underlying Action already found that discovery on Sugarman's flawed theory is out of scope, and this Court should do the same, particularly here because the burden and prejudice that would result from producing client lists and communications regarding Castalian's investments far outweighs any likely benefit in the litigation.

# ARGUMENT

## I.   LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."   Fed. R. Civ. P. 26(b)(1). "[D]iscovery may not be had on matters irrelevant to the subject matter involved in the pending action…and even if relevant, discovery is not permitted where no need is shown, or compliance would be unduly burdensome, or where harm to the person from whom discovery is sought outweighs the need of the person seeking discovery of the information." *Miscellaneous Docket Matter # 1 v. Miscellaneous Docket Matter # 2*, 197 F.3d 922, 925 (8th Cir. 1999) (internal quotation omitted); *see also Pointer v. DART*, 417 F.3d 819, 821 (8th Cir. 2005) ("A subpoena must also seek relevant information.").

In addition, "[a] party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."  Fed. R. Civ. P. 45(d)(1).  The Court "must quash or modify a subpoena that…subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A)(iv). When considering undue burden, a subpoena recipient's status as a non-party is a factor entitled to "*special weight*."  *Miscellaneous Docket Matter*, 197 F.3d at 927 (emphasis added).  Enforcement of subpoenas is within the Court's sound discretion.  *See id.* at 925.

## II.   THE SUBPOENAS SEEK DOCUMENTS AND INFORMATION THAT ARE IRRELEVANT TO THE ISSUES AND CLAIMS PENDING IN THE UNDERLYING ACTION

Sugarman's motion to compel should be denied because the information sought is not relevant to the claims in the Underlying Action. *See In Re Nat'l Hockey League Players' Concussion Injury Litig.*, No. MDL142551SRNBRT, 2017 WL 3276873, at *2 (D. Minn. July 31, 2017) (explaining denial of motion to compel third-party production because it sought information that was not relevant to the claims and allegations in the underlying litigation). Here, Sugarman contends that records detailing Castalian's "well timed" trading of Banc stock "is highly likely to support [his] materiality, class certification,[3] and loss causation arguments." (Sugarman Memo at 19.) This argument fails as a matter of law for the following four reasons.

### A.   Castalian's investment decisions are irrelevant to whether defendants made material misrepresentations in their public disclosures

The sole issue in the Underlying Action is whether Banc and Sugarman misled the investing public in connection with its April 2016 proxy by not disclosing their alleged

---

[3] Beyond this bald allegation, Sugarman does not articulate how (or why) he believes that the subpoenas are relevant to resolving class-questions in the Underlying Action. Sometimes Sugarman claims the information goes to "class *certification*"; at others, he claims it goes to "class *adjudication*." Class-certification has already been granted in the Underlying Action. (ECF No. 236.) Moreover, the U.S. Supreme Court has recently held that proof of neither materiality nor loss causation is necessary to certify a class in a fraud-on-the-market case. *See Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 481-82 (2013) (materiality); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) (loss causation). As for the presumption of reliance at class-adjudication, the confidential records of an individual investor could not possibly show that information was made "publicly known" so as to affect "the class's reliance 'on the security's market price as an unbiased assessment of the security's value in light of all public information." (ECF No. 236 at 12 (citing *Amgen*, 568 U.S. at 461-63).)

connection to a convicted fraudster in Sugarman's biography.  Castalian's sensitive trading records are wholly irrelevant to whether Sugarman's biography in the April 2016 proxy was materially misleading.  The Underlying Action is a case about alleged misrepresentations and omissions by Sugarman, *not* how and when Castalian made its investment decisions relating to Banc's stock.

But even if the court were to countenance Sugarman's theory that short sellers like Castalian somehow drove Banc's stock price down based upon false information in the Blog Post, that theory can only be tested and proven based upon the truth of the statements in the Blog Post *itself*.

