# Exhibit B

10-Q 1 banc-9302017x10q.htm 10-Q
Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the quarterly period ended September 30, 2017

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the transition period from _____ to _____
Commission file number 001-35522

# BANC OF CALIFORNIA, INC.
(Exact name of registrant as specified in its charter)

Maryland
(State or other jurisdiction of
incorporation or organization)

04-3639825
(IRS Employer Identification No.)

3 MacArthur Place, Santa Ana, California
(Address of principal executive offices)

92707
(Zip Code)

(855) 361-2262
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (Section 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act.) Yes ☐ No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock as of the latest practicable date.

As of November 1, 2017, the registrant had outstanding 50,106,058 shares of voting common stock and 430,694 shares of Class B non-voting common stock.

Table of Contents

# BANC OF CALIFORNIA, INC.

FORM 10-Q QUARTERLY REPORT

September 30, 2017

Table of Contents

|  |  |  | Page |
|---|---|---|---|
| Part I – Financial Information |  |  | 4 |
|  | Item 1 – | Financial Statements | 4 |
|  | Item 2 – | Management's Discussion and Analysis of Financial Condition and Results of Operations | 79 |
|  | Item 3 – | Quantitative and Qualitative Disclosures About Market Risk | 118 |
|  | Item 4 – | Controls and Procedures | 120 |
| Part II – Other Information |  |  | 123 |
|  | Item 1 – | Legal Proceedings | 123 |
|  | Item 1A – | Risk Factors | 124 |
|  | Item 2 – | Unregistered Sales of Equity Securities and Use of Proceeds | 126 |
|  | Item 3 – | Defaults Upon Senior Securities | 126 |
|  | Item 4 – | Mine Safety Disclosures | 126 |
|  | Item 5 – | Other Information | 126 |
|  | Item 6 – | Exhibits | 127 |
| Signatures |  |  | 132 |

Table of Contents

## NOTE 21 – RELATED-PARTY TRANSACTIONS

**General.** The Bank has granted loans to certain executive officers and directors and their related interests. Excluding the loan amounts described in detail below, loans outstanding to executive officers and directors and their related interests amounted to $249 thousand at September 30, 2017 and December 31, 2016, all of which were performing in accordance with their respective terms as of those dates. These loans were made in the ordinary course of business and on substantially the same terms and conditions, including interest rates and collateral, as those of comparable transactions with non-insiders prevailing at the time, in accordance with the Bank's underwriting guidelines, and do not involve more than the normal risk of collectability or present other unfavorable features. The Bank has an Employee Loan Program (the Program) which is available to all employees and offers executive officers, directors and principal stockholders that meet the eligibility requirements the opportunity to participate on the same terms as employees generally, provided that any loan to an executive officer, director or principal stockholder must be approved by the Bank's Board of Directors. The sole benefit provided under the Program is a reduction in loan fees.

Deposits from executive officers, directors, and their related interests amounted to $1.6 million and $2.4 million at September 30, 2017 and December 31, 2016, respectively. There are certain deposits described below, which are not included in the foregoing amounts.

***Transactions with Current Related Parties.*** The Company and the Bank have engaged in transactions described below with the Company's directors, executive officers, and beneficial owners of more than 5 percent of the outstanding shares of the Company's voting common stock and certain persons related to them.

Indemnification for Costs of Counsel in Connection with Special Committee Investigation, SEC Investigation and Related Matters. On November 3, 2016, in connection with an investigation by the Special Committee of the Company's Board of Directors, the Company Board authorized and directed the Company to provide indemnification, advancement and/or reimbursement for the costs of separate independent counsel retained by any then-current officer or director, in their individual capacity, with respect to matters related to the investigation, and to advise them on their rights and obligations with respect to the investigation. At the direction of the Company Board, this indemnification, advancement and/or reimbursement is, to the extent applicable, subject to the indemnification agreement that each officer and director previously entered into with the Company, which includes an undertaking to repay any expenses advanced if it is ultimately determined that the officer or director was not entitled to indemnification under such agreements and applicable law. In addition, the Company is also providing indemnification, advancement and/or reimbursement for costs related to (i) a formal order of investigation issued by the SEC on January 4, 2017 directed primarily at certain of the issues that the Special Committee reviewed and (ii) any related civil or administrative proceedings against the Company as well as officers currently or previously associated with the Company.

During the nine months ended September 30, 2017 and the year ended December 31, 2016, the fees and expenses paid by the Company included $343 thousand and $0, respectively, incurred by the Company's General Counsel John Grosvenor. For indemnification costs paid for former executive officers or directors, see Transactions with Former Related Parties below.

Sabal Loan. On September 5, 2017 John A. Bogler became the Chief Financial Officer of the Company and the Bank. Mr. Bogler is a founding member, and since 2015 and up until his employment with the Company, was a board member and Chief Financial Officer, of Sabal Capital Partners, LLC. Sabal Capital Partners, LLC is the sole owner of Sabal Opportunities Fund I, LLC, which in turn is the sole owner of Sabal TL1, LLC (together, Sabal). Mr. Bogler remains a material owner of Sabal. Effective June 26, 2015, the Bank provided a $35.0 million committed revolving repurchase facility, which was increased to $40.0 million effective June 11, 2017, to Sabal TL1, LLC, with a maximum funding amount of $100.0 million in certain situations.

Under the Sabal repurchase facility, commercial mortgage loans originated by Sabal are purchased from Sabal by the Bank, together with a simultaneous agreement by Sabal to repurchase the commercial mortgage loans from the Bank at a future date. The advances under the Sabal repurchase facility are secured by commercial mortgage loans that have a market value in excess of the balance of the advances under the facility. During the nine months ended September 30, 2017 and the year ended December 31, 2016, the largest aggregate amount of principal outstanding under the Sabal repurchase facility was $94.7 million and $55.1 million, respectively. The amount outstanding as of September 30, 2017 and December 31, 2016 was $34.7 million and $22.6 million, respectively. Interest on the outstanding balance under the Sabal repurchase facility accrues at the six month LIBOR rate plus a margin. $450.5 million and $514.1 million in principal, respectively, and $895 thousand and $1.1 million in interest, respectively, was paid by Sabal on the facility to the Bank during the nine months ended September 30, 2017 and the year ended December 31, 2016.

