# Exhibit C

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES EXCHANGE ACT OF 1934
Release No. 84309 / September 28, 2018

ADMINISTRATIVE PROCEEDING
File No. 3-18851

| | |
|---|---|
| In the Matter of<br><br>COR CLEARING, LLC,<br><br>Respondent. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, PURSUANT TO SECTIONS 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") against COR Clearing, LLC ("COR" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), as set forth below.

III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

SUMMARY

This matter concerns the failure by COR to file Suspicious Activity Reports ("SAR" or "SARs") for certain suspicious trade and wire activity relating to the deposit and sale of low-priced securities during the period from January 2015 through June 2016 (the "relevant period"). During the relevant period, COR cleared sales of shares of low-priced securities on behalf of customers of its introducing broker-dealer clients. These trades included a number of instances in which the customer deposited a large block of low-priced securities and sold the securities into the market shortly thereafter, and, later, withdrew the proceeds of these sales from its accounts. In some instances, the same customer engaged in this pattern of depositing large blocks of low-priced securities followed by sales and withdrawals with respect to multiple securities. COR failed to file SARs with respect to a subset of these transactions. As a result of this conduct, COR willfully violated Section 17(a) of the Exchange Act and Rule 17a-8 thereunder.[2]

RESPONDENT

**COR** is a registered broker-dealer headquartered in Omaha, Nebraska. COR was previously known as Legent Clearing, LLC ("Legent"), which changed its name to COR Clearing LLC following its acquisition by COR Securities Holdings, Inc. ("CORSHI") in January of 2012. Originally as Legent, COR has been registered with FINRA since June 4, 2002. COR derives the majority of its revenues from clearing and settlement of fixed income and equity securities for approximately 79 introducing broker-dealers ("IBDs").

FACTS

**Background**

1.  COR's practice of accepting low-priced securities for deposit and subsequent sale on behalf of the customers of its introducing broker-dealer clients predates CORSHI's acquisition of Legent in 2012. COR continued clearing sales of low-priced security deposits after the acquisition. In 2016, for example, COR ranked second among all broker-dealers in terms of the

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2] A willful violation of the securities laws means merely "that the person charged with the duty knows what he is doing." Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting Hughes v. SEC, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "also be aware that he is violating one of the Rules or Acts." Id. (quoting Gearhart & Otis, Inc. v. SEC, 348 F.2d 798, 803 (D.C. Cir. 1965)).

2

dollar value of shares deposited with a price of $1 per share or less at The Depository Trust & Clearing Corporation.

**Relevant Regulatory History**

2.  In 2013, COR settled a FINRA action that resolved findings from multiple FINRA exams of Legent (the "FINRA Action") from prior years. The FINRA Action focused on operational issues preceding the acquisition, but identified certain shortcomings in Legent's AML program as well, including a failure to devote adequate attention to AML surveillance and the failure to identify or report suspicious activity in 2009 and in early 2012.

3.  Beginning in early 2012, COR's new management began to take a number of steps to remediate the AML issues identified in the FINRA examinations that ultimately gave rise to the FINRA Action. These steps included expanding its AML-compliance staff, and implementing an automated suspicious activity software system provided by a third party vendor. As part of the settlement with FINRA, COR also hired a consulting firm to review the state of its AML compliance program and make recommendations. Subsequently, COR hired a second consulting firm (the "Consulting Firm") to address and implement the recommendations arising from the first firm's review.

4.  Starting in early 2015 and through the issuance of a final report in January of 2016 (the "Consulting Report"), the Consulting Firm identified, among other things, a number of areas for COR to review and improve regarding the operation of the third party automated suspicious activity software licensed by COR and COR's understanding of how this software worked.

5.  For example, the third party automated suspicious activity detection software licensed by COR used 24 separate models to identify potentially suspicious activity for SAR-filing consideration (the "AML Software"). The Consulting Report identified potential problems with the AML Software, including the potential for data being loaded incorrectly or not loaded at all into the AML Software, and advised COR of the need to clearly understand the parameters that the AML Software used to identify suspicious activity.

6.  Despite its efforts to implement the Consulting Firm's recommendations between 2015 and 2016, COR experienced persistent difficulties with the operation of its AML Software relative to flagging deposit, sale, and withdrawal ("DSW") transactions for review.

**COR's AML Policies and Procedures**

7.  COR's AML policies as of 2016 stated that "[p]roblems can arise when firms fail to recognize or take appropriate steps when confronted with 'red flags' that signal the possibility of an illegal, unregistered distribution" with regard to low-priced securities, and that such red flags included a "customer [having] a pattern of depositing physical share certificates, immediately

3

selling the shares and then wiring out the proceeds of the resale."[3] COR's AML policies recognized since at least early 2013 that the foregoing DSW activity indicated a red flag. Despite these policies, COR's AML procedures, including those discussed in paragraphs 9 through 11 below, were not reasonably tailored to the risks associated with COR's low-priced securities business.