This inquiry will not, and cannot, be answered or informed by Castalian's private communications and confidential analyses since they have no bearing whatsoever on the truth or reliability of the Blog Post.  Instead, the Blog Post will only be proven (or disproven) through Banc and Sugarman's own records.  *See, e.g., In re Biovail Corp., Secs. Litig*., 247 F.R.D. 72, 74 (S.D.N.Y. 2007) ("[I]f those statements were false, it can prove their falsity from its own records.  Thus Biovail does not need discovery from these non-parties to prove whether or not the reports of David Maris, for example, are false.  Either they are or they aren't."); *Aurelius v. BofI Fed. Bank*, No. MC 16–71 DSF (FFM), 2016 WL 8925145, at *3 (C.D. Cal. Sept. 20, 2016) (granting a motion to quash a subpoena where, as is the case here, defendant claimed that nonparties were involved in a "short and distort" market manipulation scheme, finding that allegations of coordinated and well-timed trading failed to demonstrate a need for the requested evidence).

**B.**      **Fraud-on-the-market cases concern the knowledge of the *market as a whole*, not the knowledge of individual investors like Castalian**

Sugarman asserts that what Castalian and other investors knew about the contents of the Blog Post and its anticipated publication—and how and when they knew it—is "directly relevant" to loss causation.  (Sugarman Memo at 14.)  That is incorrect as a matter of law.  What matters is when and what the *market* knew as a whole—not any specific investor.

To prove loss-causation, a securities fraud plaintiff "must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff."  *In re Daou Sys. Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005).  Plaintiffs proceeding under the fraud-on-the-market theory prove loss causation by alleging a "'corrective disclosure,' followed by a drop in the price of the stock."  *In re Amgen, Inc. Sec. Litig.*, 544 F. Supp. 2d. 1009, 1026 (C.D. Cal. 2008) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988)).  The plaintiff is harmed when the defendant's alleged misstatement or omission "concealed something from the market that, when disclosed, negatively affected the value of the security."  *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d. 395, 423 (S.D.N.Y. 2011) (internal citations omitted).

"The investing public justifiably places heavy reliance on the statements and opinions of corporate insiders."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 503 (9th Cir. 1992) (citing *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)). To avoid Rule 10b-5 liability, "any material information which insiders fail to disclose

must be *transmitted to the public with a degree of intensity and credibility* sufficient to effectively counterbalance any misleading impression created by the insiders' one-sided representations." *Hanon*, 976 F.2d at 503 (citing *Apple*, 886 F.2d at 1116) (emphasis added). Thus, "in order to rebut the presumption that a fraudulent statement has been transmitted through the market price, [a] defendant must show that 'corrective statements' have 'credibly entered the market.'" *Hanon*, 976 F.2d at 503 (citing *Basic Inc*, 485 U.S. at 224). [4]

Regardless of whether the inquiry concerns the plaintiff's alleged corrective disclosure (*i.e.*, the Blog Post) or the defendants' effort to rebut it, information sought in discovery *cannot* be relevant to loss-causation in a securities case unless it reflects the knowledge of the market as a whole. Most commonly, market dissemination comes through the press. *See Hanon*, 976 F.2d 503 ("Dataproducts has produced no evidence to show that the SI 480's technical problems were 'made known to the market by the press or by anyone else'") (quoting *Apple*, 886 F.2d at 1115-16 (finding that at least twenty

---

[4] Curiously, Sugarman's search for an earlier disclosure to the marketplace of his material omission of his ties to Galanis may only deepen his exposure. Implicit in Sugarman's efforts to rebut a presumption of loss-causation from an alleged corrective-disclosure is a suggestion that the market was aware of the allegedly withheld information and had assimilated it into the share price. This proves an effective defense where the stock price had been volatile or rising prior to the purported corrective disclosure. Here, however, Banc's stock value had been falling steadily prior to the Blog Post. *See* Yahoo! Finance Historical Data, Banc of California, Inc., available at: https://finance.yahoo.com/quote/BANC/history?period1=1469941200&period2=1476939600&interval=1d&filter=history&frequency=1d. If this steady decline in price resulted from an *earlier* corrective disclosure of which Castalian became aware, the discovery Sugarman seeks would serve only to lengthen the class-period and increase the class's damages.

articles of intense, sustained press disclosure of adverse information served to render even statements of "unqualified exuberance" unactionable under Rule 10b-5)).