Table of Contents

Underwriting Services. Keefe, Bruyette & Woods, Inc., a Stifel company, acted as an underwriter of public offerings of the Company's securities in 2016, 2015 and 2014, and also acted as financial advisor for the Company's sale of its Commercial Equipment Finance Division in 2016. Halle J. Benett, a director of the Company and the Bank, was employed as a Managing Director and Head of the Diversified Financials Group at Keefe, Bruyette & Woods, Inc. until August 31, 2016 and is entitled to receive compensation for certain deals that close subsequent to August 31, 2016 that he originated or actively managed (none involving the Company or the Bank). In addition, Mr. Benett agreed to provide unpaid consulting services to Keefe, Bruyette & Woods, Inc., for a small number of transactions (none involving the Company or the Bank) through December 31, 2016.

The details of the financial advisory services are as follows:

- On October 27, 2016, the Company sold its Commercial Equipment Finance Division to Hanmi Bank, a wholly-owned subsidiary of Hanmi Financial Corporation (Hanmi). Beginning on February 1, 2016, Keefe, Bruyette & Woods provided financial advisory and investment banking services to the Company with respect the possible sale of the division and, contingent upon the closing of the sale, received a non-refundable contingent fee from the Company of $516 thousand (less expenses, the amount was $500 thousand).

The details of the underwritten public offerings are as follows:

- On March 8, 2016, the Company issued and sold 5,577,500 shares of its voting common stock. Pursuant to an underwriting agreement entered into with the Company for that offering on March 2, 2016, Keefe, Bruyette & Woods, Inc. received gross underwriting fees and commissions from the Company of approximately $1.0 million (less estimated expenses, the amount was $846 thousand).
- On February 8, 2016, the Company issued and sold 5,000,000 depositary shares (Series E Depositary Shares) each representing a $1/40^{th}$ ownership interest in a share of 7.00 percent Non-Cumulative Perpetual Preferred Stock, Series E, with a liquidation preference of $1,000 per share (equivalent to $25 per depositary share). Pursuant to an underwriting agreement entered into with the Company for that offering on February 1, 2016, Keefe, Bruyette & Woods, Inc. received gross underwriting fees and commission from the Company of approximately $944 thousand (less estimated expenses, the amount was $849 thousand).
- On April 8, 2015, the Company issued and sold 4,600,000 depositary shares (Series D Depositary Shares) each representing $1/40^{th}$ ownership interest in a share of 7.375 percent Non-Cumulative Perpetual Preferred Stock, Series D, with a liquidation preference of $1,000 per share (equivalent to $25 per depositary share). Pursuant to an underwriting agreement entered into with the Company for that offering on March 31, 2015, Keefe, Bruyette & Woods, Inc. received gross underwriting fees and commissions from the Company of approximately $590 thousand (less expenses, the amount was $515 thousand).
- On April 6, 2015, the Company issued and sold $175.0 million aggregate principal amount of its 5.25 percent Senior Notes due April 15, 2025. Pursuant to a purchase agreement entered into with the Company for that offering on March 31, 2015, Keefe, Bruyette & Woods, Inc. received gross underwriting fees and commissions from the Company of approximately $263 thousand (less expenses, the amount was $221 thousand).
- On May 21, 2014, the Company issued and sold 5,922,500 shares of its voting common stock. Pursuant to an underwriting agreement entered into with the Company for that offering on May 15, 2014, Keefe, Bruyette & Woods, Inc. received gross underwriting fees and commissions from the Company of approximately $521 thousand (less expenses, the amount was $481 thousand).

Legion Affiliates. As reported in an amendment to a Schedule 13D filed with the Securities and Exchange Commission on May 23, 2017, Legion Partners Asset Management, LLC (Legion Partners), Legion Partners, L.P. I, Legion and its affiliates (collectively, the Legion Group) beneficially owned 2,938,679 shares of the Company's voting common stock as of May 19, 2017, which the Legion Group reported represented 5.6 percent of the Company's total shares outstanding.

*Cooperation Agreement*. On March 13, 2017, the Company entered into a cooperation agreement with the Legion Group (the Legion Group Cooperation Agreement). Under the terms of such agreement, among other things:

- The Legion Group agreed to irrevocably withdraw its notice of director nomination and submission of a business proposal.
- The Company agreed to conduct a search for two additional independent directors in collaboration with the Legion Group. In accordance with this provision, following a search initiated by the Company Board and (following entry into the Cooperation Agreement) conducted in consultation with Legion Group, the Company Board appointed Mary A. Curran and Bonnie G. Hill as new independent directors, for terms that became effective on June 9, 2017 at the conclusion of the Company's 2017 Annual Meeting of Stockholders. Ms. Curran is serving as a Class I director, for a term to expire at the Company's 2019 Annual Meeting of Stockholders and Dr. Hill is serving as a Class III director, for a term to expire at the Company's 2018 Annual Meeting of Stockholders. Simultaneously with the effectiveness of their appointments to the Company Board, each of Ms. Curran and Dr. Hill was appointed as a director of the Bank.

Table of Contents

- From March 13, 2017 until June 10, 2017, the day after the Company's 2017 Annual Meeting, the Legion Group agreed to vote all the shares of the Company's voting common stock that it beneficially owned (i) in favor of the Company's slate of directors, (ii) against any stockholder's nominations for directors not approved and recommended by the Board and against any proposals or resolutions to remove any director and (iii) in accordance with the Board's recommendations on all other proposals of the Board set forth in the Company's proxy statement.
- The Legion Group agreed to certain standstill provisions that restricted the Legion Group and its affiliates, associates and representatives, from March 13, 2017 until June 10, 2017, from, among other things, acquiring additional voting securities of the Company that would result in the Legion Group having ownership or voting interest in 10 percent or more of the outstanding shares of voting common stock, engaging in proxy solicitations in an election contest, subjecting any shares to any voting arrangements except as expressly provided in the Cooperation Agreement, making or being a proponent of a stockholder proposal, seeking to call a meeting of stockholders or solicit consents from stockholders, seeking to obtain representation on the Board except as otherwise expressly provided in the Cooperation Agreement, seeking to remove any director from the Board, seeking to amend any provision of the governing documents of the Company, or proposing or participating in certain extraordinary corporate transactions involving the Company.
- The Company agreed to reimburse the Legion Group up to $100 thousand for its legal fees and expenses incurred in connection with its investment in the Company.

PL Capital Affiliates. As reported in an amendment to a Schedule 13D filed with the Securities and Exchange Commission on February 10, 2017, PL Capital Advisors, LLC (PL Capital Advisors) and certain of its affiliates (collectively, the PL Capital Group) owned 3,401,719 shares of the Company's voting common stock as of February 7, 2017, which the PL Capital Group reported represented 6.9 percent of the Company's total shares outstanding.