   8. COR's procedures for review of DSW transactions relied in part on three models utilized by the AML Software. One of these, the Low Priced Security Frequency alert, was designed to generate "alerts" if deposits and/or trades of securities within COR's systems met certain specified criteria of price, volume, and frequency, and thereby flag potentially suspicious activity for additional review by COR's AML staff.

   9. During the relevant period, however, the Low Priced Security Frequency alert was programed to generate alerts only for sales of low-priced securities priced below $1 per share, despite the fact that consistent with the definition of a penny stock in 17 C.F.R. § 240.3a51-1 the Commission and FINRA have both publicly stated that penny stocks are generally securities not listed on a national securities exchange and priced under $5 per share.[4]

   10. Moreover, during the relevant period, the Low Priced Security Frequency alert at times failed to generate all the alerts it was supposed to generate. This occurred, in part, because COR'S AML Software required the activation of an extraneous parameter relating to the timing of cash transactions in order for the alerts to be generated.

   11. Finally, during the relevant time period, COR's AML Software lacked a system or control for monitoring suspicious conduct with respect to trades in low-priced securities made by an IBD's customer across multiple securities, or within certain date ranges.

### COR's Failure to File SARs

   12. COR cleared for sale a significant amount of penny stock that was originally deposited by its IBD's customers. For example, between January 2015 and June 2016, approximately 193 accounts from COR's IBDs deposited and sold blocks of low-priced securities and withdrew cash proceeds from the sale. Each DSW transaction occurred within 30 days and in amounts over $100,000, and involved multiple penny stock sales and outgoing money transfers. Nonetheless, unless another one of the modules of the AML Software flagged the transaction

---

[3] FINRA Notice to Members 09-05, which outlines various red flags that could be indicative of an unregistered distribution, similarly includes as a red flag: "A customer has a pattern of depositing physical share certificates, immediately selling the shares and then wiring out the proceeds of the resale."

[4] See "Penny Stock Rules," https://www.sec.gov/fast-answers/answerspennyhtm.html; "OTCBB Glossary," http://www.finra.org/industry/otcbb/otcbb-glossary.

4

activity, the Software failed to alert COR's AML staff to review a number of DSW transactions due to the software issues described above in paragraphs 9 through 11.

13. Below are examples of customers of COR's IBDs who engaged in multiple DSW transactions in the same account lacking any apparent business or lawful purpose.

14. COR did not file SARs identifying the patterns and transactions described below in paragraphs 15 through 17.

15. <u>Customer Account A</u>

   a. Between January 2015 and April 2016, an account opened at a COR IBD ("Customer Account A") engaged in a repeated DSW pattern in at least three different low-priced securities.

   b. Between January 2015 and April 2016, Customer Account A received approximately 24 physical deposits of large blocks of a certain low-priced security issuer ("Security A1"), and engaged in over 150 sales of Security A1 in the days immediately following the deposits, for a total of over 306 million shares of Security A1 deposited and over 273 million shares of Security A1 sold within this time period.

   c. Between January and November 2015, Customer Account A received approximately 28 physical deposits of large blocks of a second low-priced security issuer ("Security A2"), and engaged in over 80 sales of Security A2 in the days immediately following the deposits, for a total of over 1.2 billion shares of Security A2 deposited and over 1 billion shares of Security A2 sold within this time period.

   d. Between April and December 2015, Customer Account A received three physical deposits of large blocks of a third low-priced security issuer ("Security A3"), and engaged in over 25 sales of Security A3 in the days immediately following the deposits, for a total of over 2.1 million shares of Security A3 deposited and over 2 million shares of Security A3 sold within this time period

   e. In 2015 alone, Customer Account A withdrew more than $11 million from the proceeds of this activity within a short period of time after the sales of blocks of these securities.

16. <u>Customer Account B</u>

    a. Between January and September 2015, an account opened at a COR IBD ("Customer Account B") engaged in a repeated DSW pattern in at least two different low-priced securities.

    b. In January of 2015, Customer Account B received a physical deposit of 30 million shares of a certain low-priced security issuer ("Security B1"), and sold all 30 million shares of Security B1 in three different transactions over the next two weeks.

    c. Between January and November 2015, Customer Account B received approximately 28 physical deposits of large blocks of a second low-priced security issuer ("Security B2"), and engaged in over 80 sales of Security B2 in the days immediately following the deposits, for a total of over 1.2 billion shares of Security B2 deposited and over 1 billion shares of Security B2 sold within this time period.

    d. Customer Account B withdrew more than $1.24 million from the proceeds of this activity, within a short period of time after the sales of blocks of these securities.

17. At least three other COR IBD customers engaged in the pattern of DSW described above. Customer C deposited over 600 million shares in three different securities, sold most of them within days of the deposits, and contemporaneously withdrew more than $1.2 million from the proceeds of this activity; Customer D deposited over 110 million shares in two different securities, sold most of them within days of the deposits, and contemporaneously withdrew more than $890,000 from the proceeds of this activity; Customer E deposited over 7 million shares in five different securities, sold most of them within days of the deposits, and contemporaneously withdrew more than $740,000 from the proceeds of this activity.