Here, Castalian's *subjective* views and analyses of Banc stock and its *individual* investment decision relative to Banc stock has no bearing upon what the market knew as a whole or whether the Blog Post led to a decline in Banc's stock price. Furthermore, as detailed below, an individual investor's trading activity, research, and decision-making process is not, and cannot be, a proxy for the knowledge of the market as a whole. *See, e.g., In re Worlds of Wonder Sec. Litig.*, No. C-87-5491 SC (FSL), 1992 WL 330411, at *3 (N.D. Cal. July 9, 1992); *In re Herbalife, Ltd. Sec. Litig.*, No. CV142850DSFJCGX, 2015 WL 12732428, at *6 (C.D. Cal. Mar. 27, 2015); *Meyer v. Greene*, 710 F.3d 1189, 1199-1200 (11th Cir. 2013).

### C. Courts in analogous proceedings have quashed subpoenas aimed at third-party investors

Consistent with the analysis above, courts have quashed analogous subpoenas issued by securities fraud defendants to individual investors because the records sought were irrelevant to a fraud-on-the-market theory. *See In re Worlds of Wonder*, 1992 WL 330411, at *3. *Worlds of Wonder* concerned a fraud-on-the-market securities class action against a toy company which had fallen on hard times. *Id.* at *1. Plaintiffs claimed that the company had made false and misleading statements over a two-year period. *Id.* Defendants subpoenaed a number of sophisticated institutional investors who held shares in the company. *Id.* at *3. They—like Sugarman here—sought information to "show that the sophisticated institutional investors and the market as a whole were aware of all

14

the risks that plaintiffs contend were concealed" and "disregarded, or were uninterested in," the allegedly fraudulent information. *Id.* According to the *Worlds of Wonder* defendants (and Sugarman here), "the best way to determine what the market knew at any point in time is to seek discovery from market professionals, such as money managers at large institutional investors." *Id.*

The Court rejected the defendants' argument, reasoning that the pertinent evidence of market knowledge would come from "underwriters, market makers and corporate insiders rather than individual investors, even large institutional investors." *Id.* Notably, the court called the requests for individual investment records to be "highly irregular discovery" because the evidence sought from the investors "would not be relevant to the two major issues of materiality and reliance." *Id.* at *6. Accordingly, the Court entered a protective order invalidating the defendants' subpoenas. *Id.*

A multitude of other cases support the same proposition that an individual investor's opinion and decision-making process does not reflect the knowledge of the market as a whole. Both *Herbalife* and *Meyer v. Greene* dealt with short sellers—like Castalian here. *Herbalife,* 2015 WL 12732428, at *6; *Meyer*, 710 F.3d at 1199-1200. In those cases, noted Wall Street short sellers Bill Ackman and David Einhorn made presentations to investor conferences detailing their bearish opinions on the defendants' securities. Both the *Herbalife* and *Meyer* courts concluded that these presentations could not constitute corrective disclosures, and were otherwise irrelevant to the loss causation inquiry, because they consisted entirely of public information. *See also In re Mannatech, Inc. Sec. Litig*., No. CIV. 05-829 JP/RLP, 2007 WL 9717517, at *4 (D.N.M. Jan. 29,

2007) ("in a fraud-on-the-market case, plaintiffs do not have to prove the element of reliance by individual investors, and so *whatever any individual class member knew or heard would be immaterial*") (emphasis added); *Audio MPEG, Inc. v. HP Inc.*, No. 16-MC-80271-HRL, 2017 WL 950847, at *3-4 (N.D. Cal. Mar. 10, 2017) ("the motivations of a non-party are irrelevant to whether the parties are liable for antitrust violations.... A non-party's motivations and understanding of its relationship with a party accused of monopolization has no bearing on any of these elements").