*Cooperation Agreement.* On February 7, 2017, Richard J. Lashley, a co-founder of PL Capital Advisors, LLC, was appointed to the Boards of Directors of the Company and the Bank, which appointments became effective February 16, 2017. Mr. Lashley was appointed as a Class I director of the Company, for a term that will expire at the Company's 2019 Annual Meeting of Stockholders. In connection with the appointment of Mr. Lashley to the Boards, on February 8, 2017, the PL Capital Group and Mr. Lashley entered into a cooperation agreement with the Company (PL Capital Cooperation Agreement), in which PL Capital Group agreed, among other matters:

- From February 8, 2017 until June 10, 2017 (PL Capital Restricted Period), the PL Capital Group agreed to vote all the shares of Common Stock that it beneficially owned (i) in favor of the Company's slate of directors, (ii) against any stockholder's nominations for directors not approved and recommended by the Company's Board and against any proposals or resolutions to remove any director and (iii) in accordance with the recommendations by the Company's Board on all other proposals of the Company's Board set forth in the Company's proxy statement.
- In addition, during the PL Capital Restricted Period, the PL Capital Group agreed to certain standstill provisions that restricted the PL Capital Group and its affiliates, associates and representatives, during the PL Capital Restricted Period, from, among other things, acquiring additional voting securities of the Company that would result in the PL Capital Group having ownership or voting interest in 10 percent or more of the outstanding shares of voting common stock, engaging in proxy solicitations in an election contest, subjecting any shares to any voting arrangements except as expressly provided in the PL Capital Cooperation Agreement, making or being a proponent of a stockholder proposal, seeking to call a meeting of stockholders or solicit consents from stockholders, seeking to obtain representation on the Company's Board except as otherwise expressly provided in the Cooperation Agreement, seeking to remove any director from the Company's Board, seeking to amend any provision of the governing documents of the Company, or proposing or participating in certain extraordinary corporate transactions involving the Company.
- Pursuant to the PL Capital Cooperation Agreement, during the three months ended March 31, 2017, the Company reimbursed PL Capital Group $150 thousand for a portion of its legal fees and expenses incurred in connection with its investment in the Company.

Patriot Affiliates. As reported in a Schedule 13D amendment filed with the SEC on November 10, 2014, Patriot's last public filing reporting ownership of the Company's securities, Patriot Financial Partners, L.P. (together with its affiliates referred to as Patriot Partners) owned 3,100,564 shares of the Company's voting common stock as of November 7, 2014, which Patriot Partners reported represented 9.3 percent of the Company's outstanding voting common stock as of that date. For the details of the transaction in which Patriot Partners acquired certain of these shares, see *"Securities Purchase Agreement with Patriot"* below. In connection with the appointment of W. Kirk Wycoff, a managing partner of Patriot Partners, to the Boards of Directors of the Company and the Bank (described below), Mr. Wycoff filed a Form 3 with the SEC on February 24, 2017, which reported total holdings for Patriot Partners of 2,850,564 shares.

>*Director.* On February 9, 2017, Mr. Wycoff was appointed to the Boards of Directors of the Company and the Bank, which appointment became effective on February 16, 2017. Mr. Wycoff was appointed as a Class III director of the Company, for a term that will expire at the Company's 2018 Annual Meeting of Stockholders..
>
>From 2010 to 2015, Mr. Wycoff was a director of, and Patriot Partners was a stockholder of, Square 1 Financial, Inc. (Square 1). Douglas H. Bowers, who became President and Chief Executive Officer of the Company and the Bank and a director of the Bank effective May 8, 2017 and a director of the Company on June 9, 2017 at the conclusion of the Company's 2017 Annual Meeting of Stockholders, served as President and Chief Executive Officer of Square 1 from 2011 to 2015. There are no arrangements or understandings between Mr. Bowers and either Mr. Wycoff or Patriot Partners pursuant to which Mr. Bowers was selected as a director and an officer of the Company.
>
>*Securities Purchase Agreement with Patriot.* As noted above, as reported in a Schedule 13D amendment filed on November 10, 2014 with the SEC, Patriot Partners owned 3,100,564 shares of the Company's voting common stock as of November 7, 2014, which Patriot Partners reported represented 9.3 percent of the Company's total shares outstanding as of the dates set forth in the Schedule 13D. On April 22, 2014, the Company entered into a Securities Purchase Agreement (Patriot SPA) with Patriot Partners to raise a portion of the capital to be used to finance the acquisition of select assets and assumption of certain liabilities by the Bank from Banco Popular North America (BPNA) comprising BPNA's network of 20 California Branches (the BPNA Branch Acquisition), which was completed on November 8, 2014. The Patriot SPA was due to expire by its terms on October 31, 2014. Prior to such expiration, the Company and Patriot Partners entered into a Securities Purchase Agreement, dated as of October 30, 2014 (New Patriot SPA). Pursuant to the New Patriot SPA, substantially concurrently with the BPNA Branch Acquisition, Patriot Partners purchased from the Company (i) 1,076,000 shares of its voting common stock at a price of $9.78 per share and (ii) 824,000 shares of its voting common stock at a price of $11.55 per share, for an aggregate purchase price of $20.0 million. In consideration for Patriot Partners' commitment under the New SPA and pursuant the terms of the New SPA, on the closing of the sale of such shares on November 7, 2014, the Company paid Patriot Partners an equity support payment of $538 thousand and also reimbursed Patriot Partners $100 thousand in out-of-pocket expenses.
>
>On October 30, 2014, concurrent with the execution of the New Patriot SPA, Patriot and the Company entered into a Settlement Agreement and Release (the Settlement Agreement) in order to resolve, without admission of any wrongdoing by either party, a prior dispute regarding, among other things, the proper interpretation of certain provisions of the SPA, including but not limited to the computation of the purchase price per share (the Dispute). Pursuant to the Settlement Agreement, Patriot and the Company released any claims they may have had against the other party with respect to the Dispute. In addition, Patriot and the Company agreed for the period beginning on the date of the Settlement Agreement and ending on December 31, 2016, that neither Patriot nor the Company would disparage the other party or its affiliates.
>
>During the period beginning on the date of the Settlement Agreement and ending on December 31, 2016, Patriot also agreed not to:
>
>- institute, solicit, assist or join, as a party, any proxy solicitation, consent solicitation, board nomination or director removal relating to the Company against or involving the Company or any of its subsidiaries, affiliates, successors, assigns, directors, officers, employees, agents, attorneys or financial advisors;
>- take any action relative to the governance of the Company that would violate its passivity commitments or vote the shares of voting common stock held or controlled by it on any matters related to the election, removal or replacement of directors or the calling of any meeting related thereto, other than in accordance with management's recommendations included in the Company's proxy statement for any annual meeting or special meeting;

Table of Contents

- form or join in a partnership, limited partnership, syndicate or other group, or solicit proxies or written consents of stockholders or conduct any other type of referendum (binding or non-binding) with respect to, or from the holders of, the voting common stock and any other securities of the Company entitled to vote in the election of directors, or securities convertible into, or exercisable or exchangeable for, voting common stock or such other securities (such other securities, together with the voting common stock, being referred to as Voting Securities), or become a participant in or assist, encourage or advise any person in any solicitation of any proxy, consent or other authority to vote any Voting Securities; or
- enter into any negotiations, agreements, arrangements or understandings with any person with respect to any of the foregoing or advise, assist, encourage or seek to persuade any person to take any action with respect to any of the foregoing.