## **VIOLATIONS**

18. The Bank Secrecy Act (the "BSA"), and implementing regulations promulgated by Financial Crimes Enforcement Network ("FinCEN"), require that broker-dealers file SARs with FinCEN to report a transaction (or a pattern of transactions of which the transaction is a part) conducted or attempted by, at, or through the broker-dealer involving or aggregating to at least $5,000 that the broker-dealer knows, suspects, or has reason to suspect: (1) involves funds derived from illegal activity or is conducted to disguise funds derived from illegal activities; (2) is designed to evade any requirement of the BSA; (3) has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the broker-dealer knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or (4) involves use of the broker-dealer to facilitate criminal activity. 31 C.F.R. § 1023.320(a)(2) ("SAR Rule").

19. Exchange Act Rule 17a-8 requires broker-dealers registered with the Commission to comply with the reporting, record-keeping, and record retention requirements of the BSA. The failure to file a SAR as required by the SAR Rule is a violation of Section 17(a) of the Exchange Act and Rule 17a-8 thereunder.

20. By engaging in the conduct described above, COR willfully violated Section 17(a) of the Exchange Act and Rule 17a-8 thereunder.

## COR'S REMEDIAL EFFORTS

21. In determining to accept the Offer, the Commission considered the remedial acts undertaken by Respondent relating to the surveillance of trading in low-priced securities.

## UNDERTAKINGS

22. COR undertakes to not approve for open market sale any equity security that does not trade on a national securities exchange and trades at a price of less than $5 per share at the time it is submitted to COR for sale approval; provided, however, that COR may approve for sale on the open market any such security if:

    a. COR obtains and retains a trade confirmation evidencing that the securities were purchased on the open market, as opposed to having been deposited at COR or another broker-dealer;

    b. The securities are exempt from the Securities Act of 1933's ("Securities Act") registration requirements under Section 3(a)(2) or Section 3(a)(5) of the Securities Act, or the securities are defined as "government securities" under Section 3(a)(42) of the Exchange Act;

    c. The security is an unsponsored American Depositary Receipt ("ADR");[5] or

    d. The aggregate value of the sale of the securities of any particular issue is less than $10,000 and the customer has not availed itself of this exception within the last three months in any account in the name of the customer, in

---

[5] ADRs may be "unsponsored" or "sponsored." For purposes of this Order, an unsponsored ADR is set up without the cooperation of a non-U.S. company and may be initiated by a broker-dealer wishing to establish a U.S. trading market. In contrast, sponsored ADRs are those in which the non-U.S. company enters into an agreement directly with the U.S. depositary bank to arrange for recordkeeping, forwarding of shareholder communications, payment of dividends, and other services.

7

which the customer has a beneficial interest as defined in 31 CFR Section 1010.230, or over which the customer has trade or signatory authority.

23. COR will certify, in writing, the implementation of systems and procedures required for compliance with the undertakings set forth above in paragraph 22. The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance. The Commission staff may make reasonable requests for further evidence of compliance, and Respondent agrees to provide such evidence. The certification and supporting material shall be submitted to Jorge Tenreiro, Senior Trial Counsel, with a copy to the Office of Chief Counsel of the Division, no later than the 7 days after the institution of these proceedings. The undertakings in paragraph 23 will continue beyond this certification.

24. COR agrees that it will require any broker-dealer that is a successor in interest to COR, including any successors as defined in 17 C.F.R. § 240.15b1-3 and any broker-dealer that acquires or otherwise obtains substantially all of COR's assets and liabilities, business, or customers to agree to comply with these undertakings.

## IV.

In view of the foregoing, the Commission deems it appropriate, in the public interest, to impose the sanctions agreed to in Respondent's Offer.

Accordingly, pursuant to Sections 15(b) and 21C of the Exchange Act, it is hereby ORDERED that:

A. Respondent ceases and desists from committing or causing any violations and any future violations of Section 17(a) of the Exchange Act and Rule 17a-8 promulgated thereunder.

B. Respondent is censured.

C. Respondent shall comply with the undertakings in paragraph 22 through 24.

D. Respondent shall pay a civil penalty of $800,000, to the Securities and Exchange Commission within thirty (30) days of the entry of this Order for transfer to the general fund of the United States Treasury in accordance with Exchange Act Section 21F(g)(3).

E. If any payment is not made by the date the payment is required by this Order, the entire outstanding balance of civil penalties, plus any additional interest accrued pursuant to 31 U.S.C. 3717, shall be due and payable immediately, without further application. Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

> Enterprise Services Center
> Accounts Receivable Branch
> HQ Bldg., Room 181, AMZ-341
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Lara Shalov Mehraban, Associate Regional Director, Division of Enforcement, Securities and Exchange Commission, New York Regional Office, 200 Vesey Street, Suite 400, New York, New York 10281.

F. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that he shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

> Brent J. Fields
> Secretary