At bottom, Sugarman's claim that the subpoenas seek evidence "highly likely to support [his] materiality, class certification, and loss causation arguments" is no different than the failed arguments advanced in *Worlds of Wonder* and its progeny. And, as detailed below, Sugarman cites no contrary authority suggesting that an individual investor's records can be relevant in a fraud-on-the-market case.

### D. The authority relied upon by Sugarman has nothing whatsoever to do with the issues or facts in this case

Sugarman does not, because he cannot, cite a single case to support his position that individual investor records—like the records Sugarman requests here—are relevant to any element of the claims in a 10b-5 securities case. That is because no such case exists. Instead, Sugarman cites five cases that have nothing whatsoever to do with the issues or facts present here. (*See* Sugarman Memo at 18-20.) Each of the five inapposite cases are summarized briefly, in turn, below.

In *City of Farmington Hills Employee Retirement System v. Wells Fargo Bank, N.A.*, No. CV 10-4372 (DWF/JJG), 2012 WL 12898810, *1 (D. Minn. Mar. 23, 2012),

plaintiff sued defendant after enrolling in defendant's securities lending program when the value of its investments declined, allegedly as a result of defendant's poor investment decisions.   Defendant moved to compel information regarding plaintiff's other investments and investment advice to defend against a claimed violation of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69, by showing that plaintiff had not relied on defendant's alleged misrepresentation.  *Id*. at \*1-\*2.  The court ultimately required plaintiff to produce a limited subset of the information sought by defendant.  *Id*. at \*5.  Not only does this case not involve any alleged violations of § 10(b) or § 20(a) of the Securities Exchange Act of 1934, but it involves discovery requests to a party to the action—not a non-party.  Moreover, it does not bear on any of the issues for which Sugarman relies on it—namely, materiality, class certification, or loss causation in a securities case.

In *In re REMEC Inc. Securities Litigation*, 702 F. Supp. 2d 1202, 1211 (S.D. Cal. 2010), investors brought a class action against a company and its officers for allegedly overstating the company's financial results.  The court found that the methodology used by the plaintiffs' expert in support of loss causation was fatally flawed, such that his results were not admissible.  *Id*. at 1273.  Without this evidence, plaintiffs were unable to withstand defendants' motion for summary judgment as to loss causation.  *Id*. at 1275.  Notably, *REMEC* does not involve any discovery requests to a third-party, nor does it provide that the trading activity of individual investors is relevant to the issue of loss causation in a securities case.

Similarly, in *In re Bank of America AIG Disclosure Securities Litigation*, 980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) investors filed a class action against a corporation and its officers, alleging they had committed securities fraud by failing to disclose information about a potential lawsuit.  The court granted defendants' motion to dismiss because the "substance of the alleged omissions was already in the public domain."  *Id*. at 577.  While *AIG* provides guidance on the materiality prong of a securities case, it does not involve any discovery requests to a third-party, nor does it find that the trading activity of individual investors is relevant to the issue of materiality.

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) involves claims by shareholders against a company and its directors, alleging that defendants' false statement regarding future approval of a new device artificially inflated the stock price.  It does not, however, involve any third-party discovery.  Nor does it provide that the trading activity of an individual investor is relevant to the issues of materiality, loss causation, or class certification in a securities case.

Finally, in *Loos v. Immersion Corp*., 762 F.3d 880, 887 (9th Cir. 2014), *as amended* (Sept. 11, 2014), which also did not involve any third-party discovery issues, the court unequivocally confirms that the relevant inquiry in a fraud-on-the-market case is when the fraud is revealed to the ***market***.  In other words, in a fraud-on-the-market case, what individual investors knew has no bearing on the plaintiff's claim.