The Company also agreed, during the same period, not to:

- institute, solicit, assist or join, as a party, any proxy solicitation, consent solicitation, board nomination or director removal relating to Patriot against or involving Patriot or any of its subsidiaries, affiliates, successors, assigns, officers, partners, principals, employees, agents, attorneys or financial advisors; or
- enter into any negotiations, agreements, arrangements or understandings with any person with respect to any of the foregoing or advise, assist, encourage or seek to persuade any person to take any action with respect to any of the foregoing.

***Transactions with Former Related Parties***

In addition to the transactions described above with former related parties, the Company and the Bank have engaged in transactions described below with the Company's then (now former) directors, executive officers, and beneficial owners of more than 5 percent of the outstanding shares of the Company's voting common stock and certain persons related to them.

Indemnification for Costs of Counsel for Former Executive Officers and Former Directors in Connection with Special Committee Investigation, SEC Investigation and Related Matters. On November 3, 2016, in connection with the investigation by the Special Committee of the Company's Board of Directors, the Company Board authorized and directed the Company to provide indemnification, advancement and/or reimbursement for the costs of separate independent counsel retained by any then-current officer or director, in their individual capacity, with respect to matters related to the investigation, and to advise them on their rights and obligations with respect to the investigation. At the direction of the Company Board, this indemnification, advancement and/or reimbursement is, to the extent applicable, subject to the indemnification agreement that each officer and director previously entered into with the Company, which includes an undertaking to repay any expenses advanced if it is ultimately determined that the officer or director was not entitled to indemnification under such agreements and applicable law. In addition, the Company is also providing indemnification, advancement and/or reimbursement for costs related to (i) a formal order of investigation issued by the SEC on January 4, 2017 directed primarily at certain of the issues that the Special Committee reviewed and (ii) any related civil or administrative proceedings against the Company as well as officers currently or previously associated with the Company.

During the nine months ended September 30, 2017 (excluding fees paid in January 2017), the fees and expenses paid by the Company included $2.1 million incurred by the Company's then- (now former) Chair, President and Chief Executive Officer Steven A. Sugarman ; $999 thousand incurred by the Bank's then- (now former) Management Vice Chair Jeffrey T. Seabold; $584 thousand jointly incurred by the Company's then- (now former) Interim Chief Financial Officer and Chief Strategy Officer J. Francisco A. Turner and the Company's then- (now former) Chief Financial Officer James J. McKinney; and $461 thousand incurred by the Company's then- (now former) director Chad Brownstein. For the year ended December 31, 2016, fees and expenses incurred under the arrangement described above (which were paid in January 2017) included $573 thousand incurred by Mr. Sugarman; $57 thousand incurred by Mr. Seabold; $135 thousand incurred jointly by Messrs. Turner and McKinney; and $29 thousand incurred by Mr. Brownstein. Indemnification was paid on behalf of other former executive officers and former directors in lesser amounts for the nine months ended September 30, 2017 and the year ended December 31, 2016.

Table of Contents

Los Angeles Football Club Loans, Naming Rights and Sponsorship. Effective August 8, 2016, the Bank provided $40.3 million out of a $145.0 million committed construction line of credit (the Stadco Loan) to LAFC Stadium Co, LLC (Stadco) for the construction of a soccer-specific stadium for the LAFC in Los Angeles, California as well as to fund the interest and fees that become due under the Stadco Loan. LAFC is a Major League Soccer expansion franchise scheduled to debut in 2018. Also effective August 8, 2016, the Bank provided $9.7 million out of a $35.0 million committed senior secured line of credit (the Team Loan) to LAFC Sports, LLC (Team) to fund distributions to LAFC Partners, LLLP (Holdco) that will be used for stadium construction, funding interest and fees that become due under such Team Loan and to pay all other fees, costs and expenses payable by the Team in connection with project costs related to the stadium construction.

All of the outstanding equity interests in Stadco and Team are held by Holdco, and Holdco serves as sole guarantor of the Team Loan described above. Minority limited partnership interests in Holdco are held by, among others: (i) Jason Sugarman, who is the brother of the Company's and the Bank's then- (now former) Chairman, President and Chief Executive Officer, Steven A. Sugarman; and (ii) Jason Sugarman's father-in-law, who currently serves as Executive Chairman and a member of Holdco's board of directors, which is appointed by Holdco's general partner and primarily functions in an advisory capacity. The foregoing statements are based primarily on information provided to the Company by Holdco through its legal counsel.

As of September 30, 2017 and December 31, 2016, there were $15.1 million and no outstanding advances, respectively, by the Bank under the Stadco Loan. During the nine months ended September 30, 2017, the largest amount of principal outstanding under the Stadco Loan was $15.1 million. The Bank collected $277 thousand and $59 thousand, respectively, in unused loan fees during the nine months ended September 30, 2017 and the year ended December 31, 2016. Interest on the outstanding balance under the Stadco Loan accrues at LIBOR plus a margin. During the nine months ended September 30, 2017 and the year ended December 31, 2016, $121 thousand and $0 interest, respectively, was paid by Stadco to the Bank on the Stadco Loan.

As of September 30, 2017 and December 31, 2016, there were $3.5 million and no outstanding advances, respectively, by the Bank under the Team Loan. During the nine months ended September 30, 2017, the largest aggregate amount of principal outstanding under the Team Loan was $3.5 million. The Bank collected $84 thousand and $18 thousand, respectively, in unused loan fees during the nine months ended September 30, 2017 and the year ended December 31, 2016. Interest on the outstanding balance under the Team Loan accrues at LIBOR plus a margin. During the nine months ended September 30, 2017 and the year ended December 31, 2016, $43 thousand and $0 interest, respectively, was paid by Team to the Bank on the Team Loan.