III.   **THE SUBPOENAS SEEK DOCUMENTS AND INFORMATION THAT THE COURT IN THE UNDERLYING ACTION HAS ALREADY FOUND TO BE OUTSIDE THE SCOPE OF PERMISSIBLE DISCOVERY**

Consistent with the narrow scope of the surviving claims, the court in the Underlying Action already determined that analogous third-party correspondence regarding market participants, short positions, the Blog Post and Aurelius – all requested in the subpoenas at issue here – are outside the scope of permissible discovery.  (ECF No. 146.)  Specifically, in a February 14, 2018 order on omnibus discovery motions, the court determined, among other things, that the following exemplar document requests proffered by Sugarman were "outside the scope" of discovery:

- Documents in the possession of a non-party Banc director that relate to any person or entity that earned profits from trading in Banc securities, including all communications with such persons or entities.  (ECF No. 146 at 3; ECF No. 102 at 15-16, Exemplar Request 15.)

- Documents in Banc's possession that reflect or relate to any association or affiliation between a third-party director and any person or entity associated with the Blog Post or Aurelius.  (ECF No. 146 at 3; ECF No. 102 at 13-16, Exemplar Request 6, 16.)

- Documents and communications relating to a non-party Banc director's short or hedge positions held in Digital Turbine (for which that non-party also served as a director).  (ECF No. 146 at 3, EC No. 102 at 14-15, Exemplar Request 10.)

- Communications with Digital Turbine and any third parties, including any bloggers, who authored or contributed to negative articles or blogs about Digital Turbine.  (ECF No. 146 at 3, EC No. 102 at 14, Exemplar Request 8.)

More recently, on October 2, 2018, the court in the Underlying Action denied Sugarman's motion to compel aimed at discovering whether Banc had communicated with and provided certain pleadings and information to journalists.  In denying the motion, the court reiterated that the focus of discovery should be on the alleged

misrepresentations in the April 2016 proxy, stating: "At some point the basis for extending discovery beyond the circumstances surrounding the April 2016 Proxy becomes sufficiently attenuated that the *relevance goes from slight to marginal to zero*." (Thomas Decl., Ex E at 2 (emphasis added).)

While Sugarman has argued that these rulings should not have any preclusive effect here because the rejected discovery was directed to Banc directors for the purposes of rebutting "scienter" versus the "separate issue of loss causation" (Gray Decl., Ex. 10), the fact remains that the court determined that these inquiries and attendant subject matters were not reasonably tailored to the remaining, narrow issues in the Underlying Action.[5]  This Court should reach the same conclusions here.  *See UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, No. CV 05-1289 (PJS/SRN), 2010 WL 11519975, at \*4 (D. Minn. Nov. 23, 2010) (finding that prior rulings involving permissible scope of discovery in action provided "persuasive authority" in resolving future discovery dispute).  On this basis alone, Sugarman's motion fails and should be denied.

---

[5] Unfortunately, notwithstanding the narrow issues left for discovery and trial in the Underlying Action, Sugarman has embarked upon an oppressive discovery campaign, including demands to *seventy-five* separate third parties.  (ECF No. 358.)  These demands have included subpoenas on at least nine other similarly-situated short sellers.  (Thomas Decl., Ex. A.)  Banc has described his discovery conduct as a "wide-ranging vendetta" (ECF No. 358 at 6) and an effort to push boundaries and "use this securities fraud class action as a bludgeon to air his grievances with Banc over the circumstances of his resignation."   (ECF No. 345 at 7.)   Because Banc has agreed to reimburse all of Sugarman's legal fees and costs in connection with the Underlying Action, Sugarman has deployed his blank check to wage war against his former colleagues, and now individual investors, without regard to its attendant costs.  (Thomas Decl. Ex. B.)