Following the closing of the Stadco Loan and the Term Loan, the Bank on August 22, 2016 reached agreement with the Team concerning, among other things, the Bank's right to name the stadium to be operated by Stadco (the Stadium) as "Banc of California Stadium." The August 22, 2016 agreement, which contemplated the negotiation and execution of more detailed definitive agreements between the Bank, on the one hand, and Stadco and the Team on the other hand (LAFC Transaction), also included a sponsorship relationship between the Bank and the Team with an initial term ending on the completion date of LAFC's 15th full Major League Soccer (MLS) season, and the Bank having a right of first offer to extend the term for an additional 10 years (LAFC Term). On February 28, 2017, the Bank executed more detailed definitive agreements with LAFC and Stadco relating to the LAFC Transaction, which are subject to MLS rules and/or approval (the LAFC Agreements).

The LAFC Agreements provide that, during the LAFC Term, the Bank will have the exclusive right to name the Stadium and will be the exclusive provider of financial services to (and the exclusive financial services sponsor of) the Team and Stadco. In connection with its right to name the Stadium, the Bank will receive, among other rights, signage (including prominent exterior signage) and related branding rights throughout the exterior and interior of the Stadium facility (including exclusive branding rights within certain designated areas and venues within the facility), will receive the right to locate a Bank branch within the Stadium facility, will receive the exclusive right to install and operate ATMs in the Stadium facility, and will receive the exclusive right to process payments and provide other financial services (with certain exceptions) throughout the facility. In addition, the Bank will receive suite access for LAFC and certain other events held at the Stadium and will receive certain hospitality, event, media and other rights ancillary to its naming rights relating to the Stadium and its sponsorship rights relating to the Team. In conjunction with the LAFC Agreements, the Company expects to decrease its other planned marketing and sponsorship expenses.

In exchange for the Bank's rights as set forth in the LAFC Agreements, the Bank (i) paid the Team $10.0 million on March 31, 2017 and (ii) has agreed to pay the following annual aggregate amounts: for the Team's 2018 MLS season, $5.3 million; for 2019, $5.4 million; for 2020, $5.5 million; for 2021, $5.6 million; for 2022, $5.7 million; for 2023, $5.8 million; for 2024, $5.9 million; for 2025, $6.0 million; for 2026, $6.1 million; for 2027, $6.2 million; for 2028, $6.3 million; for 2029, $6.4 million; for 2030, $6.5 million; for 2031, $6.6 million; and for 2032, $6.7 million.

As of September 30, 2017 and December 31, 2016, the various entities affiliated with LAFC held $53.6 million and $76.0 million, respectively, of deposits at the Bank.

Table of Contents

Legal Fees and Other Matters. During July 2017, the Company and the Bank became aware that the former Chair, President and Chief Executive Officer of the Company and the Bank, Steven A. Sugarman, became of counsel to Michelman & Robinson, LLP, a law firm that previously provided legal services to the Bank. For legal services that were performed for the Bank over a period of more than four months, the Bank paid Michelman & Robinson, LLP approximately $330 thousand in fees during the three months ended March 31, 2017. No legal services were provided and $0 was paid to Michelman & Robinson, LLP during the six-month period from April 1, 2017 to September 30, 2017. Michelman & Robinson, LLP currently has three outstanding letters of credit with the Bank, none of which was drawn upon as of September 30, 2017, which were issued under a line of credit that was originally extended to Michelman & Robinson, LLP prior to 2008. Michelman & Robinson, LLP elected to pay in full all outstanding borrowings under the line of credit in June 2017 and, thereafter, the line of credit was terminated. During the three months ended March 31, 2017, the Bank reimbursed Michelman & Robinson, LLP $100 thousand in connection with a matter concerning funds wired by a third party to a deposit account Michelman & Robinson, LLP held at the Bank.

Consulting Agreement for the Bank. On August 4, 2016, the Bank entered into a Management Services Agreement with Carlos Salas, who was, at the time, the Chief Executive Officer of COR Clearing LLC (COR Clearing) and Chief Financial Officer of COR Securities Holding, Inc. (CORSHI). Steven A. Sugarman, the then- (now former) Chairman, President and Chief Executive Officer of the Company and the Bank, is the Chief Executive Officer, as well as a controlling equity owner, of both COR Clearing and CORSHI. For management consulting and advisory services provided to the Bank through the termination of the management services agreement on November 30, 2016, Mr. Salas earned $108 thousand in fees. On December 1, 2016, Mr. Salas became a full-time employee of the Bank and tendered his resignation from his positions as Chief Executive Officer of COR Clearing and Chief Financial Officer of CORSHI effective upon the orderly transition of his duties, but in no case later than March 31, 2017. Mr. Salas earned $17 thousand as a full time employee of the Bank during the year ended December 31, 2016. Mr. Salas separated from the Bank on February 1, 2017.

TCW Affiliates. TCW Shared Opportunity Fund V, L.P. (SHOP V Fund), an affiliate of The TCW Group, Inc., initially became a holder of the Company's voting common stock and non-voting common stock as a lead investor in the November 2010 recapitalization of the Company (the Recapitalization). In connection with its investment in the Recapitalization, SHOP V Fund also was issued by the Company an immediately exercisable five-year warrant (the SHOP V Fund Warrant) to purchase 240,000 shares of non-voting common stock or, to the extent provided therein, shares of voting common stock in lieu of non-voting common stock. SHOP V Fund was issued shares of non-voting common stock in the Recapitalization because at that time, a controlling interest in TCW Asset Management Company, the investment manager to SHOP V Fund, was held by a foreign banking organization, and in order to prevent SHOP V Fund from being considered a bank holding company under the Bank Holding Company Act of 1956, as amended, the number of shares of voting common stock it purchased in the Recapitalization had to be limited to 4.99 percent of the total number of shares of voting common stock outstanding immediately following the Recapitalization. For the same reason, the SHOP V Fund Warrant could be exercised by SHOP V Fund for voting common stock in lieu of non-voting common stock only to the extent SHOP V Fund's percentage ownership of the voting common stock at the time of exercise would be less than 4.99 percent as a result of dilution occurring from additional issuances of voting common stock subsequent to the Recapitalization.

In 2013, the foreign banking organization sold its controlling interest in TCW Asset Management Company, eliminating the need to limit SHOP V Fund's percentage ownership of the voting common stock to 4.99 percent. As a result, on May 29, 2013, the Company and SHOP V Fund entered into a Common Stock Share Exchange Agreement, dated May 29, 2013 (Exchange Agreement), pursuant to which SHOP V Fund could from time to time exchange its shares of non-voting common stock for shares of voting common stock issued by the Company on a share-for-share basis, provided that immediately following any such exchange, SHOP V Fund's percentage ownership of voting common stock did not exceed 9.99 percent. The shares of non-voting common stock that could be exchanged by SHOP V Fund pursuant to the Exchange Agreement included the shares of non-voting common stock it purchased in the Recapitalization, the additional shares of non-voting common stock SHOP V Fund acquired subsequent to the Recapitalization pursuant to the Company's Dividend Reinvestment Plan and any additional shares of non-voting common stock that SHOP V Fund acquired pursuant to its exercise of the SHOP V Fund Warrant.