## IV.  THE MOTION SHOULD BE DENIED BECAUSE THE SUBPOENAS SEEK CONFIDENTIAL COMMERCIAL INFORMATION

Pursuant to Rule 45, "[t]o protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires…disclosing a trade secret or other confidential research, development, or commercial information."  Fed. R. Civ. P. 45(d)(3)(B)(i).  "Confidential commercial information is information which, if disclosed, would cause substantial economic harm to the competitive position of the entity from whom the information was obtained."  *Gen. Parts Distrib., LLC v. Perry*, No. 12-MC-93 SRN/SER, 2013 WL 3223374, at *3 (D. Minn. June 25, 2013) (quotations omitted).  Such information need not constitute an actual trade secret for a subpoena to be quashed.  *See, e.g., id*. at *4 (affirming order quashing subpoena and noting that "the information sought to be protected need only be 'confidential commercial information,' not a 'trade secret'").

Here, the Subpoenas unabashedly target Castalian's confidential commercial information.  Among other things, Sugarman seeks "ALL DOCUMENTS that reflect YOUR TRANSACTIONS in BANC SECURITIES,"  including calculations of profits and "ALL DOCUMENTS that refer, reflect or relate to the basis for YOUR decision to engage in any TRANSACTIONS in BANC SECURITIES."  (Gray Decl. Ex. 7, Requests 2-3.)   Within these requests, Sugarman further targets Castalian's sensitive market research and analyses including "all research, investigations, analysis or reports prepared by YOU, private investors, investigation research firms or other third parties."  (*Id*.)

And if Sugarman's improper efforts to learn of the inter-workings of Castalian's business were not bad enough, he also seeks to discover the *identities* and *personal information* of Castalian's clients.  Specifically, Sugarman seeks "ALL INVESTORS in YOU as of October 18, 2016, including contact information sufficient to identify the principals, addresses and contact information associated with the INVESTOR."  (Gray Decl. Ex. 7, Request 11.)  Castalian owes a fiduciary duty to each of its clients and, in its capacity as a manager of client funds, vigorously safeguards the personal confidential information of its clients, many of whom are passive investors or wish to remain anonymous.  Consistent with Castalian's privacy policies and other written assurances (Gibson Decl. ¶ 7), Castalian's clients have a reasonable expectation of privacy and to remain unidentified (and untangled) in tangential and irrelevant litigation.

Because Castalian's entire business, and its ability to compete in the marketplace, centers on market research-based investing, the bases, means and methods for establishing its market strategies and trading positions and decisions are highly proprietary and confidential and should not be subject to discovery.  *See Act, Inc. v. Sylvan Learning Sys., Inc.*, No. CIV. A. 99-63, 1999 WL 305300, at *2 (E.D. Pa. May 14, 1999) (acknowledging that information regarding internal market research constitutes confidential commercial information within meaning of Rules 26(c) and 45 and should not be subject to discovery).  Moreover, the personal information of Castalian investors is also confidential commercial information.  *See U.S. v. Three Bank Accounts*, Nos. Civ. 05–4145–KES, 06–4005–KES, 2008 WL 915199, at *8 (D.S.D. Apr. 2, 2008) (applying Rule 45's provision regarding "confidential commercial information" to requests for

documents containing "social security numbers, employer identification numbers, account numbers, financial transactions, and other confidential information of a commercial nature").

Because the information sought is confidential commercial information, the burden is on Sugarman "to show that the information is relevant to the subject matter of the lawsuit and is *necessary* to prepare the case for trial." *ACI Worldwide Corp. v. Mastercard Tech., LLC*, 2016 WL 3647850, at *5 (D. Neb. July 1 2016) (emphasis added). Sugarman does not, and cannot, meet this burden. The court in the Underlying Action has already ruled that the information is not relevant, and case law around the country establishes that such individual investor information is not necessary to defend against a fraud-on-the-market claim. (Section II(c), *supra*). Sugarman's motion should therefore be denied.