On December 10, 2014, SHOP V Fund and two affiliated entities, Crescent Special Situations Fund Legacy V, L.P. (CSSF Legacy V) and Crescent Special Situations Fund Investor Group, L.P. (CSSF Investor Group), entered into a Contribution, Distribution and Sale Agreement pursuant to which SHOP V Fund agreed to transfer shares of non-voting common stock and portions of the SHOP V Fund Warrant to CSSF Legacy V and CSSF Investor Group. Also on December 10, 2014, SHOP V Fund, CSSF Legacy V, CSSF Investor Group and the Company entered into an Assignment and Assumption Agreement pursuant to which all of SHOP V Fund's rights and obligations under the Exchange Agreement with respect to the shares of non-voting common stock transferred by it to CSSF Legacy V and CSSF Investor Group pursuant to the Contribution, Distribution and Sale Agreement were assigned to CSSF Legacy V and CSSF Investor Group, including the right of SHOP V Fund to exchange such shares for shares of voting common stock on a one-for-one basis.

Table of Contents

Based on a Schedule 13G amendment filed with the SEC on February 12, 2015, The TCW Group's last public filing reporting ownership of the Company's securities, as of December 31, 2014, The TCW Group, Inc. and its affiliates held 1,318,462 shares of voting common stock (which included, for purposes of this calculation, the 240,000 shares of stock underlying the as yet unexercised SHOP V Fund Warrant). On June 3, 2013, January 5, 2015, January 20, 2015, and March 16, 2015, SHOP V Fund or CSSF Legacy V or CSSF Investor Group exchanged 550,000 shares, 522,564 shares, 86,620 shares, and 934 shares, respectively, of non-voting common stock for the same number of shares of voting common stock. In addition, on August 3, 2015, the SHOP V Fund Warrant, which was held in separate portions by CSSF Legacy V and CSSF Investor Group, was exercised in full using a cashless (net) exercise, resulting in a net number of shares of non-voting common stock issued in the aggregate of 70,690, which were immediately thereafter exchanged for an aggregate of 70,690 shares of voting common stock. Based on automatic adjustments to the original $11.00 exercise price of the SHOP V Fund Warrant, the exercise price at the time of exercise was $9.13 per share. As a result of these exchanges and exercises The TCW Group, Inc. and its affiliates no longer hold any shares of non-voting common stock or warrants to acquire stock. Based on TCW Group's prior report of owning 1,318,462 shares of the Company's voting common stock, TCW Group, Inc. would have owned 3.5 percent of the Company's outstanding voting common stock as of December 31, 2015.

Oaktree Affiliates. As reported in a Schedule 13G filed with the SEC on January 16, 2015, OCM BOCA Investor, LLC (OCM), an affiliate of Oaktree Capital Management, L.P., owned 3,288,947 shares of the Company's voting common stock as of November 7, 2014, which OCM reported represented 9.9 percent of the Company's total shares outstanding as of the dates set forth in the Schedule 13G. For the details of the transaction in which OCM acquired these shares, see *"Securities Purchase Agreement with Oaktree"* below. However, as reported in a Schedule 13G amendment filed with the SEC on February 12, 2016 OCM and its affiliates owned 671,702 shares of the Company's voting common stock as of December 31, 2015, which OCM reported represented less than 5 percent of the Company's total shares outstanding.

> *Loans*. Effective September 30, 2015, the Bank provided a $15.0 million committed revolving line of credit, which was increased to $20.0 million effective as of March 7, 2017, to Teleios LS Holdings DE, LLC and Teleios LS Holdings II DE, LLC (Teleios), which generate income through the purchase, monitoring, maintenance and maturity of life insurance policies. At the time the facility was executed, the Teleios entities were hedge funds in which Oaktree Capital Management L.P. or one of its affiliates was a controlling investor.
>
> Advances under the Teleios line of credit are secured by life insurance policies purchased by Teleios that have a market value in excess of the balance of the advances under the line of credit. As of September 30, 2017 and December 31, 2016, outstanding advances by the Bank under the Teleios line of credit were $16.0 million and $15.0 million, respectively. During the nine months ended September 30, 2017 and the year ended December 31, 2016, the largest aggregate amount of principal outstanding under the Teleios line of credit were $20.0 million and $15.0 million, respectively. Interest on the outstanding balance under the Teleios line of credit accrues at the Prime Rate plus a margin. During the nine months ended September 30, 2017 and the year ended December 31, 2016, $4.0 million and $2.0 million in principal, respectively, and $757 thousand and $462 thousand in interest, respectively, was paid by Teleios on the line of credit to the Bank.
>
> Effective June 26, 2015, the Bank provided a $35.0 million committed revolving repurchase facility, which was increased to $40.0 million (the Sabal repurchase facility) effective June 11, 2017, to Sabal TL1, LLC, a Delaware limited liability company, with a maximum funding amount of $100.0 million in certain situations. At the time the facility was executed, Sabal TL1, LLC was controlled by an affiliate of Oaktree Capital Management, L.P. and effective September 15, 2015, Sabal was no longer controlled by Oaktree Capital Management, L.P. For more information about the facility, see above under "Transactions with Current Related Parties, Sabal Loan."
>
> *Securities Purchase Agreement with Oaktree*. As noted above, as reported in a Schedule 13G filed with the SEC on January 16, 2015, OCM owned 3,288,947 shares of the Company's voting common stock. OCM purchased these shares from the Company on November 7, 2014 at a price of $9.78 per share pursuant to a securities purchase agreement entered into on April 22, 2014 (and amended on October 28, 2014) in order for the Company to raise a portion of the capital to be used to finance the BPNA Branch Acquisition, which was completed on November 8, 2014. In consideration for its commitment under the securities purchase agreement, OCM was paid at closing an equity support payment from the Company of $1.6 million.
>
> *Management Services*. Approximately nine months before OCM became a stockholder of the Company, certain affiliates of Oaktree Capital Management, L.P. (collectively, the Oaktree Funds) entered into a management agreement, effective January 30, 2014, as amended (the Management Agreement), with The Palisades Group, which was then a wholly owned subsidiary of the Company.