## V.   THE SUBPOENAS SEEK DOCUMENTS AND INFORMATION THAT WOULD VIOLATE THE FIRST AMENDMENT RIGHTS OF OTHER THIRD PARTIES

A subpoena issued at the request of a private party in a civil lawsuit "constitutes state action and as such is subject to constitutional limitations." *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1091-92 (W.D. Wash. 2001) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964)). Accordingly, the First Amendment limits a litigant's civil subpoena power. *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 489, 492-94 (C.D. Cal. 1981) (discussing First Amendment implications of a civil subpoena to disclose the names of confidential journalistic sources, and holding that a party seeking to enforce a subpoena to disclose nonparty journalistic

sources must demonstrate that the information is of "certain relevance" and that there is a "compelling reason" for the disclosure).

The Supreme Court has recognized that "an author's decision to remain anonymous…is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995). Furthermore, it is settled that anonymous speech on the internet is protected by the First Amendment just like other types of anonymous speech. *See In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) ("Although the Internet is the latest platform for anonymous speech, online speech stands on the same footing as other speech—there is 'no basis for qualifying the level of First Amendment scrutiny that should be applied' to online speech.") (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997)).

Federal Courts recognize that "the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation…[or] concern about social ostracism.'" *Anonymous Online Speakers*, 661 F. 3d at 1173 (quoting *McIntyre*, 514 U.S. at 341-42); *see also E. Coast Test Prep LLC v. Allnurses.com, Inc*., 309 F. Supp. 3d 644, 676 (D. Minn. 2017) (finding that plaintiff's interest in using discovery process to unmask anonymous internet users did not outweigh interests of users to remain anonymous); *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 114-19 (2d Cir. 2010) (finding that anonymous internet users had a First Amendment interest in maintaining their anonymity when a civil subpoena that was issued to the users' internet service provider sought identifying information associated with their IP addresses); *2TheMart*, 140 F.

Supp. 2d at 1090-93 (finding that Internet users who post to online bulletin boards using pseudonyms have exercised their First Amendment right to speak anonymously and cannot be stripped of their anonymity for merely speaking negatively about a company on the Internet).

Likewise, here, Aurelius – a focus of the subpoenas – is an anonymous internet user who writes online blog articles under a pseudonym in order to expose corporate mismanagement and fraud.  The subpoenas constitute a blatant attempt to unmask anonymous authors and whistleblowers, including the identity of Aurelius.  For example, Sugarman requests "ALL DOCUMENTS and COMMUNICATIONS that refer, reflect or relate to the BLOG or AURELIUS" including without limitation "any DOCUMENTS relating to AURELIUS's identity."  (Gray Decl. Ex. 7, Request No. 4.)

Such nonparty discovery cannot be used as a tool to obtain information about the identities of anonymous speakers, particularly where defendants would not be able to seek discovery from them directly.  *See Music Grp. Macao Commercial Offshore Ltd. v. Does*, 82 F. Supp. 3d 979, 983 (N.D. Cal. 2015).  In fact, courts have already resolved this exact issue with respect to ***Aurelius itself*** by quashing subpoenas aimed at determining Aurelius's identity.  *Aurelius v. BofI Fed. Bank,* No MC 16-71 DSF (FFM)*, 2016 WL 8925145, at *3-6 (C.D. Cal. Sep. 20, 2016) (granting Aurelius's motion to quash).

Aurelius (like the anonymous internet users and authors in the above-referenced case law) has a First Amendment right to remain anonymous.  Therefore, this Court

should deny Sugarman's motion because the subpoenas would purport to violate Aurelius's First Amendment rights.

## VI. THE SUBPOENAS ARE UNDULY BURDENSOME ON THEIR FACE

Rule 45 requires a party issuing a subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). In assessing undue burden, courts consider a number of factors, including overbreadth, relevance and whether the recipient is a non-party to the litigation. *Cedar Rapids Lodge & Suites, LLC v. Seibert*, No. 014CV04839SRNKMM, 2018 WL 3019899, at *3 (D. Minn. June 18, 2018).