74

Table of Contents

Table of Contents

Pursuant to the Management Agreement, The Palisades Group serves as the credit manager of pools of SFR mortgage loans held in securitization trusts or other vehicles beneficially owned by the Oaktree Funds. Under the Management Agreement, The Palisades Group is paid a monthly management fee primarily based on the amount of certain designated pool assets and may earn additional fees for advice related to financing opportunities. During the period from January 1, 2016 through May 5, 2016 (the date the Company sold its membership interests in The Palisades Group) and the years ended December 31, 2015 and 2014, the Oaktree Funds paid The Palisades Group $1.0 million, $5.1 million, and $5.3 million as management fees, respectively, which in some instances represents fees for partial year services. In addition to the Management Agreement, the Bank may from time to time in the future enter into lending transactions with portfolio companies of investment funds managed by Oaktree Capital Management, L.P.

St. Cloud Affiliates. On November 24, 2014, the Bank invested as a limited partner in an affiliate of St. Cloud Capital LLC (St. Cloud). Based on a Schedule 13G amendment filed with the SEC on February 14, 2012, St. Cloud's last public filing reporting ownership of the Company securities, St. Cloud reported holding 700,538 shares of the Company's voting common stock (approximately 1.4 percent of the Company's outstanding voting common shares as of December 31, 2015). The affiliate is St. Cloud Capital Partners III SBIC, LP (the Partnership), which applied for a license granted by the U.S. Small Business Administration to operate as a debenture Small Business Investment Company (SBIC) under the Small Business Investment Act of 1958 and the regulations promulgated thereunder. The Community Reinvestment Act of 1977 expressly identifies an investment by a bank in an SBIC as a type of investment that is presumed by the regulatory agencies to promote economic development. The Boards of Directors of the Company and the Bank approved the Bank's investment. The Bank has agreed to invest a minimum of $5.0 million, but up to $7.5 million as long as the Bank's limited partnership interest in the Partnership remains under 9.9 percent.

Other affiliated funds of St. Cloud have previously invested in CORSHI, of which Steven A. Sugarman (the former Chairman, President and Chief Executive Officer of the Company and the Bank) is the Chief Executive Officer as well as a controlling stockholder (both directly and indirectly). St. Cloud Capital Partners III SBIC, LP has provided oral representations to the Bank that the Partnership will not make any investments in COR Securities Holdings, Inc.

As of September 30, 2017 and December 31, 2016, St. Cloud entities held $0 and $1 thousand, respectively, in deposits at the Bank.

Consulting Services to the Company. On May 15, 2014, the disinterested members of the Board of Directors of the Company approved a strategic advisor agreement with Chrisman & Co. pursuant to which Chrisman & Co. would provide strategic advisory services for the Company. Timothy Chrisman, who retired from the Company's Board on May 15, 2014 upon the expiration of the term of his directorship after the Company's 2014 annual meeting of stockholders, is the Chief Executive Officer and founding principal of Chrisman & Co. The term of the strategic advisor agreement was for a period of one year, which ended on May 15, 2015. For services performed during the term of the agreement, a fixed annual advisory fee of $200 thousand was paid to Chrisman & Co. during the year ended December 31, 2014 and no additional fees were paid during the year ended December 31, 2015.

Consulting Services to The Palisades Group. The Company completed the sale of its subsidiary, The Palisades Group, on May 5, 2016, which it originally acquired on September 10, 2013. The information included herein is based on information known to the Company as of May 5, 2016, the date the Company completed the sale of The Palisades Group. Effective as of July 1, 2013, prior to the Company's acquisition of The Palisades Group, The Palisades Group entered into a consulting agreement with Jason Sugarman, the brother of the Company's and the Bank's then- (now former) Chairman, President and Chief Executive Officer, Steven A. Sugarman. Jason Sugarman has historically provided advisory services to financial institutions and other institutional clients related to investments in residential mortgages, real estate and real estate related assets and The Palisades Group entered into the consulting agreement with Jason Sugarman to provide these types of services. The consulting agreement is for a term of five years, with a minimum payment of $30 thousand owed at the end of each quarter (or $600 thousand in aggregate quarterly payments over the five-year term of the agreement). These payments do not include any bonuses that may be earned under the agreement. Effective as of March 26, 2015, the bonus amount earned by Jason Sugarman for consulting services he provided during the year ended December 31, 2014 was credited in satisfaction and full discharge of all then currently accrued but unpaid quarterly payments as well as any future quarterly payments specified under the consulting agreement, but not against any future bonuses that he may earn under the consulting agreement. During the period from January 1, 2016 through May 5, 2016 (the date the Company sold its membership interests in The Palisades Group), no bonus amounts were earned by Jason Sugarman under the consulting agreement. For the years ended December 31, 2015, 2014 and 2013 base and bonus amounts earned by Jason Sugarman under the consulting agreement totaled $30 thousand, $1.2 million, and $121 thousand, respectively.

Table of Contents

The consulting agreement may be terminated at any time by either The Palisades Group or Jason Sugarman upon 30 days prior written notice. The consulting agreement with Jason Sugarman was reviewed as a related party transaction and approved by the then-acting Compensation, Nominating and Corporate Governance Committee and approved by the disinterested directors of the Board. As of May 5, 2016, the Company has no direct or indirect obligation under the consulting agreement, as the agreement was entered into between Jason Sugarman and The Palisades Group, and the Company completed the sale of The Palisades Group on that date.

Lease Payment Reimbursements for The Palisades Group. At the time it was acquired by the Company, The Palisades Group occupied premises in Santa Monica, California leased by COR Securities Holding, Inc. (CORSHI). Steven A. Sugarman, the then- (now former) Chairman, President and Chief Executive Officer of the Company and the Bank, is the Chief Executive Officer, as well as a controlling stockholder (both directly and indirectly), of CORSHI. In light of the benefit received by The Palisades Group of its occupancy of the Santa Monica premises, the disinterested directors of the Company's Board ratified reimbursement to CORSHI for rental payments made for the Santa Monica premises for the period from September 16, 2013 through June 27, 2014, the last date The Palisades Group occupied the premises. The Palisades Group negotiated with an unaffiliated third party a lease for new premises and occupied those premises on June 27, 2014.

The aggregate amount of rent payments reimbursed to CORSHI from September 16, 2013 through December 30, 2013 were $40 thousand. In addition, the Company reimbursed CORSHI for a $34 thousand security deposit and The Palisades Group, in turn, reimbursed the Company for this cost. For the period from January 1, 2014 through June 27, 2014, CORSHI granted The Palisades Group a rent abatement equal to the $34 thousand security deposit and, combined with additional payments, The Palisades Group paid leasing costs totaling $58 thousand to CORSHI for that same time period. The then-acting Compensation, Nominating and Corporate Governance Committee of the Board monitored all the reimbursement costs and reviewed the aggregate reimbursement costs.