Here, the subpoenas serve as a poster child for the type of overbroad and unduly burdensome requests that courts routinely reject when directed at non-parties. Among other things, Sugarman seeks all communications, ***regardless of subject matter***, with: (i) Banc (a party to the Underlying Action); (ii) third-parties representing Banc; and an additional (iii) ***thirty separate non-party individuals*** or entities, including journalists and Castalian's own principal. (Gray Aff. Ex. 7, Request No. 1, 9.) Likewise, Sugarman seeks "ALL DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and any third party regarding BANC, SUGARMAN, GALANIS, ALLEGED GALANIS ENTITY, the BLOG, or AURELIUS" including communications with a non-exclusive list of ***54 separate entities or persons***, including journalists, news outlets, individual investors, persons associated with Banc, and "BofI Holdings, Inc.," a completely separate company that has nothing to do with Banc or Sugarman. (*Id.*, Request No. 5.)

26

Sugarman similarly demands "ALL COMMUNICATIONS with and DOCUMENTS that refer, reflect or relate to GALANIS or any ALLEGED GALANIS ENTITY" (defined to include at least *30 separate entities*) and "ALL DOCUMENTS that refer, reflect or relate to COMMUNICATIONS between YOU and COR CLEARING or COR SECURITIES HOLDINGS regarding BANC or SUGARMAN."  (*Id*., Request No. 6-7.) Sugarman then makes a similar demand for all such "COMMUNICATIONS between YOU" and *16 separate law firms*, the SEC, at least 4 other "REGULATORS," and all "BANC INVESTORS or SHORTS, or any representative thereof."  (*Id.* at Request No. 8.)

These requests, seemingly limitless in scope, are impermissibly overbroad.  *See In re Biovail*, 247 F.R.D at 74 ("the virtually limitless financial and other information Biovail seeks is unnecessary and irrelevant, at least in this case, and the burden these demands place on the subpoenaed non-parties and diversion of their staff to provide it far outweighs any probative value of the information"); *In re Ashworth, Inc. Secs. Litig.*, No. 99-cv-121, 2002 WL 33009225, at *6 (S.D. Cal. May 10, 2002) ("This Court's review of the subpoenas issued to the financial analysts and investment companies reveals that the requests are overwhelmingly broad in category and content.").

The third-party subpoenas are facially overbroad and irrelevant, and they are therefore unduly burdensome under applicable authority. *See Seibert*, 2018 WL 3019899, at *3 (assessing burden based on factors that include overbreadth, relevance and whether the recipient is a non-party to the litigation).  Accordingly, the Court should deny Sugarman's motion to compel.

## VII.   THE SUBPOENAS ARE DIRECTED TO AN ENTITY THAT DOES NOT EXIST

Finally, the motion to compel should also be denied insofar as the subpoenas are improperly directed to James Gibson, LLC, which does not exist.   (Gibson Decl. ¶ 3.) Castalian brought this issue to Sugarman's attention, but no corrected subpoena was issued.   Process directed to a non-existent entity is void. *See, e.g., Carr v. Spherion*, No. CIV.A. 08-0326, 2009 WL 3380007, at *3 (W.D. La. Oct. 19, 2009).

## CONCLUSION

For the foregoing reasons, Castalian respectfully requests that this court enter an order denying, in its entirety, Sugarman's motion to compel.

Dated:  October 12, 2018                                  **BRIGGS AND MORGAN, P.A.**


                                                          By: *s/ Aaron G. Thomas*
                                                          _____
                                                             Charles B. Rogers (#130588)
                                                             Aaron G. Thomas (#0389011)
                                                          2200 IDS Center
                                                          80 South Eighth Street
                                                          Minneapolis, MN  55402-2157
                                                          Telephone: (612) 977-8400
                                                          Fax:        (612) 977-8650
                                                          Email:     athomas@briggs.com

                                                          **ATTORNEYS FOR RESPONDENTS**