CS Financial Acquisition. Effective October 31, 2013, the Company acquired CS Financial, which was controlled by Jeffrey T. Seabold and in which certain relatives of Steven A. Sugarman (the then- (now former) Chairman, President and Chief Executive Officer of the Company and the Bank) directly or through their affiliated entities also owned certain minority, non-controlling interests. Mr. Seabold previously served as Management Vice Chair of the Bank and also held prior positions as a director of the Company and the Bank; on September 5, 2017, Mr. Seabold submitted a notice of termination of employment as Management Vice Chair of the Bank pursuant to his employment agreement with the Bank effective immediately.

*CS Financial Services Agreement*. On December 27, 2012, the Company entered into a Management Services Agreement (Services Agreement) with CS Financial. On December 27, 2012, Mr. Seabold was then a member of the Board of Directors of each of the Company and the Bank. Under the Services Agreement, CS Financial agreed to provide the Bank such reasonably requested financial analysis, management consulting, knowledge sharing, training services and general advisory services as the Bank and CS Financial mutually agreed upon with respect to the Bank's residential mortgage lending business, including strategic plans and business objectives, compliance function, monitoring, reporting and related systems, and policies and procedures, at a monthly fee of $100 thousand. The Services Agreement was recommended by disinterested members of management of the Bank and negotiated and approved by special committees of the Board of Directors of each of the Company and the Bank (Special Committees), comprised exclusively of independent, disinterested directors of the Boards. Each of the Boards of Directors of the Bank and the Company also considered and approved the Services Agreement, upon the recommendation of the Special Committees.

On May 13, 2013, the Bank hired Mr. Seabold as Managing Director and Chief Lending Officer by entering into a three-year employment agreement with Mr. Seabold (the 2013 Employment Agreement, which was amended and restated effective as of April 1, 2015). Mr. Seabold was appointed Chief Banking Officer of the Bank on April 1, 2015 and was then appointed as Executive Vice President, Management Vice Chair on July 26, 2016. Simultaneously with entering into the 2013 Employment Agreement, the Bank terminated, with immediate effect, its Services Agreement with CS Financial. For the year ended December 31, 2013, the total compensation paid to CS Financial under the Services Agreement was $439 thousand.

*Option to Acquire CS Financial*. Under the 2013 Employment Agreement, Mr. Seabold granted to the Company and the Bank an option (CS Call Option), to acquire CS Financial for a purchase price of $10.0 million, payable pursuant to the terms provided under the 2013 Employment Agreement. Based upon the recommendation of the Special Committees, with the assistance of outside financial and legal advisors and consultants, the Boards of Directors of the Company and the Bank, with Mr. Sugarman recusing himself from the discussions and vote due to previously disclosed conflicts of interest, approved the recommendation of the Special Committees and, pursuant to a letter dated July 29, 2013, the Company indicated that the CS Call Option was being exercised by the Bank, subject to the negotiation and execution of definitive transaction documentation consistent with the applicable provisions of the 2013 Employment Agreement and the satisfaction of the terms and conditions set forth therein.

Table of Contents

*Merger Agreement*. After exercise of the CS Call Option as described above, the Company and the Bank entered into an Agreement and Plan of Merger (Merger Agreement) with CS Financial, the stockholders of CS Financial (Sellers) and Mr. Seabold, as the Sellers' Representative, and completed its acquisition of CS Financial on October 31, 2013 (Merger).

Subject to the terms and conditions set forth in the Merger Agreement, which was approved by the Board of Directors of each of the Company, the Bank and CS Financial, at the effective time of the Merger, the outstanding shares of common stock of CS Financial were converted into the right to receive in the aggregate: (i) upon the closing of the Merger, (a) 173,791 shares (Closing Date Shares) of voting common stock, par value $0.01 per share, of the Company, and (b) $1.5 million in cash and $3.2 million in the form of a noninterest-bearing note issued by the Company to Mr. Seabold that was due and paid by the Company on January 2, 2014; and (i) upon the achievement of certain performance targets by the Bank's lending activities following the closing of the Merger that are set forth in the Merger Agreement, up to 92,781 shares (Performance Shares) of voting common stock ((i) and (ii), together, Merger Consideration).

*Seller Stock Consideration*. The Sellers under the Merger Agreement included Mr. Seabold, and the following relatives of Steven A. Sugarman: Jason Sugarman (brother), Elizabeth Sugarman (sister-in-law), and Michael Sugarman (father), who each owned minority, non-controlling interests in CS Financial.

Upon the closing of the Merger and pursuant to the terms of the Merger Agreement, the aggregate shares of voting common stock issued as the consideration to the Sellers was 173,791 shares, which was allocated by the Sellers and issued as follows: (i) 103,663 shares to Mr. Seabold; (ii) 16,140 shares to Jason Sugarman; (iii) 16,140 shares to Elizabeth Sugarman; (iv) 3,228 shares to Michael Sugarman; and (v) 34,620 shares to certain employees of CS Financial. Of the 103,663 shares to be issued to Mr. Seabold, as allowed under the Merger Agreement and in consideration of repayment of a certain debt incurred by CS Financial owed to an entity controlled by Elizabeth Sugarman, Mr. Seabold requested the Company to issue all 103,663 shares directly to Elizabeth Sugarman, and such shares were so issued by the Company to Elizabeth Sugarman.

On October 31, 2014, certain of the Performance Shares were issued as follows: (i) 28,545 shares to Mr. Seabold; (ii) 1,082 shares to Jason Sugarman; (iii) 1,082 shares to Elizabeth Sugarman; and (iv) 216 shares to Michael Sugarman. An additional portion of the Performance Shares was issued on November 2, 2015 as follows: (i) 28,545 shares to Mr. Seabold; (ii) 1,082 shares to Jason Sugarman; (iii) 1,082 shares to Elizabeth Sugarman; and (iv) 216 shares to Michael Sugarman. The final tranche of the Performance Shares were issued on October 31, 2016 as follows: (i) 28,547 shares to Mr. Seabold; (ii) 1,083 shares to Jason Sugarman; (iii) 1,083 shares to Elizabeth Sugarman and (iv) 218 shares to Michael Sugarman.

*Approval of the CS Call Option, Merger Agreement and Merger*. All decisions and actions with respect to the exercise of the CS Agreement Option, the Merger Agreement and the Merger (including without limitation the determination of the Merger Consideration and the other material terms of the Merger Agreement) were subject to under the purview and authority of special committees of the Board of Directors of each of the Company and the Bank, each of which was composed exclusively of independent, disinterested directors of the Boards of Directors, with the assistance of outside financial and legal advisors. Mr. Sugarman abstained from the vote of each of the Boards of Directors of the Company and the Bank to approve the Merger Agreement and the Merger.